UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**ERIC MICHAEL ROSEMAN, ALEXANDER LEE, and WILLIAM VAN VLEET, individually and on behalf of others similarly situated,**

**Plaintiffs,**

**v.**

**BLOOMBERG L.P.,**

**Defendant.**

**Case No. 14-CV-2657 (TPG) (KNF)**

**ECF Case**

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BLOOMBERG L.P.'S MOTION TO DECERTIFY THE CONDITIONALLY-CERTIFIED FAIR LABOR STANDARDS ACT OPT-IN CLASS**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................ iv

PRELIMINARY STATEMENT .......................................................................... 1

I.   BACKGROUND ...................................................................................... 2

    A.   THE BLOOMBERG TERMINAL. ................................................ 2

    B.   THE JOB RESPONSIBILITIES OF ANALYTICS
        REPRESENTATIVES. ...................................................................... 3

        1.   OVERVIEW OF REPRESENTATIVES' VARYING
            RESPONSIBILITIES. ....................................................... 4

        2.   REPRESENTATIVES' VARYING ROLES AND SPECIALTIES. .... 6

    C.   NAMED PLAINTIFFS' DUTIES AS ANALYTICS
        REPRESENTATIVES. ...................................................................... 9

II.   THE COURT SHOULD DECERTIFY THE FLSA COLLECTIVE ....................... 11

    A.   THE DECERTIFICATION STANDARD. ....................................... 11

    B.   PLAINTIFFS HAD DISPARATE FACTUAL AND EMPLOYMENT
        SETTINGS AND THE ADMINISTRATIVE EXEMPTION CANNOT BE
        APPLIED COLLECTIVELY. .......................................................... 12

        1.   THE "PRIMARY DUTY" ANALYSIS VARIES FROM PLAINTIFF
            TO PLAINTIFF. ............................................................ 14

            (a)   PLAINTIFFS' DUTIES VARIED FROM PERSON TO
                PERSON. ......................................................... 15

            (b)   PLAINTIFFS SPENT VARYING PERCENTAGES OF TIME
                ON THEIR DUTIES. ........................................... 18

            (c)   PLAINTIFFS HAD DIFFERENT SPECIALTIES AND
                PERFORMED DUTIES OF VARYING COMPLEXITY. ...... 18

            (d)   PLAINTIFFS CARRIED OUT THEIR DUTIES IN
                VARYING WAYS. .............................................. 19

            (e)   PLAINTIFFS EXPERIENCED DIFFERENT LEVELS OF
                SUPERVISION. ................................................. 20

2.      DIFFERENCES IN THE EXERCISE OF DISCRETION
        AND INDEPENDENT JUDGMENT MANDATE
        DECERTIFICATION. .......................................................................... 21

    C.  FAIRNESS AND PROCEDURAL CONSIDERATIONS WARRANT
        DECERTIFICATION. ...................................................................................... 24

CONCLUSION ...................................................................................................................... 25

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Myers v. Hertz Corp.*,
    624 F.3d 537 (2d Cir. 2010)..................................................11

*Tracy v. NVR, Inc.*,
    293 F.R.D. 395 (W.D.N.Y. 2013)....................................11, 12, 13

*Gavin v. NVR, Inc.*,
    604 Fed App'x 87 (2d Cir. May 27, 2015) ..........................11, 13

*Zivali v. AT&T Mobility, LLC*,
    784 F. Supp. 2d 456 (S.D.N.Y. 2011)..................................11

*Stevens v. HMSHost Corp.*,
    2014 WL 4261410 (E.D.N.Y. Aug. 27, 2014)................12, 24, 25

*Glatt v. Fox Searchlight Pictures, Inc.*,
    811 F.3d 528 (2d Cir. 2016)..............................................12

*Kadden v. VisualLex, LLC*,
    910 F. Supp. 2d 523 (S.D.N.Y. 2012)..................................12

*Altemus v. Fed. Realty Inv. Trust*,
    490 F. App'x 532 (4th Cir. 2012) ......................................13

*Ferrell v. Gwinnett Cty. Bd. of Educ.*,
    481 F. Supp. 2d 1338, 1344 (N.D. Ga. 2007) ......................13

*Kastor v. Sam's Wholesale Club*,
    131 F. Supp. 2d 862 (N.D. Tex. 2001) ...............................13

*Benedict v. Hewlett-Packard*,
    2016 WL 3742342 (N.D. Cal. July 13, 2016)...........13, 14, 15, 19, 21, 24

*Cruz v. Lawson Software, Inc.*,
    764 F. Supp. 2d 1050 (D. Minn. 2011).................14, 19, 20, 21, 22, 24

*Bradford v. CVS Pharmacy, Inc.*,
    308 F.R.D. 696, 699 (N.D. Ga. 2015)...............................14, 15

*Hundt v. DirectSat USA, LLC*,
    294 F.R.D. 101 (N.D. Ill. 2013).........................................14

*Santiago v. Amdocs, Inc.*,
    2013 WL 5444324 (N.D. Cal. Sept. 30, 2013) .....................14

*Hill v. R+L Carriers, Inc.*,
   2011 WL 830546 (N.D. Cal. Mar. 3, 2011)..................................................................14, 21, 24

*Aguirre v. SBC Communications, Inc.*,
   2006 WL 964554 (S.D. Tex. Apr. 11, 2006) ........................................................................17

*Aguirre v. SBC Communications, Inc.*,
   2007 WL 772756 (S.D. Tex. Mar. 12, 2007).........................................................................18

*Zavala v. Wal-Mart Stores, Inc.*,
   2010 WL 2652510, at *5 (D.N.J. June 25, 2010) .................................................................24

*Seward v. IBM Corp.*,
   2012 U.S. Dist. LEXIS 49688 (S.D.N.Y. Jan. 20, 2012) ......................................................25

## STATUTES

29 U.S.C. § 213...............................................................................................................................12

## RULES

29 C.F.R. § 541.200 ..................................................................................................................12, 23

29 C.F.R. § 541.700 ..............................................................................................12, 13, 18, 20, 21

29 C.F.R. § 541.202 ..................................................................................................................21, 23

Named Plaintiffs Eric Michael Roseman, Alexander Lee, and William Van Vleet (collectively, "Named Plaintiffs") claim that Bloomberg, L.P. ("Bloomberg" or the "Company") misclassified them and other Analytics Representatives as exempt from overtime pay requirements in violation of the Fair Labor Standards Act ("FLSA"). Early in the case, at the first step of the FLSA certification process, the Court found that Named Plaintiffs satisfied the "minimal" burden justifying conditional certification of an opt-in class. (Dkt. No. 37 at 3.) Notice issued to more than 700 individuals, and 33 individuals have "opted in" (30 "Opt-In Plaintiffs" plus the three Named Plaintiffs (collectively, "Plaintiffs")).[1] (Declaration of Matthew Lampe executed September 22, 2016 (hereinafter "Lampe Dec.") at ¶ 3.)

The Court's conditional certification decision was "merely preliminary" (Dkt. No. 37 at 3) and now, at the second step of the certification process and with discovery complete, Bloomberg moves to decertify the opt-in class. At this step the court applies a more stringent standard and Plaintiffs bear the burden of proving that continued certification is warranted. Plaintiffs cannot satisfy their burden where variance in their individual circumstances precludes the Court from making a blanket liability determination, necessitating a series of mini-trials to resolve the claims.

For precisely this reason, Plaintiffs cannot meet their stringent second-stage burden and the Court should decertify the opt-in class. The Plaintiffs' individual circumstances materially vary on numerous issues that go to the heart of the liability questions in this case. Whether Plaintiffs' claims are barred by the FLSA's administrative exemption is an issue that requires a fact-intensive and detailed analysis of the Plaintiffs' day-to-day job duties and the level of

---

[1] Plaintiffs have separately moved for class certification of their New York and California state law claims (Dkt. No. 166), which is governed by a different procedural mechanism, Fed. R. Civ. P. 23. Bloomberg will be filing an opposition to certification of the state law claims.

discretion exercised in carrying out those duties.  Yet job duties here varied from Plaintiff to

Plaintiff, as did the manner in which the Plaintiffs performed their duties, all of which is critical

to the exemption analysis.  Further, Plaintiffs testified to exercising varying levels of discretion,

with some Plaintiffs allegedly exercising substantially more discretion than others.  Moreover,

the duties of each Plaintiff evolved rapidly as they moved through different roles (Generalist,

Specialist, and Advanced Specialist) and took on differing mixes of specialties and

subspecialties, doing so at different points in their respective tenures, depending upon the

Plaintiff's own development, interest, and the needs of the Company and its customers.  Thus,

individual adjudication would be required to determine liability, a result that is fundamentally

inconsistent with collective treatment.

In sum, the experiences of Plaintiffs are too varied as to the key elements on which the

question of exempt status turns, such that the administrative exemption cannot be fairly and

properly applied as to all Plaintiffs in a single stroke.  The Court therefore should decertify the

opt-in class and dismiss the Opt-In Plaintiffs without prejudice.

## I.    BACKGROUND

### A.    The Bloomberg Terminal

Bloomberg develops and markets the Bloomberg Professional Service, also known as the

Bloomberg Terminal (the "Terminal"), a complex and powerful computer-based data platform

with over 30,000 different functions, which Bloomberg's clients use to conduct financial and

market analysis and help them run their businesses.  (Declaration of Chris Saven executed

September 21, 2016 (hereinafter "Saven 2016 Dec."), ¶ 4.)  Using the Terminal, clients manage

portfolios, generate investment ideas, forecast decisions on commodities, conduct risk analysis

for proposed transactions, and analyze trading options, among myriad other tasks.  (Declaration

of Joseph DeMartino executed April 8, 2016 (hereinafter "DeMartino Dec."), ¶ 4, 27; Saven

2016 Dec. ¶ 4.)  Bloomberg's clients are primarily financial institutions, such as investment

banks, hedge funds, and brokerages, and the Terminal is integral to the work of over 300,000

business and financial professionals, such as traders, analysts, portfolio managers, investment

bankers, and stock brokers, working at these institutions.  (DeMartino Dec. ¶¶ 4, 5; Saven 2016

Dec. ¶ 5; Saven 2014 Dec. ¶ 3.)

> **B.**    **The Job Responsibilities of Analytics Representatives**

Given the complexity not only of the Terminal and its functionality but also the financial

markets themselves, Bloomberg's success is driven by its ability to make its technology fully

accessible to its clients so they can integrate the vast capabilities of the Terminal into their

business operations.  (Saven 2016 Dec. ¶ 6; Lampe Dec., Ex. A, Deposition of Ian Yeulett

(hereinafter "Yeulett Dep.") at 178:10-16.)  Bloomberg also strives to maximize the value of the

Terminal to its clients by continually enhancing its product offerings to respond to changes in the

markets and customer's business needs.  (Saven 2016 Dec. ¶ 6; Declaration of Ian Yeulett

executed September 21, 2016 (hereinafter "Yeulett Dec.") at ¶ 13.)

Central to the fulfillment of these objectives is Bloomberg's Analytics Department

(herein also "Analytics" or the "Department").  The work of Analytics, in turn, is generally

carried out by Analytics Representatives (or simply "Representatives").  Currently, there are

approximately 314 Analytics Representatives located in the United States, with the vast majority

in New York City and the remainder in San Francisco.  (Yeulett Dec. ¶ 5.)  Reflective of the

broad mandate of the Department, the Representative position encompasses a broad set of

responsibilities, and Representatives perform different mixes of duties within this broad set.

(Saven 2016 Dec. ¶¶ 7, 22; Yeulett Dec. ¶¶ 4, 13.)  As discussed below, each Representative's

particular mix of duties changes as they advance through various roles within the Department

(Generalist, Specialist, and Advanced Specialist) and duties also vary from employee to

employee based on Representatives' skills, interests, and the business needs of Bloomberg's clients and the Department.  (Saven 2016 Dec. ¶¶ 11, 22; Lampe Dec., Ex. B, Deposition of Chris Saven (hereinafter "Saven Dep.") at 72:23-74:8; Yeulett Dec. ¶ 13; Yeulett Dep. 164:3-25.)

### 1.    Representatives' Varying Job Responsibilities

To varying extents, Representatives consult with clients on how they can most effectively use the Terminal to accomplish their business objectives.  (Saven 2016 Dec. ¶ 7; Yeulett Dec. ¶ 4.)  As part of this multifaceted workflow, Representatives field questions from clients, both over the phone and over Bloomberg's instant messaging function (known as "chat"), on a diverse array of business concerns, such as how to identify potential sources of future risk in the clients' portfolios; how to search for securities on emerging markets; and how to use the Terminal's Foreign Exchange calculation to analyze the foreign exchange market.  (Saven 2016 Dec. ¶ 14; Yeulett Dep. 245:7-20.)  By way of example, Named Plaintiff Roseman "[a]ssisted Portfolio Managers . . . to create and manage proprietary portfolios to best prepare portfolio analytics," while Opt-In Plaintiff Leyfman "[d]eveloped creative solutions . . . in regard to monitoring and valuating derivatives," and Opt-In Plaintiff Psulkowski "generated solutions . . . on security pricing, relative valuation, hedging, [and] risk and return."  (Lampe Dec. Ex. C (Deposition of Eric Roseman (hereinafter "Roseman Dep") at Ex. 2); Lampe Dec. Ex. D (Deposition of Aleksander Leyfman (hereinafter "Leyfman Dep") at Ex. 1; Lampe Dec. Ex. E (Deposition of Nicholas Psulkoswski (hereinafter "Psulkowski Dep") at Ex. 2).)

In the course of consulting, Representatives are expected to, and do, explore their clients' business objectives, or their "end goal."  (Saven 2016 Dec. ¶ 15; Roseman Dep. 56:7-14 ("you always want to get to what is their end goal").)  Although a small percentage of inquiries may be straightforward, for most inquiries there is no single correct answer, advice, or strategy, and understanding the clients' objectives improves the quality of the Representatives' advice.  (Dkt.

No. 25, Declaration of Christopher Saven executed September 12, 2014 (hereinafter "Saven 2014 Dec.") at ¶ 20; Saven 2016 Dec. ¶ 15.)  From the beginning of their tenure, Representatives are expected to, and do, evaluate the different potential solutions to the client's inquiry, and recommend the best solution based on that evaluation, often laying out for the client the options and the rationale supporting the recommendation.  (Saven 2016 Dec. ¶ 15; Yeulett Dec. ¶ 9.)

Consulting work goes well beyond addressing the client's specific question.  Based on their inquiry into the client's work flows and broader business goals, Representatives proactively recommend Terminal functionality that the client may not have previously considered or known about.  (Saven 2016 Dec. ¶ 16; Yeulett Dep. 44:8-45:11; Yeulett Dec. ¶ 10; Lampe Dec., Ex. F, Deposition of William Van Vleet (hereinafter "Van Vleet Dep.") at 40:11-41:14 ("tr[ied] to get [clients] to utilize the Terminal more in their day-to-day activities" and "show[ed] them different aspects of the Terminal that would make their jobs easier and make them better at their jobs").) Representatives also develop creative solutions, known as workarounds, when there is no Terminal functionality available that exactly aligns with the client's needs.  (Saven 2016 Dec. ¶ 16; Yeulett Dec. ¶ 9; Leyfman Dep. 93:22-94:25 (developed creative solutions combining multiple Terminal functions); Lampe Dec., Ex. G, Deposition of Amanda Lownes (hereinafter "Lownes Dep.") at 57:10-21, 58:12-21.)

Beyond this consulting work, Representatives perform one or more of numerous other responsibilities, with their particular mix of duties dependent upon each Representative's level of experience, particular skills, areas of interest, and the business needs of Bloomberg's clients and the Analytics Department.  (Yeulett Dep. 245:21-246:17; Saven 2016 Dec. ¶ 18.)  These responsibilities can include training other Representatives (Yeulett Dep. 246:7-15; Saven 2016 Dec. ¶ 18; Psulkowski Dep. 279:19-280:15, 67:11-19; 103:18-107:19); performing quality

control on work done by other Representatives (Psulkowski Dep. 253:3-20, Lampe Dec., Ex. H,

Deposition of Matthew Renny (hereinafter "Renny Dep.") at 154:6-20); leading client seminars

and visiting clients to educate them on the Terminal and market concepts and strengthen and

develop client relationships (Lownes Dep. 48:15-25, 243:19-22 (went on multiple visits a day

during six weeks), Renny Dep. 200:17-21 (attended 13 client visits and did approximately 13

client seminars during an approximately six-month period); and serving as deputy team leaders

(Lampe Dec., Ex. I, Deposition of Tyler Held (hereinafter "Held Dep.") at 96:14-98:15).

     In addition, Representatives make product enhancement recommendations (Psulkowski

Dep. 149:18-151:22 ("[r]ecommend new features and enhancements to better address client and

consumer UI/UX needs"), Lampe Dec., Ex. J, Deposition of Alexander Lee (hereinafter "Lee

Dep.") at 127:13-128:25 ("engineer . . . enhancement and product requests")); promote sales of

the Terminal, including by visiting clients (Psulkowski Dep. 256:13-259:19; Roseman Dep.

222:6-20); and create internal continuing education resources for other Representatives

(Psulkowski Dep. 213:5-8, 286:15-21; Leyfman Dep. 197:13-19, 210:4-7, 212:11-22, 224:9-11).

## 2.    Representatives' Varying Roles and Specialties

     Representatives progress through three established roles within Analytics: Generalist,

Specialist, and Advanced Specialist, progressing quickly from one role to the next during their

tenure.  As they progress, they perform less consulting work as a percentage of time, although

their consulting work becomes more complex and specialized, and they spend increasing

percentages of time on other, proactive duties.  (Saven 2016 Dec. ¶¶ 11, 17-20; Yeulett Dec. ¶¶ 6,

11-12.)  After a brief training period, Analytics Representatives start out in the Generalist role.

(Saven 2014 Dec. ¶ 12.)  Generalists tend to spend about 80% of their time consulting with

clients.  (Saven 2014 Dec. ¶ 13; Saven Dep. 211:22-212:7; Yeulett Dep. 100:21-101:24.)  Within

a few weeks in the role, Generalists begin to focus on functionality related to financial products

in one or more of four broadly defined asset classes: Fixed Income (bonds, loans, asset-backed securities, and related derivatives such as credit-default and interest rate swaps); Equity (stocks and derivatives such as options); Foreign Exchange (currencies and related derivatives, such as forwards, spots, and swaps); and Commodities (raw or "primary" materials derivatives, such as futures).  (Saven 2016 Dec. ¶ 13; Saven Dep. 72:23-73:8; Yeulett Dec.¶ 8.)

After roughly 5-8 months as a Generalist, Analytics Representatives move into the Specialist role, soon thereafter specializing in one or more of about 40 areas of expertise, such as Fixed Income Derivatives, PORT Advanced Equity, Advanced Charting, Mobile, FX/Commodities, API Fixed Income, and Mortgages.  (Saven 2016 Dec. ¶ 17; Saven Dep. 26:22-27:18; Yeulett Dec. ¶ 11.)  By way of example, Representatives who are Fixed Income Derivatives specialists focus on various instruments used to hedge against risks and they advise clients on the use of Terminal functionality to analyze these instruments.  (Saven 2016 Dec. ¶ 17.) PORT Advanced Equity Specialists, in contrast, are Representatives who have expertise in both equities and the Terminal's portfolio and risk analytics functionality, and they advise clients on using the Terminal functionality to create and analyze the clients' portfolios.  (Saven 2016 Dec. ¶ 17.)  Specialists generally spend approximately 60-80% of their overall time consulting in response to client inquiries, and 20-40% of the time on other duties such as working with Product Managers and Application Specialists.  (Saven 2016 Dec. ¶ 18; Saven Dep. 211:22-212:8, 212:17-213:18; Yeulett Dec. ¶ 11.)

After about 7 months to 1 year as a Specialist, Representatives may transition into the Advanced Specialist role, where they further specialize in their areas of expertise and handle matters of still increasing complexity.  (Saven 2016 Dec. ¶ 19.)  Advanced Specialists are expected to, and do, have in-depth knowledge of the markets and the Terminal in their particular

specialties.  (Saven 2016 Dec. ¶ 19.)  They handle extremely complex inquiries and provide sophisticated advice related to those specialties.  (Saven 2016 Dec. ¶ 19.)  While consulting in response to client inquiries remains important, this work generally decreases as a percentage of time while time spent on other duties such as developing training programs and/or working on product enhancements increases to 40-60%.  (Saven 2016 Dec. ¶ 20; Saven Dep. 211:22-212:9, 215:10-216:19; Yeulett Dep. 102:21-24, 103:15-104:3.)

The roles within the Department are not rigid; rather, in order to progress from one role to another and to further develop their expertise through subspecializations, Representatives generally must demonstrate their proficiency by performing the responsibilities of the role to which they aspire, be it at the Specialist or Advanced Specialist level.  (Saven 2016 Dec. ¶ 21; Saven Dep. 73:18-74:8.)  Accordingly, each Representative's duties evolve even during their limited time in any single role.  (Saven 2016 Dec. ¶ 21.)

Because of the breadth of the Analytics Representative position and the rapid evolution of duties within the position, Representatives' duties vary person to person based on their role, level of experience, particular skills and interests, the needs of Bloomberg's clients, and the needs of the Department at any given time.  (Saven 2016 Dec. ¶ 22.)  At no point has Bloomberg made and across-the-board determination that any particular duty performed by Representatives is more important than any other.  (Saven Dep. 232:15-233:9, 279:4-19; Saven 2016 Dec. ¶ 22.)  In fact, Bloomberg designed the Analytics Representative job to encompass a broad range of important duties so as to allow the Company the flexibility to meet business needs and the demands of sophisticated clients in a highly technical and ever changing environment.  (Saven 2016 Dec. ¶ 22.)

For any given Representative, the importance of particular duties relative to others in his

or her mix changes over time and depends on a number of considerations, such as what the Representative is doing at a given time, staffing levels within the Department, developments in the financial markets, product development cycles, customer demands, competitive pressures, and the Representatives' skills, experience, and interest.  (Saven Dep. 239:14-24, 280:12-281:9; Saven 2016 Dec. ¶ 22; Yeulett Dep. 187:21-188:2, 245:21-246:20)  For example, during times of high client demand or low headcount, a Representative's consulting services may take on particular importance.  (Saven 2016 Dec. ¶ 22.)  Alternatively, when Bloomberg rolls out new functionality or large-scale changes to the Terminal, a Representative's most important responsibility may be promoting these new functions to clients.  (Saven 2016 Dec. ¶ 22.)  For a Representative with particularly strong product knowledge, assisting with product development may be the most important duty.  (Saven 2016 Dec. ¶ 22.)

Representatives' duties have also changed with changes in the Department.  For example, the Department created subspecialties through which Representatives increasingly provided customized advice to clients (Saven 2016 Dec. ¶ 23); instituted a process for formalizing cooperation with the Sales Department to promote the Terminal, such as through campaigns in which Representatives educate clients on targeted functions (Yeulett Dec. ¶ 13); and increased the number of Advanced Specialists in the Department to improve training and product development (Yeulett Dec. ¶ 13).

### C.    Named Plaintiffs' Duties as Analytics Representatives

The variance in job duties among Analytics Representatives is also demonstrated by the variance in job duties among just the Named Plaintiffs.  Named Plaintiff Roseman started as a Generalist, became an Equity Specialist after 6 months, and moved to an Advanced Specialist role after another 8-11 months (Roseman Dep. 44:18-46:21), specializing in Equity Portfolio and Equity Derivatives.  (Roseman Dep. 147:23-148:19.)  Named Plaintiff Lee started as a Generalist

and became a Fixed Income Specialist after seven months (Lee Dep. 45:12-46:4), specializing in Mortgages.  (Lee Dep. 170:24-171:2.)  Named Plaintiff Van Vleet became an Equity Specialist after about eight months as a Generalist (Van Vleet Dep. 35:3-11), with an expertise in the application programming interface.  (Van Vleet Dep. 106:7-17.)

Named Plaintiffs carried out their consulting work in different ways.  Roseman claims he rarely had occasion to present the client with multiple options because in his opinion there was generally only one solution.  (Roseman Dep. 180:6-81:24).  When there were multiple options, he rarely explained the relative advantages and disadvantages of each option.  (Roseman Dep. 181:25-82:14).  Lee testified that in his experience a "monkey can" answer client questions because "you're just searching, copying and pasting." (Lee Dep. 273:18-24, 396:12-14.).  He also did not routinely recommend additional Terminal functions to clients.  (Lee Dep. 268:11-269:5.)[2]  In stark contrast, Van Vleet testified that he handled questions with multiple solutions 60-65% of the time as a Generalist and 80-85% of the time as a Specialist.  (Van Vleet Dep. 139:17-140:10.)  Van Vleet also "tr[ied] to get [clients] to utilize the Terminal more in their day-to-day activities" and "show[ed] them different aspects of the Terminal that would make their jobs easier and make them better at their jobs."  (Van Vleet Dep. 41:7-8, 12-14.)

The Named Plaintiffs' respective mixes of work also varied markedly.  Roseman performed quality control reviews and trained other Representatives.  (Roseman Dep. 287:9-13.) Lee did not perform these duties, but he did write a blog on developments in the market, was a deputy team leader, and conducted client seminars.  (Lee Dep. 66:18-23, 69:16-25, 130:24-131:8, 178:17-179:2, 275:10-13.)  Van Vleet did not write any blogs or newsletters, serve as a deputy

---

[2] Lee's testimony is in tension with how he described his duties in his resume.  (Lee Dep., Ex. 3 (Lee "[a]cted as a highly trained analytics specialist, consulted clients in their analysis [of] fixed income, FX and commodity securities").)

team leader, conduct client seminars, or perform quality control.  (Van Vleet Dep. 60:4-61:17, 167:4-21, 155:3-4).  He did, however, support Sales on client development projects.  (Van Vleet Dep. 135:4-19, 193:24-194:6).

## II.   THE COURT SHOULD DECERTIFY THE FLSA COLLECTIVE

### A.   The Decertification Standard

"[T]he district courts of this Circuit . . . have coalesced around a two-step method" for "certification of a 'collective action' under § 216(b) of the FLSA."  *Myers v. Hertz Corp.*, 624 F.3d 537, 554-55 (2d Cir. 2010).  At the conditional certification stage, the court applies a "minimal" burden to determine whether plaintiffs and members of their proposed class are "similarly situated."  (Dkt. No. 37 at 3 (citing *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010) (requiring only a "modest factual showing").)

After the completion of discovery, the case proceeds to the decertification stage, where the court determines "whether the plaintiffs who have opted in are in fact similarly situated to the named plaintiffs."  *Id.* at 666.  "In contrast to the lenient standard required for conditional certification . . ., the Court, with the benefit of a fuller record, must apply a more stringent standard in considering . . . [a] motion for decertification."  *Tracy v. NVR, Inc.*, 293 F.R.D. 395, 397 (W.D.N.Y. 2013), *aff'd sub nom.*, *Gavin v. NVR, Inc.*, 604 Fed App'x 87 (2d Cir. May 27, 2015).  "The burden is on the named plaintiff to prove that the other employees are similarly situated."  *Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 460 (S.D.N.Y. 2011); *see also Tracy*, 293 F.R.D. at 397 ("[t]he burden to demonstrate these factors lies with plaintiffs").  If decertification is granted, the opt-in plaintiffs are dismissed without prejudice.  *See Tracy*, 293 F.R.D. at 397; Dkt. No. 37 at 3.

In analyzing a motion to decertify, "courts in this circuit have traditionally looked to: (1) whether the factual and employment settings of the individual plaintiffs are disparate; (2)

-11-

whether the defenses available to the defendant are individual to each plaintiff; and (3) the

fairness and procedural considerations militating for or against collective action treatment."

*Tracy*, 293 F.R.D. at 397.  To assess whether plaintiffs have met their burden, it is necessary to

"understand[] their claims" in order to "decid[e] whether Plaintiffs are similarly situated *in*

*relevant respects* and allowed to proceed as a collective."  *Stevens v. HMSHost Corp.*, 2014 WL

4261410, at *5 (E.D.N.Y. Aug. 27, 2014) (emphasis in original), appeal dismissed (Dec. 30,

2014), motion to certify appeal denied, 2015 WL 926007 (E.D.N.Y. Mar. 4, 2015); *Glatt v. Fox*

*Searchlight Pictures, Inc.*, 811 F.3d 528, 540 (2d Cir. 2016) ("wide[] range of experience"

among plaintiffs as to "most important question in this litigation" cuts against FLSA

certification).

    **B.**    **Plaintiffs Had Disparate Factual and Employment Settings and The**
            **Administrative Exemption Cannot Be Applied Collectively**

    The key issue in the case is whether Plaintiffs satisfy the FLSA's administrative

exemption.  If a particular Plaintiff meets the requirements of the administrative exemption, his

or her claim is barred as a matter of law.  29 U.S.C. § 213(a).

    "Applying the administrative employee regulations requires a thorough, fact-intensive

analysis of the employee's employment duties and responsibilities."  *Kadden v. VisualLex, LLC*,

910 F. Supp. 2d 523, 535 (S.D.N.Y. 2012).  The exemption applies to any employee whose

"primary duty is the performance of office or non-manual work directly related to the

management or general business operations of the employer or the employer's customers" and

whose primary duty "includes the exercise of discretion and independent judgment with respect

to matters of significance."  29 C.F.R. § 541.200.  "[P]rimary duty means the principal, main,

major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  The

primary duty analysis "must be based on all the facts in a particular case" and requires

consideration of "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; [and] the employee's relative freedom from direct supervision."  29 C.F.R. § 541.700(a).  "[E]mployees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement."  29 C.F.R. § 541.700(b).  That said, "[e]mployees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement" if the exempt work is the employee's most important duty.  *Id.*  A particular duty can be the primary duty even where it takes up a relatively small percentage of the employee's overall time.  *See, e.g.*, *Altemus v. Fed. Realty Inv. Trust*, 490 F. App'x 532, 536 (4th Cir. 2012) (20-25% of overall time); *Ferrell v. Gwinnett Cty. Bd. of Educ.*, 481 F. Supp. 2d 1338, 1344 (N.D. Ga. 2007) (5-15% of the time); *Kastor v. Sam's Wholesale Club*, 131 F. Supp. 2d 862, 867 (N.D. Tex. 2001) (10% of the time).

In *Gavin*, the Second Circuit affirmed and adopted the District Court's rationale for granting decertification in a case involving the outside sales exemption, *Tracy*, 293 F.R.D. at 397. *See Gavin*, 604 Fed. App'x at 88 ("we affirm for substantially the same reasons provided by the District Court").  In *Tracy*, the court granted decertification on the grounds that "broad variations" in the circumstances of putative class members relative to the exemption criteria made it "impossible to make a blanket determination concerning the FLSA exempt status of the entire class of putative plaintiffs," thus necessitating "dozens of mini-trials to determine whether each employee[ ]" satisfied the exemption.  293 F.R.D. at 397.

Multiple decisions apply the *Gavin* rationale in administrative exemption cases.  For example, in *Benedict v. Hewlett-Packard*, 2016 WL 3742342 at *10 (N.D. Cal. July 13, 2016), the court decertified an opt-in class of Technical Solutions Consultants where "adjudicating

-13-

[d]efendant's [administrative exemption] defenses would require significant individualized inquiries." *Id.* Regardless of a common job title, the "primary duties differed" among class members because the type of work performed "could vary by an individual's role, complexity of assigned product, and years of experience." *Id.* at *8. Similarly, in *Cruz v. Lawson Software, Inc.*, 764 F. Supp. 2d 1050, 1061 (D. Minn. 2011), the court decertified an FLSA opt-in class of consultants where "different consultants . . . perform the same duty differently" and consultants were slotted into different levels by experience and by specialty, with consultants at "higher levels [having] more responsibilities." *Id.* at 1060. In *Bradford v. CVS Pharmacy, Inc.*, 308 F.R.D. 696, 699 (N.D. Ga. 2015), the court decertified a class of loss prevention managers where "different Plaintiffs took on various, unique duties" such that the "primary duties" of some opt-ins differed from the primary duties of other opt-ins. *Id.*[3]

### 1.    The "Primary Duty" Analysis Varies From Plaintiff To Plaintiff

Here, as in *Benedict*, *Cruz*, and *Bradford*, there is significant variation in the day-to-day duties of the 33 Plaintiffs, the percentage of time spent on particular duties, the manner in which they carried out their duties, and the extent to which they worked independently. *See, e.g.*, *Bradford*, 308 F.R.D. at 700 (granting decertification; where there are "distinctions [among opt-ins] relevant to the [administrative exemption] analysis, the Court would have to conduct a separate inquiry for each Plaintiff to determine whether the defense applies"). Accordingly, the

---

[3] Other courts have likewise granted decertification where class members' duties vary in ways that impact the administrative exemption analysis. *See, e.g.*, *Hundt v. DirectSat USA, LLC*, 294 F.R.D. 101, 105, 108 (N.D. Ill. 2013) ("[e]ven opt-in plaintiffs with the same job title had different duties" and "determinations about each plaintiff's primary duty must be undertaken individually in order to evaluate 'relative importance of the exempt duties as compared with other types of duties,' 'the amount of time spent performing exempt work,' and 'the employee's relative freedom from direct supervision."); *Santiago v. Amdocs, Inc.*, 2013 WL 5444324, at *5 (N.D. Cal. Sept. 30, 2013) (decertifying class of IT employees because "even class members with the same job title, same Band ranking, and within the same Job Family have very different job duties"); *Hill v. R+L Carriers, Inc.,* 2011 WL 830546, at *5 (N.D. Cal. Mar. 3, 2011) ("the circumstances of each [opt-in's] employment situation differed, which would require an individual inquiry into whether each of them was properly classified as exempt").

Court should decertify the opt-in class.

(a)      **Plaintiffs' Duties Varied From Person to Person**

To begin with, decertification is necessary because of variance in the Plaintiffs' duties. *See Bradford*, 308 F.R.D. at 702 (granting decertification where "[d]efendant submits evidence to support its claim that auditing and investigating were not the only two 'primary duties' for each [p]laintiff"); *Benedict*, 2016 WL 3742342, at *8 (granting decertification where "primary duties . . . could vary by an individual's role, complexity of assigned product, and years of experience"). As Plaintiffs concede (Dkt. No. 77, p. 5), Company documents detailing Representatives' duties reflect "a variety of functions." These duties range from "helping construct a relative comparison sheet for a research analyst" to "advising a portfolio manager on our risk management tools" to "providing liquidity analysis solutions to a trade." (Dkt. No. 179-19, Job Requisitions, BLP_RM_00001648, Cell M110.) Job postings reflect yet other types of duties, such as "face-to-face trainings to our customers" and "showcas[ing] basic and advanced Bloomberg solutions to meet our clients' specific workflow needs." (*Id.*)

Plaintiffs' individual experiences, as reflected in their resumes, confirm the varying nature of their consulting duties. Named Plaintiff Roseman "[a]ssisted Portfolio Managers and Analysts to create and manage proprietary portfolios to best prepare portfolio analytics." (Roseman Dep., Ex. 2.) Opt-In Psulkowski "[p]rovided analysis and generated solutions for global clients on security pricing, relative valuation, hedging, risk and return, derivative valuation, and idea generation." (Psulkowski Dep., Ex. 2.) Opt-In Coldwell "consult[ed] on Bloomberg's fixed income analytics software platform, including complex applications designed to value corporate, government, municipal, and mortgage asset-backed securities, ultimately increasing client efficiency and reducing client costs." (Lampe Dec., Ex. K.)

Plaintiffs' resumes likewise demonstrate the disparate and individualized mixes of work

-15-

that each respectively performed.  *See, e.g.*, Lampe Dec. Ex. L (Opt-In Cavallaro "[t]aught client

seminars for new product functionality across multiple asset classes"); Psulkowski Dep., Ex. 6

(Opt-In Psulkowski "[r]egularly interface[d] with programming team, to build fixed income

calculators and functions; recommend[ed] new features and enhancements"); Lampe Dec. Ex. M

(Opt-In Schwebel "[l]ed the Emerging Markets Focus Group" and was a "mentor to foster the

development of new representatives"); *id.* at Ex. K (Opt-In Coldwell "[s]erved as global point

person for all mortgage and municipal bond training" and "plan[ned] and implement[ed]

inaugural two-day in-depth training on mortgage-backed securities"); Renny Dep., Ex. 3 (Opt-In

Renny "perform[ed] on demand mathematical validation of entire lifecycle of structured product

trade" and "create[d] example price, yield, and risk models").

This stark variance in duties is further confirmed by Plaintiffs' deposition testimony.

Opt-In Psulkowski went on client visits, trained other Analytics Representatives, and performed

quality control, among other responsibilities.  (Psulkowski Dep. 61:9-14, 103:18-107:19, 253:3-

20.)  Psulkowski did not, however, serve as a Deputy Team Leader.  (Psulkowski Dep. 167:7-12.)

Opt-In Amanda Lownes, on the other hand, did serve as a Deputy Team Leader and, like

Psulkowski, went on client visits and performed other promotional functions, such as "working

to displace redundant competitive products" and "identify[ing] new sales opportunities."

(Lownes Dep. 32:20-33:7, 49:18-50:50:5, 102:9-103:12.)  However, unlike Psulkowski, Lownes

did not train other Representatives or conduct quality control.  (Lownes Dep. 259:22-23, 255:15-

21.)  Opt-In Johnson, like Lownes, was a Deputy Team Leader, but she did not generate sales

leads or analyze client data to uncover competitors' products.  (Lampe Dec., Ex. N, Deposition

of Mary L. Johnson (hereinafter "Johnson Dep.") at 43:6-13, 69:16-70:14, 142:4-144-8.)  Nor

was she responsible for quality control.  (Johnson Dep. 316:7-10.)  Johnson did, however, teach

client seminars, assist in training new Representatives, and train high-level Bloomberg employees from outside of the Department.  (Johnson Dep. 122:12-23, 126:10-127:17.)  Opt-In Andrew Krieger, meanwhile, consulted clients, but did not serve as a Deputy Team Leader, conduct trainings, generate sales leads, visit clients, uncover competitors' products, or conduct quality control. (Lampe Dec., Ex. O, Deposition of Andrew Krieger (hereinafter "Krieger Dep.") at 74:7-10, 88:14-21, 90:9-92:10, 93:25-94:12, 97:8-9.)  And Opt-In Michael Coldwell performed far different tasks, as he "developed…training content for 400+ new hires and 200+ fixed income specialists" and "plan[ned] and implement[ed] inaugural two day in-depth training on mortgage-backed securities."  (Lampe Dec. Ex. K; *compare with* Psulkowski Dep. 69:16-70:4 (only updated existing training).).

  In addition, each Plaintiff's mix of duties changed over time.  *Aguirre v. SBC Communications, Inc*., 2006 WL 964554, at *7 (S.D. Tex. Apr. 11, 2006) (not similarly situated where "duties often vary from day-to-day and change over time").  For example, as a Generalist, Plaintiff Roseman shadowed recent hires to provide them real-time performance feedback (Roseman Dep. 252:9-23); assisted other Generalists (*id.* at 152:22-153:11); and created customized and integrated Launchpads for clients (*id.* at 50:14-18).  As a Specialist, he coordinated client transitions from competing products (Roseman Dep. 51:3-13); served as a Deputy Team Leader (*id.* at 193:6-9); and became a subspecialist in equity derivatives and portfolio (*id.* at 191:8-16).  And as an Advanced Specialist, Roseman performed still other duties, such as conducting client seminars on topics such as market theory (Roseman Dep. 75:18:18); overhauling portfolio analytics training across the department (*id.* at 226:11-227:6); and conducting quality control for other Representatives (*id.* at 230:2-231:13).  For his part, as a Generalist, Opt-In Plaintiff Psulkowski provided end-user support covering all market sectors,

advised other Analytics Representatives on swap-related and complex Excel-related issues, and edited internal guidebooks.  (Psulkowski Dep. 25:2-16, 206:12-207:12, 210:10-211:20, 213:3-8.) By the time he was an Advanced Specialist, Psulkowski performed an entirely different set of tasks: he went on sales visits, coached, assisted in recruiting, trained other Analytics Representatives, performed quality control, and wrote an article.  (Psulkowski Dep. 29:2-30:10, 69:9-14, 89:2-91:16, 103:18-107:19, 256:13-24, 266:3-267:9, 278:16-279:11, 253:3-20.)

> **(b)**      **Plaintiffs Spent Varying Percentages of Time on Their Duties**

The evidence reflects variance in the percentage of time Plaintiffs spent on particular duties (an element of the primary duty test, *see* 29 C.F.R. § 541.700(a)) as they progressed from role to role, and time percentages also varied among Plaintiffs while in the same role, further reasons that decertification should be granted.  *See Aguirre v. SBC Communications, Inc.*, 2007 WL 772756, at *7, 14 (S.D. Tex. Mar. 12, 2007) (not similarly situated where time spent on duties "varies from [p]laintiff to [p]laintiff").  As a Generalist, Named Plaintiff Van Vleet spent 100% of his time consulting.  (Van Vleet Dep. 39:15-18, 93:11-19.) But, as a Specialist, Van Vleet consulted only 75% of the time.  While Opt-In Plaintiff Amanda Lownes was a Specialist, in contrast, she spent 50% of her time consulting, and the other 50% of her time identifying sales opportunities, going on sales visits, and persuading customers to use Bloomberg products instead of competing products.  (Lownes Dep. 22:13-23:3, 32:20-33:7, 49:18-50:5, 320:19-20.)  And Opt-In Plaintiff Matthew Renny testified that he spent about 80% of his time as a Specialist and 66% of his time as an Advanced Specialist consulting clients in response to their requests. (Renny Dep. 223:25-224:7.)

> **(c)**      **Plaintiffs Had Different Specialties and Performed Duties of Varying Complexity**

Yet another factor supporting decertification is that Plaintiffs' work varied in complexity

from employee to employee. *Benedict*, 2016 WL 3742342, at *10 (granting decertification due to "disparities in the complexity and sophistication of [opt-ins'] technical work"); *Cruz*, 764 F. Supp. 2d at 1059-60 (granting decertification where consultants slotted into different levels by experience and by specialty, with consultants at "higher levels [having] more responsibilities," and by industry such that a consultant "in one industry . . . cannot work in a different industry"). For example, from the time they were Generalists, Plaintiffs were encouraged to become subject-matter experts on a subset of Terminal functionality and market sectors, through both formal certifications and informal self-study, enabling them to take on work of increasing complexity; they did so, however, to varying extents. (*Compare* Krieger Dep. 44:16-45:16 (was a Message "contact"), *with* Psulkowski Dep 206:12-14, 210:24-211:10 (was Excel application programming interface contact and "informal" contact on swap management functionality), *and* Lownes Dep. 182:12-20 (never a subject-matter contact as a Generalist).) Further, Plaintiffs held different asset- and product-specific specialties, and these varied in complexity and sophistication from one to the next (Saven 2016 Dec. ¶ 17; Yeulett Dec. ¶ 11), and some Plaintiffs did not specialize at all. (*Compare* Psulkowski Dep. 29:15-19 (subspecialties in mortgage-backed securities and municipal bonds), Roseman Dep. 147:23-25, 148:14-19 (equity portfolio and equity derivatives subspecialist), Johnson Dep. 78:3-13 (municipal bids wanted and inventory manager specialist), Leyfman Dep. 120:8-12 (technical analysis specialist), Lownes Dep. 228:23-231:14 (never handled subspecialist inquiries).)

**(d)     Plaintiffs Carried Out Their Duties in Varying Ways**

Decertification is also warranted because Plaintiffs testified to carrying out their consulting duties in different ways. *Cruz*, 764 F. Supp. 2d at 1061 (granting decertification where "different consultants . . . perform the same duty differently"); *id.* at 1062 (application of administration exemption "on a collective basis will be difficult because [p]laintiffs . . . interact

with customers in different manners").  Opt-In Plaintiff Aleksander Leyfman testified that he chose between multiple possible solutions to client's inquiries based on the client's "specific needs" (Leyfman Dep. 169:21-170:18, 244:9-24) and created "creative solutions" including workarounds to allow the client to accomplish goals they could not otherwise accomplish on the Terminal (*id.* at 93:22-94:23).  *See Cruz*, 764 F. Supp. 2d at 1067 ("consultant who implements her employer's software at a client and assists the client with training, trouble shooting, and modifications" is exempt "if the employee uses independent judgment in how to train and address the client's problems with the software").  In contrast, Named Plaintiff Lee testified to "just searching, copying and pasting." (Lee Dep. 396:12-14.)  The approach of Named Plaintiff Van Vleet, unlike Leyfman and Lee, was "to get [clients] to utilize the Terminal more in their day-to-day activities" and "show[ ] them different aspects of the Terminal that would make their jobs easier and make them better at their jobs."  (Van Vleet Dep. 40:11-41:18.)  The approach of Opt-In Plaintiff Lownes was highly client-centered because "every client was different" and "[e]very client had a different role."  (Lownes Dep. 80:14-20.)

Moreover, the manner in which Representatives consulted was often dependent upon the sector in which their clients worked, as clients in different industries had different expectations and demands.  (*Compare* Psulkowski Dep. 163:15-17 (mortgage clients are "known to be . . . more quantitative and typically more demanding"), *with* Lownes Dep. 80:21-24 ("traders . . . didn't [want] to speak on the phone"), *and* Lee Dep. 205:7-21 (it was "important...to understand what the client's role was in framing a response").

### (e)       Plaintiffs Experienced Different Levels of Supervision

The degree to which Plaintiffs worked independently also varied substantially, further confirming that the Court should grant decertification.  29 C.F.R. § 541.700(a) (primary duty analysis includes evaluation of "employee's relative freedom from direct supervision"); *Cruz*,

764 F. Supp. 2d at 1062 (granting decertification where plaintiffs "g[a]ve conflicting testimony regarding the extent to which they independently solve problems").  While some Plaintiffs worked independently when interacting with clients (Lownes Dep. 278:20-21 ("I was there answering the chats by myself."); Held Dep. 174:22-175:21 (estimating he ran client advice by his supervisor less than 5% of the time)), others testified to experiencing close supervision.  For example, Opt-In Matthew Renny testified that he consistently asked his Team Leaders to review advice before providing it to clients (Renny Dep. 126:19-127:2 ("five times a day")) and Opt-In Mary Johnson said she did not work independently "at all" (Johnson Dep. 300:21-23).

In sum, decertification should be granted because the question of whether Plaintiffs' primary duty was exempt administrative work cannot be fairly and efficiently adjudicated on a collective basis.  The exemption analysis "must be based on all the facts in a particular case," 29 C.F.R. § 541.700(a), and Plaintiffs here had significantly varying experiences with respect to factors at the very core of the exemption analysis.

## 2.   Differences in the Exercise of Discretion and Independent Judgment Mandate Decertification

Decertification is also warranted because of highly divergent testimony related to whether plaintiffs "exercise discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.202.  This prong of the exemption requires an analysis of whether a plaintiff "compar[ed] and . . . evaluat[ed] . . . possible courses of conduct, and act[ed] or ma[de] a decision after the various possibilities ha[d] been considered."  29 C.F.R. § 541.202(a).  Where some opt-in plaintiffs testify that they "exercise[] more discretion than others," decertification is warranted.  *Hill*, 2011 WL 830546 at *5; *see also Benedict*, 2016 WL 3742342, at *10 (decertification granted; "evidence shows variation in the exercise of discretion and independent judgment"); *Cruz*, 764 F. Supp. 2d at 1062 (decertification granted; opt-ins "give

-21-

conflicting testimony regarding the extent to which they independently solve problems").

This is plainly the case here.  Named Plaintiff Van Vleet handled questions with multiple solutions 60-65% of the time as a Generalist and 80-85% of the time as a Specialist  (Van Vleet Dep. 139:17-140:10.)  Opt-In Plaintiff Leyfman chose between multiple possible solutions to client inquiries based on the client's "specific needs."  (Leyfman Dep. 169:21-170:18, 244:9-24.)  But, for Opt-In Tyler Held, it was allegedly "rare" that he had to choose between multiple solutions because "in [his] opinion . . . there was one answer."  (Held Dep. 249:24-250:14.)  Opt-In Mary Johnson claims to have chosen between alternatives only in limited situations, such as where there was both a Terminal option and an Excel option.  (Johnson Dep. 300:6-20.)

Plaintiffs also varied in their alleged practice of falling back on existing resources, such as transcripts of past chats, instead of evaluating alternatives.  (Leyfman Dep. 295:13-25, 342:5-8 (Representatives' use of resources is a matter of "preference" and he was "sure" most Representatives take different approaches to answering client inquiries).)  For example, while Opt-In Psulkowski testified that it was "not common" for him to copy and paste from a past chat (Psulkowski Dep. 236:17-239:16), and Named Plaintiff Van Vleet testified that he could rely on a HELP page resource only about 1/3 of the time (Van Vleet Dep. 141:13-142:2), Named Plaintiff Lee testified that his entire job was just "searching, copying and pasting" (Lee Dep. 396:12-14).

Plaintiffs exercised varying degrees of discretion and independent judgment in other ways as well.  Some Opt-In Plaintiffs used judgment in proactively evaluating and recommending additional functionality that could enhance the client's business, while others did not.  (*Compare* Van Vleet Dep. 39:25-41:18 ("every time that I took a chat from a client, I tried to give them something that they weren't aware of," "trying to get [clients] to utilize the

Terminal more in their day-to-day activities" and "showing them different aspects of the Terminal that would make their jobs easier and make them better at their jobs."); *with* Krieger Dep. 76:11-18; 117:2-119:5 (never recommended functionality that "didn't pertain to the question they were asking"), *and* Psulkowski Dep. 46:13-47:5; 381:17-25 ("[o]ur job was merely to provide the data and functionality that pertained to the particular question at hand").)

Opt-In Plaintiffs also exercised different levels of discretion in deciding whether to escalate client requests to a specialist Representative or to create workarounds.  As to escalation, while Plaintiff William Van Vleet made the decision as to when to escalate requests (Van Vleet Dep. 118:25-119:11), Opt-In Renny testified that there was no decision-making because he always escalated when the chat window started flashing or his manager directed him to do so (Renny Dep. 33:9-24, 36:3-19).  As to workarounds, Opt-Ins Lownes and Leyfman created workarounds to allow the client to accomplish goals when their needs did not precisely line up with existing Terminal functionality.  (Leyfman Dep. 93:22-94:23 (developed "creative solutions" that included workarounds); Lownes Dep. 57:13-17, 58:12-21.)  Other Opt-In Plaintiffs used only preexisting workarounds (Renny Dep. 139:19-140:14), while yet others, such as Opt-In Johnson, did not recall using workarounds at all (Johnson Dep. 216:16-217:11).

Plaintiffs also diverged on the extent to which they advised clients on "matters of significance," another exemption criterion.  29 C.F.R. § 541.200 (discretion and independent judgment must be exercised "with respect to matters of significance"); 29 C.F.R. § 541.202 ("the term 'matters of significance' refers to the level of importance or consequence of the work performed").  Opt-In Nicholas Psulkowski "provided analysis and generated solutions for global clients on security pricing, relative valuation, hedging risk and return, derivative valuation, and idea generation." (Psulkowski Dep. 74:10-75:3.)  Named Plaintiff Roseman, for his part, stated

-23-

that "he worked directly with portfolio managers and equity analysts to develop new approaches to analyze investment ideas." (Roseman Dep. 112:11-16.) By contrast, Named Plaintiff Lee testified that his job consisted of the mundane handling of "issues [clients had] with colors they are seeking" and "noises that they are hearing that they wanted to go away." (Lee Dep. 47:20-48:7.) This sharply contrasting testimony further precludes collective treatment.

Because Plaintiffs "exercised varying amounts of discretion in performing their duties," individual inquiries are needed "to determine whether they are subject to Defendant's exemption defenses," further justifying decertification. *Hill*, 2011 WL 830546, at *7.

### C.    Fairness and Procedural Considerations Warrant Decertification

Finally, to avoid decertification, Plaintiffs must show their claims can be tried together fairly and efficiently. "[W]here [p]laintiffs' duties and work performance vary significantly, the FLSA exemptions cannot be efficiently adjudicated en masse because the exemption analysis is fact-driven and Plaintiff-specific." *Cruz*, 764 F. Supp. 2d at 1063; *Stevens*, 2014 WL 4261410, at *8 (where "job duties var[y] widely in material ways and defendants' exemption defenses are accordingly not amenable to generalized or representative proof," "[p]roceeding as a collective action . . . would either prejudice defendants' ability to present their defenses, or require mini-trials for each of the opt-in plaintiffs"). Plaintiffs must demonstrate that a collective trial could be managed in a way that would not confuse the jury or unduly prejudice a party. *Zavala v. Wal-Mart Stores, Inc.*, 2010 WL 2652510, at *5 (D.N.J. June 25, 2010) ("this Court must also consider the manageability of the class and the fairness to the Defendant"); *Benedict*, 2016 WL 3742342, at *11 (granting decertification; "a single trial [for administrative exemption] would . . . be unmanageable and inefficient").

Here, in light of the significant variation in Plaintiffs' duties, discretion, specialties, supervision, and the manner in which they carried out their jobs, group adjudication would

-24-

fundamentally compromise the imperative of fair and efficient resolution of disputes.  The distinctions applicable to the various Plaintiffs go to the heart of the exemption criteria and disregarding those differences for the sake of accommodating group adjudication would be patently unfair to Bloomberg.  *Stevens*, 2014 WL 4261410, at *8.  And the inevitable breakdown of the proceedings into numerous mini-trials featuring divergent and conflicting evidence would unavoidably confuse and tax the jury.  *Seward v. IBM Corp.*, 2012 U.S. Dist. LEXIS 49688, at *55 (S.D.N.Y. Jan. 20, 2012), objections overruled, 2012 U.S. Dist. LEXIS 38523 (S.D.N.Y. Mar. 9, 2012) (decertification of 39-person opt-in class; "overall, fairness requires that this collective action be decertified given the various individualized issues presented in the case").

## CONCLUSION

For the reasons set forth herein, the Court should decertify the conditionally-certified FLSA class and dismiss the Opt-In Plaintiffs without prejudice.

Dated: September 22, 2016
      New York, New York

Respectfully submitted,

JONES DAY

By: /s Matthew W. Lampe

Matthew W. Lampe
Terri L. Chase
250 Vesey Street
New York, New York 10281
(212) 326-3939
mwlampe@jonesday.com
tlchase@jonesday.com