UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **ERIC MICHAEL ROSEMAN, ALEXANDER LEE, and WILLIAM VAN VLEET, individually and on behalf of others similarly situated,** | **Case No. 14-CV-2657 (TPG) (KNF)** |
| **Plaintiffs,** | |
| **v.** | ECF Case |
| **BLOOMBERG L.P.,** | |
| **Defendant.** | |

**BLOOMBERG, L.P.'S MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION TO CERTIFY STATE LAW CLASSES**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION.............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

    A.    THE BLOOMBERG TERMINAL. ................................................................. 2

    B.    THE JOB RESPONSIBILITIES OF ANALYTICS
        REPRESENTATIVES.................................................................................... 2

        1.    REPRESENTATIVES' VARYING RESPONSIBILITIES.................. 3

        2.    REPRESENTATIVES' VARYING ROLES AND SPECIALTIES..... 5

    C.    NAMED PLAINTIFFS' DUTIES AS ANALYTICS
        REPRESENTATIVES.................................................................................... 8

    D.    TIME AND HOURS WORKED BY ANALYTICS REPRESENTATIVES. . 9

    E.    PROCEDURAL HISTORY. ......................................................................... 10

ARGUMENT..................................................................................................................... 10

I.    THE CLASS CERTIFICATION STANDARD ......................................................... 10

    A.    THE ADMINISTRATIVE EXEMPTION UNDER NEW YORK AND
        CALIFORNIA LAW. ................................................................................. 11

    B.    APPLICATION OF RULE 23 IN EXEMPTION CASES. ............................ 12

II.    THE COURT SHOULD DENY PLAINTIFFS' MOTION FOR CLASS
    CERTIFICATION OF NEW YORK LAW CLAIMS ................................................ 14

    A.    PLAINTIFFS HAVE FAILED TO SATISFY RULE 23(B)(3). ..................... 14

        1.    PLAINTIFFS HAVE FAILED TO DEMONSTRATE THAT
            COMMON ISSUES PREDOMINATE.................................................. 14

            (a)    THE "PRIMARY DUTY" ANALYSIS VARIES FROM
                PERSON TO PERSON. .............................................................. 15

                (i)    PLAINTIFFS DUTIES VARIED FROM PERSON
                    TO PERSON..................................................... 15

(ii)   REPRESENTATIVES SPENT VARYING PERCENTAGES OF TIME ON THEIR DUTIES...... 19

(iii)   REPRESENTATIVES PERFORMED DUTIES OF VARYING COMPLEXITY. ........................................... 19

(iv)   REPRESENTATIVES CARRIED OUT THEIR DUTIES IN VARYING WAYS. ................................... 20

(v)   PLAINTIFFS EXPERIENCED DIFFERENT LEVELS OF SUPERVISION. ........................................ 21

(b)   DIFFERENCES IN THE EXERCISE OF DISCRETION AND INDEPENDENT JUDGMENT. ....................................... 22

(c)   DAMAGES MUST BE ASCERTAINED ON AN INDIVIDUAL BASIS. .................................................. 24

2.   PLAINTIFFS PREDOMINANCE ARGUMENTS ARE UNAVAILING. .......................................................... 25

3.   PLAINTIFFS HAVE FAILED TO DEMONSTRATE THAT CLASS TREATMENT IS SUPERIOR TO INDIVIDUAL ACTIONS. ............................................................... 28

B.   PLAINTIFFS HAVE FAILED TO SATISFY RULE 23(A). ........................... 30

1.   PLAINTIFFS CANNOT DEMONSTRATE COMMONALITY. ....... 30

2.   PLAINTIFFS CANNOT DEMONSTRATE TYPICALITY OR ADEQUACY. ................................................................. 32

III.   THE COURT SHOULD DENY PLAINTIFFS' MOTION FOR CLASS CERTIFICATION OF CALIFORNIA LAW CLAIMS ................................ 33

B.   PLAINTIFFS HAVE FAILED TO SATISFY RULE 23(B)(3). .................... 33

B.   PLAINTIFFS HAVE FAILED TO SATISFY RULE 23(A). ........................... 35

IV.   THE COURT SHOULD DENY PLAINTIFFS' REQUEST TO ISSUE CLASS NOTICE AND FOR PRODUCTION OF CLASS MEMBER INFORMATION..... 36

CONCLUSION ................................................................................... 37

# TABLE OF AUTHORITIES

**Page**

CASES

*Myers v. Hertz Corp.*,
    624 F.3d 537 (2d Cir. 2010).............................................10, 11, 12, 13, 14, 26, 27, 28

*Gen Tel. Co. of S.W. v. Falcon*,
    457 U.S. 147 (1982)...................................................................................10

*Comcast Corp. v. Behrend*,
    133 S.Ct. 1426, 1432 (2013)........................................................................10

*Kadden v. VisualLex, LLC*,
    910 F. Supp. 2d 523 (S.D.N.Y. 2012)............................................................11

*Romero v. H.B. Auto. Grp., Inc.*,
    2012 WL 1514810 (S.D.N.Y. May 1, 2012) .....................................................11

*Altemus v. Fed. Realty Inv. Trust*,
    490 F. App'x 532 (4th Cir. 2012) .................................................................12

*Ferrell v. Gwinnett Cty. Bd. of Educ.*,
    481 F. Supp. 2d 1338 (N.D. Ga. 2007)...........................................................12

*Kastor v. Sam's Wholesale Club*,
    131 F. Supp. 2d 862 (N.D. Tex. 2001) ..........................................................12

*Cuevas v. Citizens Fin. Grp., Inc.*,
    526 Fed. App'x 19 (2d Cir. 2013)............................................................13, 17

*Benedict v. Hewlett-Packard*,
    314 F.R.D. 457 (N.D. Cal. 2016).................................13, 15, 19, 20, 22, 29, 34

*Hendricks v. J.P. Morgan Chase Bank*,
    263 F.R.D. 78 (D. Conn. 2009)..................................................13, 15, 20, 29

*Williams v. Lockheed Martin Corp.*,
    2011 WL 2200631 (S.D. Cal. June 2, 2011)....................13, 14, 15, 21, 22, 26, 34

*Ruggles v. WellPoint, Inc.*,
    272 F.R.D. 320 (N.D.N.Y. 2011)..........................................................14, 26, 29

*Trawinski v. KPMG LLP*,
    2012 WL 6758059 (S.D.N.Y. Dec. 21, 2012) ...........................................14, 32, 33

*In re Morgan Stanley Smith Barney LLC Wage & Hour Litig.*,
    2016 WL 1407743 (D.N.J. Apr. 11, 2016) ..........................................................14

*In re RBC Dain Rauscher Overtime Litig.*,
   703 F. Supp. 2d 910 (D. Minn. 2010) ........................................................................14

*Novak v. Boeing Co.*,
   2011 WL 7627789 (C.D. Cal. Dec. 19, 2011) ...........................................................14

*Amchem Prods. v. Windsor*,
   521 U.S. 591 (1997) ...................................................................................................14

*Schwind v. EW & Associates, Inc.*,
   357 F. Supp. 2d 691 (S.D.N.Y. 2005) ........................................................................17

*Lopez v. United Parcel Serv., Inc.*,
   2010 WL 3630619 (N.D. Cal. Sept. 10, 2010) ..........................................................17

*Cruz v. Lawson Software, Inc.*,
   764 F. Supp. 2d 1050 (D. Minn. 2011) .................................................................17, 20

*Grupke v. GFK Custom Research N. Am.*,
   2015 WL 363589, at *6 (S.D.N.Y. Jan. 28, 2015) .....................................................17

*Hill v. R+L Carriers, Inc.*,
   2011 WL 830546 (N.D. Cal. Mar. 3, 2011) ...............................................................24

*Roach v. T.L. Cannon Corp.*,
   778 F.3d 401 (2d Cir. 2015) .......................................................................................24

*Traver v. Lowe's Home Centers, LLC*,
   2016 WL 880169 (S.D.N.Y. Mar. 1, 2016) ...............................................................24

*Burch v. Qwest Commcns Int'l*,
   677 F. Supp. 2d 1101 (D. Minn. 2009) ......................................................................26

*Nolan v. Reliant Equity Investors, LLC*,
   2009 WL 2461008 (N.D. W. Va. 2009) .....................................................................26

*Pippins v. KPMG LLP*,
   2012 WL 19379 (S.D.N.Y. Jan. 3, 2012) ..............................................................26, 31

*Jackson v. Bloomberg, L.P.*,
   298 F.R.D. 152 (S.D.N.Y. 2014) ...............................................................................28

*Enea v. Bloomberg, L.P.*,
   2014 WL 1044027 (S.D.N.Y. Mar. 17, 2014) ...........................................................28

*Barth v. Wolf Creek Nuclear Operating Corp.*,
   2002 U.S. Dist. LEXIS 19716 (D. Kan. Aug. 28, 2002) ...........................................28

*In re WorldCom, Inc. Sec. Litig.*,
   219 F.R.D. 267 (S.D.N.Y. 2003) ........................................................28, 29

*Wang v. Hearst Corp.*,
   293 F.R.D. 489 (S.D.N.Y. 2013) ..................................................................29

*Benner v. Becton Dickinson & Co.*,
   214 F.R.D. 157 (S.D.N.Y. 2003) ..................................................................29

*Emig v. Am. Tobacco Co., Inc.*,
   184 F.R.D. 379 (D. Kan. 1998)......................................................................29

*Ansari v. New York University*,
   179 F.R.D. 112 (S.D.N.Y. 1998) ..................................................................29

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)..............................................................................30, 31

*Dailey v. Groupon, Inc.*,
   2014 WL 4379232 (N.D. Ill. Aug. 27, 2014) ...............................................30

*Romero v. H.B. Auto. Grp.*,
   2012 WL 1514810 (S.D.N.Y. May 1, 2012) ...........................................31, 32

*Callari v. Blackman Plumbing Supply, Inc.,*,
   307 F.R.D. 67 (E.D.N.Y. 2015) ....................................................................31

*Espinoza v. 953 Associates LLC*,
   280 F.R.D. 113 (S.D.N.Y. 2011) ..................................................................31

*Flores v. Anjost Corp.*,
   284 F.R.D. 112 (S.D.N.Y. 2012) ..................................................................32

*Noble v. 93 Univ. Place Corp.*,
   224 F.R.D. 330 (S.D.N.Y. 2004) ..................................................................32

*Kilbourne v. The Coca-Cola Co.*,
   2015 WL 5117080 (S.D. Cal. July 29, 2015) ...............................................33

*Delodder v. Aerotek*,
   2010 BL 383299 (C.D. Cal. Aug. 16, 2010)............................................34, 35

*Alakozai v. Chase Investment Servs. Corp.*,
   2014 WL 5660697 (C.D. Cal. Oct. 6, 2014)..................................................35

*Litty v. Merrill Lynch & Co.*,
   2014 WL 5904907 (C.D. Cal. Aug. 4, 2014).................................................36

*Till v. Saks Inc.*,
    2013 WL 5755671 (N.D. Cal. Sept. 30, 2013) ........................................................36

*Hamelin v. Faxton-St. Luke's Healthcare*,
    274 F.R.D. 385 (N.D.N.Y. 2011)..............................................................................36

*Aponte v. Comprehensive Health Management, Inc.*,
    2011 WL 2207586 (S.D.N.Y. June 2, 2011) ...........................................................37

*Beckman v. KeyBank, N.A.*,
    293 F.R.D. 467 (S.D.N.Y. 2013) ..............................................................................37

*Karvaly v. EBay, Inc.*,
    245 F.R.D. 71 (E.D.N.Y. 2007) ................................................................................37

*Koehler v. Freightquote.com, Inc.*,
    93 F. Supp. 3d 1257 (D. Kan. Mar. 18, 2015) .........................................................37

*Pichardo v. Carmine's Broadway Feast, Inc.*,
    2016 WL 4379421 (S.D.N.Y. June 13, 2016) .........................................................37

## RULES

Fed.R.Civ.P. 23 ...........................................................................................11, 28, 32, 36

29 C.F.R. § 541.200 ............................................................................................11, 23

29 C.F.R. § 541.700 .............................................................11, 12, 14, 19, 21, 25, 27

8 Cal. Code Regs. § 11040................................................................12, 33, 34, 35

Cal. Wage Order 4-2001 .............................................................................12, 33

29 C.F.R. § 541.201 .......................................................................................17

29 C.F.R. § 541.203 .......................................................................................17

29 C.F.R. § 541.202 ...................................................................................22, 23

## INTRODUCTION

Named Plaintiffs Eric Michael Roseman, Alexander Lee, and William Van Vleet (collectively, "Plaintiffs" or "Named Plaintiffs") move this Court under Rule 23 to certify their claims that Bloomberg, L.P. ("Bloomberg" or the "Company") misclassified them and other Analytics Representatives ("Representatives") as exempt from the overtime pay requirements of the New York Labor Law ("NYLL") and California law.  Because overtime claims require a close examination of job duties, class certification is impossible where plaintiff-employees' duties vary.  In such cases, the ultimate issue is too individualized for class treatment.

Here, Plaintiffs' proposed classes suffer from this fatal defect: widely varying job duties. Not only do duties vary from person to person, but so does the manner in which class members perform their duties, all of which is critical to the exemption analysis.  Further, class members exercise varying levels of discretion, with some allegedly exercising substantially more discretion than others.  And the duties of class members evolve rapidly as they move through different roles, taking on differing mixes of specialties and subspecialties, doing so at different points in their respective tenures depending upon each person's own development, interest, and the needs of the Company and its customers.  With well more than 1,000 proposed class members, an endless series of mini-trials would be required to determine liability, a result fundamentally inconsistent with class treatment.

Plaintiffs, for their part, simply ignore the overwhelming evidence of disqualifying variation, much of it in Named Plaintiffs' and the Opt-In Plaintiffs' own statements about their respective duties.  Instead, Plaintiffs focus on minor issues that do not and cannot satisfy their Rule 23 evidentiary burden.  Having ducked the issue at the heart of certification inquiry, and in view of the highly individualized liability issues present here, Plaintiffs have not carried their burden.  The Motion should be denied.

## BACKGROUND

### A.    The Bloomberg Terminal

Bloomberg develops and markets the Bloomberg Professional Service, also known as the Bloomberg Terminal (the "Terminal"), a complex and powerful computer-based data platform with over 30,000 different functions, which Bloomberg's clients use to conduct financial and market analysis and help them run their businesses.  (Saven 2016 Dec. ¶ 4.)  Using the Terminal, clients manage portfolios, generate investment ideas, forecast decisions on commodities, conduct risk analysis for proposed transactions, and analyze trading options, among myriad other tasks. (Dkt. 203 ("DeMartino Dec.") ¶¶ 4, 27; Dkt. 201 ("Saven 2016 Dec.") ¶ 4.)  Bloomberg's clients are primarily financial institutions, such as investment banks, hedge funds, and brokerages, and the Terminal is integral to the work of over 300,000 business and financial professionals, such as traders, analysts, portfolio managers, investment bankers, and stock brokers, working at these institutions.  (DeMartino Dec. ¶¶ 4, 5; Saven 2016 Dec. ¶ 5; Saven 2014 Dec. ¶ 3.)

### B.    The Job Responsibilities of Analytics Representatives

Given the complexity not only of the Terminal's functionality but also the financial markets themselves, Bloomberg's success is driven by its ability to make its technology fully accessible to clients so they can integrate the vast capabilities of the Terminal into their business operations.  (Saven 2016 Dec. ¶ 6; Yeulett Dep. 178:10-16.)[1]  Bloomberg also strives to maximize the value of the Terminal by continually enhancing product offerings to respond to changes in the markets and customers' business needs.  (Saven 2016 Dec. ¶ 6; Dkt. 202 ("Yeulett Dec.") ¶ 13.)

Central to the fulfillment of these objectives is Bloomberg's Analytics Department

---

[1] References to "___ Dec." are to the declarations submitted herewith.  References to "___ Dep." are to excerpts of depositions, which are attached to the Declaration of Matthew W. Lampe.

("Analytics" or the "Department"). The work of Analytics, in turn, is generally carried out by Representatives. Approximately 1,300 individuals have worked as Representatives in New York since April 2008, and approximately 115 individuals have done so in California since April 2010. (Shalian Dec. ¶ 5, 6.) Reflective of the Department's broad mandate, the Representative position encompasses a broad set of duties, and Representatives perform different mixes of duties within this broad set. (Saven 2016 Dec. ¶¶ 7, 22; Yeulett Dec. ¶¶ 4, 13.) As discussed below, each Representative's particular mix of duties changes as they advance through various roles within the Department and duties also vary from employee to employee based on Representatives' skills, interests, and the business needs of Bloomberg and its clients. (Saven 2016 Dec. ¶¶ 11, 22; Saven Dep. 72:23-74:8; Yeulett Dec. ¶ 13; Yeulett Dep. 164:3-25.)

### 1.    Representatives' Varying Job Responsibilities

To varying degrees, Representatives consult with clients on how they can most effectively use the Terminal to accomplish their business objectives. (Saven 2016 Dec. ¶ 7; Yeulett Dec. ¶ 4.) As part of this multifaceted workflow, Representatives field questions from clients (by phone and electronic messaging) on a diverse array of business concerns, such as how to identify future risk in the clients' portfolios; evaluate securities in emerging markets; and analyze the foreign exchange market. (Saven 2016 Dec. ¶ 14; Yeulett Dep. 245:7-20.) By way of example, Named Plaintiff Roseman "[a]ssisted Portfolio Managers . . . to create and manage proprietary portfolios to best prepare portfolio analytics," while Opt-In Plaintiff Leyfman "[d]eveloped creative solutions . . . to monitor[] and valu[e] derivatives," and Opt-In Plaintiff Psulkowski "generated solutions . . . on security pricing, evaluating valuation, hedging, [and] risk and return." (Roseman Dep. at Ex. 2; Leyfman Dep at Ex. 1; Psulkowski Dep. at Ex. 2.)

In the course of consulting, Representatives are expected to, and do, explore their clients' business objectives, or "end goal." (Saven 2016 Dec. ¶ 15; Roseman Dep. 56:7-14 ("always

want to get to . . . their end goal").)  Although a small percentage of inquiries may be straightforward, most inquiries do not have a single correct answer, advice, or strategy, and understanding the clients' objectives improves the quality of the Representatives' advice.  (Dkt. 25 ("Saven 2014 Dec.") ¶ 20; Saven 2016 Dec. ¶ 15.)  From the start of their tenure, Representatives are expected to, and do, evaluate different potential solutions to the client's inquiry, and recommend the best solution based on that evaluation, often laying out the options and the rationale supporting the recommendation.  (Saven 2016 Dec. ¶ 15; Berner Dec. ¶ 7 (as Generalist, used "judgment to determine which Terminal functionalities best suited the client under the circumstances"); Sanseverino Dec. ¶ 8 (as Generalist, decided the "option to recommend").)

Consulting work goes well beyond addressing the client's specific question.  Based on their inquiry into the client's work flows and goals, Representatives proactively recommend Terminal functionality that the client may not have previously considered.  (Saven 2016 Dec. ¶ 16; Winsor Dec. ¶ 10 ("often provided information beyond that which the client was specifically asking"); Leathers Dec. ¶ 6 ("provided recommendations on business solutions that the client had not even considered").)  Representatives also develop creative solutions, known as workarounds, when there is no Terminal functionality that exactly aligns with the client's needs.  (Saven 2016 Dec. ¶ 16; Yeulett Dec. ¶ 9; Leyfman Dep. 93:22-94:25; Berner Dec. ¶ 12).)

Beyond consulting work, Representatives perform one or more of numerous other responsibilities, with their particular mix of duties dependent upon each Representative's level of experience, skills, areas of interest, and the business needs of Bloomberg's clients and the Department.  (Yeulett Dep. 245:21-246:17; Saven 2016 Dec. ¶ 18.)  These responsibilities can include training other Representatives (Yeulett Dep. 246:7-15; Saven 2016 Dec. ¶ 18; Stephens

-4-

Dec. ¶ 15); quality control on the work of others Representatives (Psulkowski Dep. 253:3-20, Renny Dep. 154:6-20); leading client seminars and visiting clients to educate them on the Terminal and market concepts (Sanseverino Dec. ¶ 17 ("presented customized training to clients on Terminal functionality")); and serving as deputy team leaders (Held Dep. 96:14-98:15).

In addition, Representatives make product enhancement recommendations (Psulkowski Dep. 149:18-151:22 ("[r]ecommend new features and enhancements to better address client . . . needs"), promote Terminal sales, including by visiting clients (Psulkowski Dep. 256:13-259:19); and create internal education resources for other Representatives (Leyfman Dep. 197:13-19, 210:4-7, 212:11-22, 224:9-11).

### 2.    Representatives' Varying Roles and Specialties

Representatives progress through three established roles within Analytics: Generalist, Specialist, and Advanced Specialist, progressing from one role to the next during their tenure. As they progress, they perform less consulting work as a percentage of time, although their consulting work becomes more complex and specialized, and they spend increasing percentages of time on other, proactive duties.  (Saven 2016 Dec. ¶¶ 11, 17-20; Yeulett Dec. ¶¶ 6, 11-12.) After a brief training period, Analytics Representatives start in the Generalist role.  (Saven 2014 Dec. ¶ 12.)  Generalists tend to spend about 80% of their time consulting with clients.  (Saven 2014 Dec. ¶ 13; Saven Dep. 211:22-212:7; Yeulett Dep. 100:21-101:24.)  Within a few weeks in the role, Generalists begin to focus on Terminal functions specific to one or more of four broad asset classes: Fixed Income (bonds, loans, and related derivatives); Equity (stocks and related derivatives); Foreign Exchange (currencies and related derivatives); and Commodities (materials derivatives).  (Saven 2016 Dec. ¶ 13; Saven Dep. 72:23-73:8; Yeulett Dec. ¶ 8.)

After roughly 5-8 months as a Generalist, Representatives move into the Specialist role, specializing in one or more of about 40 areas of expertise, such as Fixed Income Derivatives,

PORT Advanced Equity, Advanced Charting, FX/Commodities, API Fixed Income, and

Mortgages.  (Saven 2016 Dec. ¶ 17; Saven Dep. 26:22-27:18; Yeulett Dec. ¶ 11.)  By way of

example, Fixed Income Derivatives specialists advise on Terminal functionality that analyzes

instruments used to hedge against risks.  (Saven 2016 Dec. ¶ 17.)  PORT Advanced Equity

Specialists, in contrast, advise clients on using Terminal functionality to create and analyze the

clients' portfolios.  (Saven 2016 Dec. ¶ 17.)  Specialists generally spend approximately 60-80%

of their overall time consulting in response to client inquiries, and 20-40% of their time on other

duties.  (Saven 2016 Dec. ¶ 18; Saven Dep. 211:22-212:8, 212:17-213:18; Yeulett Dec. ¶ 11.)

After about 7 months to 1 year as a Specialist, Representatives may transition into the

Advanced Specialist role, where they further specialize in their areas of expertise and handle

matters of still increasing complexity.  (Saven 2016 Dec. ¶ 19.)  Advanced Specialists are

expected to, and do, have in-depth knowledge of the markets and the Terminal, handling

extremely complex inquiries and providing sophisticated advice.  (Saven 2016 Dec. ¶ 19.)

Consulting in response to client inquiries generally decreases as a percentage of time while time

spent on other duties increases to 40-60%.  (Saven 2016 Dec. ¶ 20; Saven Dep. 211:22-212:9,

215:10-216:19; Yeulett Dep. 102:21-24, 103:15-104:3.)

The roles within the Department are not rigid; rather, to progress from one role to another,

Representatives generally must perform the responsibilities of the role to which they aspire, be it

at the Specialist or Advanced Specialist level.  (Saven 2016 Dec. ¶ 21; Saven Dep. 73:18-74:8.)

Accordingly, each Representative's duties evolve even during their limited time in any single

role.  (Saven 2016 Dec. ¶ 21.)

Because of the breadth of the Representative position and the rapid evolution of duties

within the position, Representatives' duties vary person to person based on their role, level of

experience, particular skills and interests, the needs of Bloomberg's clients, and the needs of the Department at any given time.  (Saven 2016 Dec. ¶ 22.)  At no point has Bloomberg made an across-the-board determination that any duty performed by Representatives is more important than any other.  (Saven Dep. 232:15-233:9, 279:4-19; Saven 2016 Dec. ¶ 22.)  In fact, Bloomberg designed the position to encompass a broad range of important duties specifically to give the Company flexibility to meet business needs and the demands of sophisticated clients in a highly technical and ever changing environment.  (Saven 2016 Dec. ¶ 22.)

For any given Representative, the importance of specific duties relative to others changes over time and, at any particular point, depends on the Representative's mix of work, Department staffing levels, developments in the financial markets, product development cycles, customer demands, competitive pressures, and the Representatives' skills, experience, and interests. (Saven Dep. 239:14-24, 280:12-281:9; Saven 2016 Dec. ¶ 22; Yeulett Dep. 187:21-188:2, 245:21-246:20)  For example, during times of high client demand or low headcount, a Representative's consulting services may be particularly important.  (Saven 2016 Dec. ¶ 22.) Alternatively, when Bloomberg rolls out new functionality or large-scale Terminal changes, a Representative's most important responsibility may be promoting new functions to clients. (Saven 2016 Dec. ¶ 22.)  For a Representative with particularly strong product knowledge, assisting with product development may be the most important duty.  (Saven 2016 Dec. ¶ 22.)

Representatives' duties have also changed with changes in the Department.  For example, subspecialties were created through which Representatives increasingly provided customized advice (Saven 2016 Dec. ¶ 23); cooperation with the Sales Department was formalized to better promote the Terminal (Yeulett Dec. ¶ 13); the number of Advanced Specialists was increased to improve training and product development functions.  (Yeulett Dec. ¶ 13).

-7-

Electronic Trading Representatives, although housed in Analytics, have different duties from other Representatives, working with completely different Terminal functionality.  (Izidoro Dec. ¶ 6, 7, 8; Saven 2014 Dec. ¶¶ 17, 18; Saven Dep. 322:2-16.)

### C.   Named Plaintiffs' Duties as Analytics Representatives

The variance in job duties among Analytics Representatives is also demonstrated by the variance in job duties among just the Named Plaintiffs.  Named Plaintiff Roseman started as a Generalist, became an Equity Specialist after 6 months, and moved to an Advanced Specialist role after another 8-11 months (Roseman Dep. 44:18-46:21), specializing in Equity Portfolio and Equity Derivatives.  (Roseman Dep. 147:23-148:19.)  Named Plaintiff Lee started as a Generalist and became a Fixed Income Specialist after seven months (Lee Dep. 45:12-46:4), specializing in Mortgages.  (Lee Dep. 170:24-171:2.)  Named Plaintiff Van Vleet became an Equity Specialist after about eight months as a Generalist (Van Vleet Dep. 35:3-11), with an expertise in the application programming interface.  (Van Vleet Dep. 106:7-17.)

Named Plaintiffs carried out their consulting work in different ways.  Roseman claims that he rarely presented the client with multiple options because in his opinion there was generally only one solution.  (Roseman Dep. 180:6-81:24).  When there were multiple options, he rarely explained the relative advantages and disadvantages of each.  (Roseman Dep. 181:25-82:14).  Lee testified that in his experience a "monkey can" answer client questions because "you're just searching, copying and pasting."  (Lee Dep. 273:18-24, 396:12-14.)[2]  In stark contrast, Van Vleet handled questions with multiple solutions 60-65% of the time as a Generalist and 80-85% of the time as a Specialist.  (Van Vleet Dep. 139:17-140:10.)  Van Vleet also "tr[ied] to get [clients] to utilize the Terminal more in their day-to-day activities" and "show[ed] them

---

[2] Lee's testimony conflicts with his resume description of his duties.  (Lee Dep., Ex. 3 ("highly trained analytics specialist [who] consulted clients in their analysis [of] fixed income, FX and commodity securities").)

different aspects of the Terminal." (Van Vleet Dep. 41:7-8, 12-14.)

The Named Plaintiffs' respective mixes of work also varied markedly. Roseman performed quality control reviews and trained other Representatives. (Roseman Dep. 287:9-13.) Lee did not perform these duties, but he did write a blog on market developments, was a deputy team leader, and conducted client seminars. (Lee Dep. 66:18-23, 69:16-25, 130:24-131:8, 178:17-179:2, 275:10-13.) Van Vleet did not write any blogs or newsletters, serve as a deputy team leader, conduct client seminars, or perform quality control. (Van Vleet Dep. 60:4-61:17, 167:4-21, 155:3-4). He did, however, support Sales on client development projects. (Van Vleet Dep. 135:4-19, 193:24-194:6).

### D.  Time and Hours Worked by Analytics Representatives

Bloomberg does not track Representatives' hours worked. (Wheatley Dep. 253:14-254:5.) Representatives badge in and out of Bloomberg's facilities, but the badge hours do not necessarily represent working hours, since they include time engaged in personal tasks of varying duration and undertaken with varying frequency while badged in. (Saven 2014 Dec. ¶¶ 8, 9; Lampe Dec., Ex. P, Expert Report of Dr. John H. Johnson, IV ("Johnson Rpt.") ¶ 10.) These include eating breakfast (Williamson Dec. ¶ 4; Van Vleet Dep. 223:13-15; Roseman Dep. 308:16-309:6; Leyfman Dep. 321:12-15), eating lunch (Williamson Dec. ¶ 8), reading the news (Krizek Dec. ¶ 5), and chatting with friends (Lee Dep. 360:22-365:11; *see also* Johnson Rpt. ¶ 10). Thus, class members vary as to when they start working after they badge in and how often and for how long they take breaks. (Johnson Rpt. ¶ 10.)

To the extent that Representatives worked outside of a Bloomberg facility, no data reflects this work time. (Hannawacker Dep. 129:2-5; 194:5-20.) Class members variously allege working between 2 and 15 hours per week outside the office. (Johnson Rpt. ¶ 33.)

E.        **Procedural History**

Plaintiff Roseman filed this case in April 2014, alleging that he and other Representatives were misclassified as exempt from overtime requirements under the FLSA and NYLL.  (Dkt. No. 2.)  Early in the case, the Court granted Roseman's motion for conditional certification of an FLSA opt-in class of Representatives (all of whom worked in New York or California), finding that Roseman satisfied his "minimal" burden.  (Dkt. No. 37 at 3.)  Notice issued to more than 700 individuals, but in addition to the Named Plaintiffs, only 30 people – less than 5% – have opted into the FLSA collective action ("Opt-In Plaintiffs" or "Opt-Ins").  (Lampe Dec. ¶ 3.)  On September 22, 2016, Bloomberg moved to decertify the FLSA opt-in class.  (Dkt. No. 198.)

In the interim, on April 6, 2016, Roseman filed a Third Amended Complaint adding (i) Lee and Van Vleet as named plaintiffs and, (ii) California-law claims.  (Dkt. No. 103.)  Lee and Van Vleet now ask the Court to certify their respective NYLL and California-law claims under Rule 23.  (Motion 1-2.)  In so doing, they seek to represent the 95% of putative class members who received notice but affirmatively declined to participate as an FLSA opt-in plaintiff.

## ARGUMENT

## I.     THE CLASS CERTIFICATION STANDARD

"The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met."  *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010).  A class may be certified only "if the trial court is satisfied, after a rigorous analysis," that the plaintiff has met the exacting standards of Rule 23.  *Gen Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 161 (1982).  "The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1432 (2013).

"Rule 23 requires that a proposed class action (1) be sufficiently numerous, (2) involve

questions of law or fact common to the class, (3) involve class plaintiffs whose claims are typical of those of the class, and (4) involve . . . representatives who adequately represent the interests of the class." *Myers*, 624 F.3d at 547 (citing Fed.R.Civ.P. 23(a)). "Moreover, Rule 23(b)(3) . . . . requires the party seeking certification to show that 'questions of law or fact common to class members predominate over any questions affecting only individual members' and that class treatment would be superior to individual litigation." *Myers*, 624 F.3d at 547 (quoting Fed.R.Civ.P. 23(b)(3)). Here, Plaintiffs fail to meet Rule 23(a)'s commonality, typicality, and adequacy prongs, and further fail to meet Rule 23(b)(3)'s predominance and superiority prongs.

### A.   The Administrative Exemption Under New York and California Law

The key issues in this case are whether Lee and the putative New York class members meet the New York administrative exemption, and whether Van Vleet and the putative California class members meet the California administrative exemption. (Dkt. No. 106, p. 14.) If an employee meets the exemption requirements, his or her claims are barred as a matter of law.

"Applying the administrative employee regulations requires a thorough, fact-intensive analysis of the employee's employment duties and responsibilities." *Kadden v. VisualLex, LLC*, 910 F. Supp. 2d 523, 535 (S.D.N.Y. 2012). The New York administrative exemption follows the current FLSA administrative exemption, *see Romero v. H.B. Auto. Grp., Inc.,* 2012 WL 1514810, at *7 (S.D.N.Y. May 1, 2012), and applies to any employee whose "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers" and whose primary duty "includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200.

"[P]rimary duty means the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). This analysis "must be based on all the facts in a

particular case" and requires consideration of "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; [and] the employee's relative freedom from direct supervision."  29 C.F.R. § 541.700(a). "[E]mployees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement."  29 C.F.R. § 541.700(b).  That said, "[e]mployees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement" if the exempt work is the employee's most important duty.  *Id.*  Courts routinely find a particular duty to be the primary duty even where it takes up a relatively small percentage of the employee's overall time.  *See, e.g.*, *Altemus v. Fed. Realty Inv. Trust*, 490 F. App'x 532, 536 (4th Cir. 2012) (20-25% of the time); *Ferrell v. Gwinnett Cty. Bd. of Educ.*, 481 F. Supp. 2d 1338, 1344 (N.D. Ga. 2007) (5-15% of the time); *Kastor v. Sam's Wholesale Club*, 131 F. Supp. 2d 862, 867 (N.D. Tex. 2001) (10% of the time).

The California administrative exemption applies to any employee "[w]hose duties and responsibilities involve . . . [t]he performance of office or non-manual work directly related to management policies or general business operations of his/her employer or his/her employer's customers," "[w]ho customarily and regularly exercises discretion and independent judgment," and "[w]ho performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge" or "executes under only general supervision special assignments and tasks," and "[w]ho is primary engaged" in exempt duties. Cal. Wage Order 4-2001(1)(A)(2), codified at 8 Cal. Code Regs. § 11040(1)(A)(2).

### B.    Application of Rule 23 in Exemption Cases

In *Myers*, 624 F.3d at 550, the Second Circuit affirmed denial of Rule 23 certification in a NYLL executive exemption case.  The court noted that the exemption analysis "require[s] the district court to decide a number of subsidiary questions involving whether plaintiffs fall within"

-12-

certain Labor Department criteria, with "the question of entitlement to overtime pay . . . answered by examining the employee's actual duties." *Id.* at 548, 550 (citing 29 C.F.R. §§ 541.2; 541.700)). The Second Circuit found that resolving defendant's liability required "individual factual analysis" given differences in class member duties and given defendant's "suggestion that the 'primary duties' of managers differ." *Myers*, 624 F.3d at 550.

In *Cuevas v. Citizens Fin. Grp., Inc.*, 526 Fed. App'x 19, 22 (2d Cir. 2013), another misclassification case, the Second Circuit reversed the grant of class certification, finding that the lower court failed "to address all of the evidence before it and resolve the material factual disputes arising from the conflicting declarations." *Id.* The declarations – from putative class members and company managers – "if credited, suggested that . . . [class members'] primary duties varied." *Id.*

Numerous Rule 23 cases involving the administrative exemption embrace these principles. For example, in *Benedict v. Hewlett-Packard Co.*, 314 F.R.D. 457, 474-75 (N.D. Cal. 2016), the court denied Rule 23 certification, finding that "individual inquiries would be necessary to determine what constitutes each [Technical Solutions Consultant's] primary duty because the evidence shows . . . work experiences that differ in ways that go to the heart of the elements of the" administrative exemption. *Id.* at 477. In *Hendricks v. J.P. Morgan Chase Bank, N.A.*, 263 F.R.D. 78, 86 (D. Conn. 2009), the court denied certification of a class of fund accountants where class members testified to differing levels of accounting knowledge and different duties resulting from "different types of . . . clients hav[ing] different needs and consequently request[ing] different types of . . . accounting services." In *Williams v. Lockheed Martin Corp.*, 2011 WL 2200631, *12 (S.D. Cal. June 2, 2011), the court denied certification of a class of systems administrators and analysts because their "broad categories of work . . .

-13-

encompass varying tasks with varying levels of complexity [and] varying levels of judgment."[3]

## II.   THE COURT SHOULD DENY PLAINTIFFS' MOTION FOR CLASS CERTIFICATION OF NEW YORK LAW CLAIMS

Plaintiffs have failed to meet their exacting burden of proof to justify class certification.

### A.   Plaintiffs Have Failed To Satisfy Rule 23(b)(3)

Under Rule 23(b)(3), Plaintiffs must prove that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior" to individual litigation.  Fed. R. Civ. P. 23.  The purpose of 23(b)(3) "is to ensure that the class will be certified only when it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness."  *Myers*, 624 F.3d at 547.

#### 1.   Plaintiffs Have Failed to Demonstrate That Common Issues Predominate

"The 'predominance' requirement of Rule 23(b)(3) 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"  *Myers*, 624 F.3d at 547 (quoting *Amchem Prods. v. Windsor*, 521 U.S. 591, 623 (1997)).  Because overtime exemptions, including the administrative exemption, turn on the "duties that the employee actually performs," *Myers*, 624 F.3d at 549 (citing 29 C.F.R. § 541.700(a)), a plaintiff cannot show predominance where "individualized inquiries would be necessary to determine the correct" classification of each class member, *Ruggles*, 272 F.R.D. at 340, or where class members "are all exempt for

---

[3] Other courts have denied Rule 23 class certification where variation in duties impacts resolution of the administrative exemption.  *See, e.g., Ruggles v. WellPoint, Inc.*, 272 F.R.D. 320, 340 (N.D.N.Y. 2011) (denying certification; "nurses employ different tools in different combinations and consult them with varying frequency"); *Trawinski v. KPMG LLP*, 2012 WL 6758059, *7 (S.D.N.Y. Dec. 21, 2012) (denying certification; "the types of assignments given to [Transaction] Associates may be similar, [but] the specifics can vary"); *In re Morgan Stanley Smith Barney LLC Wage & Hour Litig.*, 2016 WL 1407743, at *5 (D.N.J. Apr. 11, 2016) (denying certification; administrative exemption "involves a fact intensive inquiry"); *In re RBC Dain Rauscher Overtime Litig.*, 703 F. Supp. 2d 910, 969 (D. Minn. 2010) ("painstaking and fact-intensive inquiry with respect to each individual plaintiff's actual, day-to-day work"); *Novak v. Boeing Co.*, 2011 WL 7627789, at *6 (C.D. Cal. Dec. 19, 2011) ("differences between class members . . . would require individualized assessment").

reasons as multitudinous as their varied assignments," *Trawinski*, 2012 WL 6758059, at *6.

### (a)   The "Primary Duty" Analysis Varies From Person to Person

Here, as in *Benedict*, *Hendricks*, and *Williams*, there is significant variation in the day-to-day duties of class members, the percentage of time spent on particular duties, the manner in which they carried out their duties, and the extent to which they worked independently, such that individualized issues relating to each Representative's exempt status would swamp any alleged common issue.  Accordingly, the Court should deny Plaintiffs' class certification motion.

### (i)   Plaintiffs' Duties Varied From Person To Person

The material, disqualifying variation in duties across the proposed class is undeniable. *Benedict*, 314 F.R.D. at 475 (certification denied; "significant variation in the actual work performed by [putative class members]"); *Hendricks*, 263 F.R.D. at 89-90 (certification denied; class members "perform a wide variety of job duties" such that "the differences between [their] job responsibilities outweigh their similarities"); *Williams*, 2011 WL 2200631, at *13 ("tasks actually performed by proposed class members differs across the proposed class").

To begin with, as Plaintiffs concede (Dkt. No. 77, p. 5), the multiplicity of potential duties is clear on the face of Company documents describing what Representatives do.  These duties range broadly from "helping construct a relative comparison sheet for a research analyst" to "advising a portfolio manager on our risk management tools" to "providing liquidity analysis solutions to a trade."  (Dkt. No. 179-19, Job Reqs., BLP_RM_00001648, Cell M110.)  Job postings reflect other types of duties, such as "face-to-face trainings [for] customers" and "showcas[ing] . . . Bloomberg solutions to meet our clients' specific workflow needs."  (*Id.*)

Class member testimony confirms Representatives' disparate and individualized mixes of work.  *See, e.g.*, Winsor Dec. ¶ 23 ("evaluated chats between clients and . . . Generalists and Specialists for quality purposes"); Izidoro Dec. ¶ 19 ("client visits to educate them about FXGO,"

including "a trip to visit several clients in Brazil"); Ardemagni Dec. ¶ 10 ("analyze[d] trends in the type of advice requests that Bloomberg receives from clients" and "suggested product enhancements based on the trends"); Sanseverino Dec. ¶ 17 ("presented customized training to clients on Terminal functionality"); Stephens Dec. ¶ 18 ("analyzed [Representatives'] workload and made recommendations regarding the number . . . working during each shift").

Even within the realm of consulting, class members' duties varied significantly, which is unsurprising given that Bloomberg's customers themselves have widely varying business models and needs, and thus seek a diverse array of advice.  For example, Named Plaintiff Roseman "[a]ssisted Portfolio Managers and Analysts to create and manage proprietary portfolios to best prepare portfolio analytics."  (Roseman Dep., Ex. 2.)  Opt-In Nicholas Psulkwoski "[p]rovided analysis and generated solutions for global clients on security pricing, relative valuation, hedging, risk and return, [and] derivative valuation."  (Psulkowski Dep., Ex. 2.)  And Sanseverino "advised traders looking to find the right time to buy or sell."  (Sanseverino Dec. ¶ 6.)

This variance is also made abundantly clear through Plaintiffs' own deposition testimony. For example, Opt-In Psulkowski went on client visits, trained other Analytics Representatives, and performed quality control, among other responsibilities.  (Psulkowski Dep. 61:9-14, 103:18-107:19, 253:3-20.)  Psulkowski did not, however, serve as a Deputy Team Leader.  (Psulkowski Dep. 167:7-12.)  Opt-In Lownes, on the other hand, did serve as a Deputy Team Leader and, like Psulkowski, went on client visits and performed other promotional work, such as "displac[ing] redundant competitive products" and "identify[ing] new sales opportunities."  (Lownes Dep. 32:20-33:7, 49:18-50:50:5, 102:9-103:12.)  However, unlike Psulkowski, Lownes did not train other Representatives or conduct quality control.  (Lownes Dep. 259:22-23, 255:15- 21.)  Opt-In Krieger, meanwhile, consulted clients, but did not serve as a Deputy Team Leader, conduct

-16-

trainings, generate sales leads, visit clients, uncover competitors' products, or conduct quality control.  (Krieger Dep. 74:7-10, 88:14-21, 90:9-92:10, 93:25-94:12, 97:8-9.)  And Opt-In Coldwell performed far different tasks, as he "developed . . . training content for 400+ new hires and 200+ fixed income specialists" and "plan[ned] . . . inaugural two day in-depth training on mortgage-backed securities."  (Lampe Dec. Ex. O.)

Each class member's particular compliment of duties *must* be considered by the fact finder in applying the exemption.  *Cuevas*, 526 Fed. App'x at 22 (reversing class certification; district court failed to consider "conflicting evidence concerning the primary duties"); 29 C.F.R. § 541.700(a) (primary duty "must be based on all the facts in a particular case").  Indeed, depending upon on the individual circumstances, including the importance of the duty relative to others in the individual's mix, the percentage of time spent on the duty, and the level of supervision under which it was performed, 29 C.F.R. § 541.700(a), each of the duties encompassed by the Representative position could separately satisfy the exemption criteria.  *See, e.g.*, See 29 C.F.R. § 541.201(c) ("employees acting as . . .consultants" satisfy administrative exemption); 29 C.F.R. 541.203 (b) ("promoting the employer's financial products" is exempt administrative work); *Schwind v. EW & Associates, Inc.,* 357 F. Supp. 2d 691, 706 (S.D.N.Y. 2005) ("providing . . . training services" is exempt administrative work); *Lopez v. United Parcel Serv., Inc.*, 2010 WL 3630619, at *4 (N.D. Cal. Sept. 10, 2010) ("recommend[ing] improvements to increase efficiency" is exempt administrative work); *Cruz v. Lawson Software, Inc.*, 764 F. Supp. 2d 1050, 1067 (D. Minn. 2011) ("modif[ying] user manuals" is exempt administrative work); *Grupke v. GFK Custom Research N. Am.*, 2015 WL 363589, at *6 (S.D.N.Y. Jan. 28, 2015) (quality control is exempt administrative work).  Moreover, because a duty can qualify as "primary" even where it is performed well less than 50% of the time (*see*

-17-

*supra* I.A), none of these duties can be overlooked.

Further demonstrating the highly individualized nature of duties here, each Representative's own mix of duties changed over time.  For example, as a Generalist, Plaintiff Roseman shadowed recent hires to provide them real-time performance feedback (Roseman Dep. 252:9-23); assisted other Generalists (*id*. at 152:22-153:11); and created customized and integrated Launchpads for clients (*id*. at 50:14-18).  As a Specialist, he coordinated client transitions from competing products (Roseman Dep. 51:3-13); served as a Deputy Team Leader (*id*. at 193:6-9); and became a subspecialist in equity derivatives and portfolio (*id*. at 191:8-16).  And as an Advanced Specialist, Roseman performed still other duties, such as conducting client seminars (Roseman Dep. 75:18:18); overhauling portfolio analytics training (*id*. at 226:11-227:6); and conducting quality control for other Representatives (*id*. at 230:2-231:13).  For his part, as a Generalist, Opt-In Psulkowski provided end-user support covering all market sectors, advised other Representatives on swap-related issues, and edited internal guidebooks.  (Psulkowski Dep. 25:2-16, 206:12-207:12, 210:10-211:20, 213:3-8.)  By the time he was an Advanced Specialist, Psulkowski performed an entirely different set of tasks: sales visits, coached, assisted in recruiting, trained other Representatives, performed quality control, and wrote an article. (Psulkowski Dep. 29:2-30:10, 69:9-14, 89:2-91:16, 103:18-107:19, 256:13-24, 266:3-267:9, 278:16-279:11, 253:3-20.)

Representatives' duties evolved even within the time they were in a particular role. (Ardemagni Dec. ¶ 16 ("job as an Advanced Specialist changed significantly during the time I was in the role"); Berner Dec. ¶ 16 (as Specialist, joined Advanced Specialist team and took Advanced Specialist inquiries); Lownes Dep. 21:18-23:20, 35:15-36:4, 75:10-13 (Specialist duties changed markedly after joining Sales rotation).)  For example, Ardemagni initially spent

-18-

much of his time consulting because "the group was very busy." (Ardemagni Dec. ¶ 16.) Later

on, with a lower volume of consulting, he spent "a lot of time training Generalists and Specialists,

developing user guides and working with product managers to analyze trends and make

enhancement recommendations." (Ardemagni Dec. ¶ 16.)

### (ii)    Representatives Spent Varying Percentages of Time On Their Duties

In addition, variance in the percentage of time that Representatives spent on particular

tasks independently bars class certification. *See* 29 C.F.R. § 541.700(a) (administrative

exemption requires analysis of "amount of time spent performing exempt work"); *Benedict*, 314

F.R.D. at 478 (denying certification; "proportion of each [type of work] varies," thus "an

individualized inquiry [is] necessary to determine each employee's primary duty"). As a

Specialist, Named Plaintiff Roseman spent over 95% of his time consulting clients in response to

their inquiries. (Roseman Dep. 287:14-18.) In contrast, while Amanda Lownes was a Specialist,

she spent 50% of her time consulting, and the other 50% identifying sales opportunities, going

on sales visits, and persuading customers to use Bloomberg products. (Lownes Dep. 22:13-23:3,

32:20-33:7, 49:18-50:5, 320:19-20.) Matthew Renny testified that he spent about 80% of his

time as a Specialist consulting clients in response to their requests. (Renny Dep. 223:25-224:7.)

### (iii)    Representatives Performed Duties of Varying Complexity

Variance in the complexity of work performed by class members further demonstrates the

predominance of individual issues. *Benedict*, 314 F.R.D. at 475 (denying class certification;

complexity of "work varies depending upon the individual's tier and function"). For example,

from the time they were Generalists, Representatives were encouraged to become subject-matter

experts on a subset of Terminal functionality and market sectors, enabling them to take on work

of increasing complexity; they did so, however, to varying extents. (*Compare* Krieger Dep.

44:16-45:16 (Message "contact") *with* Stephens Dec. ¶ 11 (application programming interface contact as a Generalist), *and* Lownes Dep. 182:12-20 (never a subject-matter contact as a Generalist).)  Further, many Representatives held different asset- and product-specific specialties, and these varied in complexity and sophistication (Saven 2016 Dec. ¶ 17; Yeulett Dec. ¶ 11), whereas some did not specialize at all.  (*Compare* Psulkowski Dep. 29:15-19 (mortgage-backed securities and municipal bonds subspecialties), Leyfman Dep. 120:8-12 (technical analysis specialist), Lownes Dep. 228:23-231:14 (no subspecialist inquiries).)  Others still, like Lucas Izidoro, held the Electronic Trading Representative specialty.  (Izidoro Dec. ¶¶ 6-8 ("very little overlap between the expertise and duties of ET Reps" and other Representatives).)

### (iv)    Representatives Carried Out Their Duties in Varying Ways

Individual issues also predominate because class members testified to carrying out their consulting duties in materially varying ways.  *Hendricks*, 263 F.R.D. at 85 (denying certification; some fund accountants were "not . . . concerned with accounting principles and GAAP"; others used such principles routinely); *Benedict*, 314 F.R.D. at 474 (some describe a "limited troubleshooting role"; others "engage in proactive planning and advising").  Aleksander Leyfman testified that he chose between multiple possible solutions to client's inquiries based on the client's "specific needs" (Leyfman Dep. 169:21-170:18, 244:9-24) and created "creative solutions" (*id*. at 93:22-94:23).  Daniel Berner similarly "tailored [his] advice to the client's individual needs" and made different recommendations "depending on their market sector, market role, and individualized preferences."  (Berner Dec. ¶ 5; *see also* Stephens Dec. ¶ 7 ("assess the client's needs before recommending the function that I thought would suit them best").)  *See Cruz*, 764 F. Supp. 2d at 1067 ("consultant who implements her employer's software at a client and assists the client with training, trouble shooting, and modifications"

exempt if "independent judgment" used).  In sharp contrast, Named Plaintiff Lee testified to "just searching, copying and pasting" (Lee Dep. 396:12-14) and Opt-In Renny testified that his job was like "working in a salt mine…same questions…same responses" (Renny Dep. 150:12-24).

Moreover, the manner in which Representatives consulted was often dependent upon the sector in which their clients worked, as clients in different industries had different expectations and demands.  For example, clients "routinely" contacted Berner "seeking open-ended advice on how to use certain terminal functions," such as "a very experienced mortgage trader" whose "firm was preparing to trade in swaps."  (Berner Dec. ¶ 15.)  Lucas Izidoro consulted on complex trading functionality issues for clients who "were technical and back-office staff who did not necessarily work at a Terminal."  (Izidoro Dec. ¶ 8.)  And Kevin Stephens "tended to work with hedge funds, mutual funds and other financial institutions that buy securities," so he "gained an understanding of how they tended to use the Terminal," which in turn "helped [Stephens] make recommendations on Terminal functionality."  (Stephens Dec. ¶ 5.)

### (v)     Plaintiffs Experienced Different Levels of Supervision

The degree to which Plaintiffs worked independently without supervision also varied substantially, further demonstrating the predominance of individualized issues.  29 C.F.R. § 541.700(a) (must evaluate"employee's relative freedom from direct supervision"); *Williams*, 2011 WL 2200631, at *14 (denying certification; "employees worked under varying degrees of supervision").  Opt-In Renny testified that he consistently asked his Team Leaders to review advice before providing it to clients.  (Renny Dep. 126:19-127:2 ("five times a day").)  Others were more closely supervised in the period after they were hired, but the level of supervision gradually decreased.  (Lee Dep. 312:10-25.)  But, from the start of his Generalist tenure, Lucas Izidoro was "provided little guidance about how to advise clients" and he "work[ed] largely unsupervised."  (Izidoro Dec. ¶ 10; *see also* Winsor Dec. ¶ 18 ("my Team Leader let me work

independently"); Sanseverino Dec. ¶ 10 ("I generally work under minimal supervision").)

In sum, Plaintiffs cannot prove that commons issues predominate because duties broadly varied among class members in ways that fundamentally impact the exemption analysis.

> **(b)   Differences in the Exercise of Discretion and Independent Judgment**

Class certification should also be denied because of highly divergent testimony on the "exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.202(a); *see Benedict*, 314 F.R.D. at 478 (certification denied; some "recall doing routine work that requires minimal judgment and discretion," while others "advis[ed] clients, train[ed] other engineers, and exercise[ed] significant discretion"); *Williams*, 2011 WL 2200631 at *12 (certification denied; tasks "executed with varying levels of judgment").

For example, Opt-In Renny testified to handling "repetitive" questions and giving the "same responses" over and over again.  (Renny Dep. 150:14-24.)  By contrast, Cono Sanseverino generally chose from among "three or four different Terminal functionalities" and "[s]ince each client came . . . with different goals and different businesses, every client interaction was unique and every piece of advice we gave had to be tailored to that client[]."  (Sanseverino Dec. ¶ 8.)

Representatives also differed in the extent to which they used judgment in evaluating and recommending functionality to enhance the client's business.  Opt-In Leyfman did not generally recommend additional Terminal functions (Leyfman Dep. 89:15-18), but Izidoro "seized upon opportunities to discuss . . . additional functions," particularly where he "thought another function was more appropriate for the [client's] work."  (Izidoro Dec. ¶ 13; *see also* Berner Dec. ¶ 14 ("clients . . . ask for one type of functionality but actually need something else.").)

Representatives' use of workarounds reflects similar variance.  Some performed workarounds frequently.  (Winsor Dec. ¶ 20 ("Often, . . . I had to create custom Excel

worksheets and workarounds to find a creative solution");  Stephens Dec. ¶ 14 ("I often needed

to be creative in finding workarounds"); Berner Dec. ¶ 12 (used "creativity" where clients' needs

cannot "be addressed through any one function").)  Other Representatives used only preexisting

workarounds (Renny Dep. 139:19-140:14), while yet others, such as Andrew Krieger, did not

recall using workarounds at all (Krieger Dep. 121:8-24).

Plaintiffs also varied in their alleged practice of falling back on existing resources, such

as transcripts of past chats, instead of independently evaluating alternatives.  (Leyfman Dep.

295:13-25, 342:5-8 (use of resources a matter of "preference"; was "sure" most Representatives

take different approaches).)  For example, Named Plaintiff Lee alleged that his job was just

"searching, copying and pasting. " (Lee Dep. 396:12-14.)  By contrast, Opt-In Psulkowski

testified that it was "not common" for him to copy and paste from a past chat.  (Psulkowski Dep.

236:17-239:16.)  And Sanseverino did not use these resources at all because "they covered only a

tiny sliver" of Terminal functions and "each client interaction was different and required me to

use my own judgment."  (Sanseverino Dec. ¶ 18.)

Representatives also exercised varying levels of discretion in escalating client requests to

Representative with more specialized knowledge.  Opt-In Renny testified to having no decision-

making latitude because he was required to escalate when the chat window started flashing.

(Renny Dep. 33:9-24, 36:3-19.)  By contrast, Winsor had "no guidelines . . . to follow" so he

"decide[d] whether to consult a client [him]self or escalate the client to an Advanced Specialist."

(Winsor Dec. ¶ 16.)  Others simply preferred to not escalate requests.  (Berner Dec. ¶ 9 )

Plaintiffs also diverged on the extent to which they advised clients on "matters of

significance," another exemption criterion.  29 C.F.R. § 541.200; 29 C.F.R. § 541.202 ("'matters

of significance' refers to the level of importance or consequence of the work performed").  Some

Representatives testified to providing advice of critical importance to Bloomberg's clients.  (*See, e.g.*, Izidoro Dec. ¶ 11 ( "information gap" on Dodd-Frank reporting requirements); Sanseverino Dec. ¶ 6 ("I advised buy-side analysts looking to buy stocks with low price to earnings ratio how to use the equity screening functionality to make those decisions"); Ardemagni Dec. ¶ 7 ("how [clients] could best forecast interest rates" in order to "gauge the right time to undertake…a trade").)  By contrast, Named Plaintiff Lee testified that his job consisted of the mundane handling of questions regarding colors displayed on the Terminal.  (Lee Dep. 47:20- 48:7.)  This sharply contrasting testimony further precludes class treatment.

Because Representatives "exercised varying amounts of discretion in performing their duties," individual inquiries are needed "to determine whether they are subject to . . . exemption defenses," further justifying denial of class certification.  *Hill*, 2011 WL 830546, at *7.

### (c)    Damages Must Be Ascertained on an Individual Basis

"[T]he fact that damages may have to be ascertained on an individual basis is . . . a factor that [a court] must consider in deciding whether issues susceptible to generalized proof 'outweigh' individual issues."  *Roach v. T.L. Cannon Corp*., 778 F.3d 401, 408 (2d Cir. 2015); *Traver v. Lowe's Home Centers, LLC*, 2016 WL 880169, at *5 (S.D.N.Y. Mar. 1, 2016) (failure to "submit[] a model demonstrating that . . . damages can be calculated on a classwide basis" is "prejudicial to plaintiffs' claim that common issues of fact will predominate").

Here, classwide damages are not susceptible to "generalized proof."  *Roach*, 778 F.3d at 408.  Representatives did not track hours worked, and there is no data to accurately show hours worked.  For example, although Bloomberg badge data may show when Representatives arrived at and left the office, this data does not take into account a host of personal non-working time, such as eating breakfast at the Company's pantries before starting work, lunch breaks, and time spent reading the news or checking the internet.  (Johnson Report ¶ 10; Saven 2014 Dec. ¶¶ 8-9;

Williamson Dec. ¶¶ 4, 6, 8.)  To accurately determine damages, the trier of fact must inquire into the daily routine of each Representative to sort out working time from non-working time. (Johnson Report ¶ 10.)  This is yet another reason predominance is not satisfied.

### 2.   Plaintiffs' Predominance Arguments Are Unavailing

For their part, Plaintiffs offer a series of arguments that do little more than confirm that Plaintiffs have fallen woefully short of meeting their stringent Rule 23 burden.

First, Plaintiffs argue (Motion 5) that class certification is appropriate because Representatives "all have the same primary job: to answer help requests from Bloomberg's customers who need assistance with" the Terminal.  But this broad-brush description wholly ignores the most critical element of this case and Plaintiffs' class certification request: the Representatives' *actual* day-to-day duties.  29 C.F.R. § 541.700(a) (primary duty "must be based on all the facts in a particular case").  Indeed, the Second Circuit *reversed* a grant of class certification where the district court did not "address all of the evidence before it" or "resolve the material factual disputes arising from the conflicting declarations," which, if credited, "suggested that [class members'] primary duties varied in respects material to whether they were exempt." *Cuevas*, 526 Fed. App'x, at *21-22 (analyzing all evidence is an "essential" step in "determining whether [putative class members] actually share primary duties such that common issues predominate over individual ones").  Plaintiffs likewise impermissibly ignore the abundant record evidence demonstrating that class members performed a wide variety of duties of varying complexity for varying amounts of time, in varying ways, under varying levels of supervision, which evolved as the Representative progressed in his or her career – all key factors in the exemption analysis.  (*Supra* II.A.)

Second, Plaintiffs argue (Motion 10) that "courts consistently certify wage and hour class actions brought by help-desk employees, similar to the Plaintiffs here, work out of a call center

answering calls from customers who need service and support."  But the cases that Plaintiffs cite,
– *Burch v. Qwest Commcns Int'l*, 677 F. Supp. 2d 1101 (D. Minn. 2009), and *Nolan v. Reliant
Equity Investors, LLC*, 2009 WL 2461008 (N.D. W. Va. 2009) – do not even involve exemption
claims.  *Burch* involved *non-exempt* employees claiming they were not paid for all hours worked.
*Burch*, 677 F. Supp. 2d at 1124.  In *Nolan*, the Rule 23 component involved remedies under the
federal Worker Adjustment and Retraining Notification Act and not a state overtime law.  *Nolan*
2009 WL 2461008, at *1.  While *Nolan* did include FLSA wage claims, as in *Burch* these were
not claims challenging exempt status.  *Id.* at *8.

Moreover, Plaintiffs' statement that class members here are mere "help desk employees"
ignores that, under the governing law, such broad labels do not suffice and the day-to-day duties
must be examined.  *Myers*, 624 F.3d at 548 ("regulations make clear that these questions should
be resolved by examining the employees' actual job characteristics and duties"); *Ruggles*, 272
F.R.D. at 339 (rejecting argument that primary duty is "case management"; analyzing day-to-day
duties to conclude that class members' primary duty varies); *Williams*, 2011 WL 2200631, at *12
(denying certification; "broad categories of work . . . encompass varying tasks with varying
levels of complexity which are executed with varying levels of judgment").  This is true
notwithstanding that Bloomberg, to emphasize the accessibility of Representatives to clients,
referred to the Department as "Help Desk" in client communications.  (Saven 2016 Dec. ¶ 10.)
*Pippins v. KPMG LLP*, 2012 WL 19379, at *42 (S.D.N.Y. Jan. 3, 2012) ("[w]hether an
employee is exempt is determined by the employee's actual work activities, not by the employer's
characterization of those activities").

<u>Third</u>, Plaintiffs cite testimony (Motion 6) from two company witnesses, Christopher
Saven and Ian Yuelett, to argue that Representatives "have the same primary duty . . . to answer

help requests from Bloomberg's customers."  But Saven's testimony concerns only the amount

of time that Representatives spent on consulting work (Saven Dep. 211:22-212:16) and the

amount of time spent on a duty is just one of *many* factors in the primary duty analysis, 29 C.F.R.

§ 541.700(b).  On top of that, the primary duty can be one that a plaintiff spends very little time

on.  *Kastor*, 131 F. Supp. 2d at 867 (primary duty 10% of time).  Plaintiffs rely upon Yeulett's

testimony that, in his opinion, "nothing beside proactive and reactive customer service rises to

the level of importance of these duties within Analytics."  (Yeulett Dep. 183:17-185:12.)  But

Plaintiffs omit Yuelett's subsequent testimony, explaining that "proactive and reactive customer

service" means, in addition to consulting, duties such as training clients, campaigns to introduce

Terminal functionality, assisting with product enhancements, and training other Representatives,

such that no "duty . . . [is] most important for the analytics reps as a whole."  (Yeulett Dep.

187:13-17, 245:7-246:20.)

    Fourth, Plaintiffs ask the Court to certify the class based on "subsidiary related legal

issues," separate from the exemption defense, such as "whether the Defendant employed

plaintiffs, [and] whether Plaintiffs worked over 40 hours in a week."  (Motion 25.)  But the

Second Circuit rejected this precise argument, requiring plaintiffs to prove that the "*more*

*substantial* aspects of this litigation. . . [are] susceptible to generalized proof for all class

members."  *Myers*, 624 F.3d at 551 (emphasis added).  Plaintiffs' "subsidiary" issues (Motion 25)

"are clearly less substantial in the overall mix of issues this case presents when compared to the

ultimate (contested) question . . . [of] whether plaintiffs were *legally entitled*" to overtime.

*Myers*, 624 F.3d at 551 (emphasis in original).

    Fifth, Plaintiffs argue that common issues predominate because Bloomberg's

administrative exemption defense "applies to the class as a whole."  This is yet another argument

rejected by the Second Circuit.  *Myers*, 524 F.3d at 548 ("fact of common exemption does not

establish whether all plaintiffs were *actually* entitled to overtime pay or whether they were

covered by the applicable administrative regulations") (emphasis in original).

Sixth, Plaintiffs make much of two prior cases in which Bloomberg was a defendant

where class certification was granted, *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152 (S.D.N.Y.

2014), and *Enea v. Bloomberg, L.P.*, 2014 WL 1044027 (S.D.N.Y. Mar. 17, 2014).  But those

cases involved different positions – not the Representative position – with different duties,

requirements, and expectations.  *Cf. Barth v. Wolf Creek Nuclear Operating Corp.*, 2002 U.S.

Dist. LEXIS 19716, at *6-7 (D. Kan. Aug. 28, 2002) ("that defendant has previously been found

to have erroneously classified various employees in other positions fails to show that its overtime

policies regarding these employees are suspect").  *Jackson* involved the Global Customer

Support Representative position, and "[t]he parties agree[d] that [class members] have the same

primary responsibility—taking and routing calls."  298 F.R.D. at 166.  This is far afield from the

instant case.  (*Supra* II.A.)  *Enea*, too, has no bearing on the instant case, as that case involved

Global Technical Support Representatives, responsible for hardware and software technical

support and troubleshooting on Bloomberg products.  (Saven 2016 Dec. ¶ 9.)

In sum, Plaintiffs have failed to prove that common issues predominate and their

certification bid fails for this reason alone.  *See* Fed. R. Civ. P. 23(b)(3).

### 3.    Plaintiffs Have Failed to Demonstrate That Class Treatment is Superior to Individual Actions

Class certification should also be denied because Plaintiffs have failed to meet the second

requirement of Rule 23(b)(3), that class treatment would be "superior" to individual litigation.

Fed. R. Civ. P. 23(b)(3).  Factors relevant to this analysis include "the interest of members of the

class in individually controlling the prosecution or defense of separate actions" and "the

difficulties likely to be encountered in the management of a class action." *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 304 (S.D.N.Y. 2003) (citing Rule 23(b)(3)).

Here, because of the significant variation in the work experiences of Representatives, which directly impacts the administrative exemption analysis (*supra* I.A), class treatment is not the superior method to resolve the dispute.  "[A] class action is *not* a superior mechanism for adjudicating . . . claims" where "individualized proof is required to determine the correctness of [d]efendant's categorizing putative class members as exempt." *Ruggles*, 272 F.R.D. at 341 (emphasis added); *see also Wang v. Hearst Corp.*, 293 F.R.D. 489, 498 (S.D.N.Y. 2013) ("individualized nature of proofs . . . signals that case management would be difficult . . . and separate actions may be more appropriate"), aff'd in rel. part, 617 F. App'x 35 (2d Cir. 2015).  In this case, liability turns on facts that are unique to each Representative, as the trier of fact must sort through each Representative's varying duties, the amount of time spent on those duties, and each Representative's specialties and subspecialties, along with each Representative's level of supervision and exercise of discretion and independent judgment.  (*Supra* II.A.)  Trying these claims in a single proceeding would be impossible.  By contrast, individual actions brought by any class members claimed to be aggrieved would be more efficient, manageable, and fair. *Benedict*, 314 F.R.D. at 478 (because "the determination of whether or not a [class member] is exempt would require individual inquiries, [p]laintiffs have also failed to carry their [superiority] burden"); *Hendricks*, 263 F.R.D. at 90 (where "differences among the potential class members . . . outweigh the similarities . . ., managing the class would be quite difficult").

Furthermore, given the amounts of Plaintiffs' damages claims, "this is not a case where the potential recovery for each plaintiff is *de minimis* and a class action is necessary for any class members to recover." *Benner v. Becton Dickinson & Co.*, 214 F.R.D. 157, 173 (S.D.N.Y. 2003).

-29-

Where a case "does not allege small claims of the type that the [Federal Rules] Advisory Committee had in mind when Rule 23(b)(3) was drafted," *Benner*, 214 F.R.D. at 173, "proposed class [members] have a substantial stake and motivation to make individual decisions" and "a class action is not superior to individual litigation," *Emig v. Am. Tobacco Co., Inc.*, 184 F.R.D. 379, 393 (D. Kan. 1998) (cited by *Benner*, 214 F.R.D. at 173). Here, for example, Plaintiff Roseman estimates his total damages are $163,432, while Plaintiff Lee estimates that his damages are $118,948. (Lampe Dec. ¶¶ 20-21.) Plaintiffs estimate that Joseph Cavallaro is owed $276,504 in damages, and the average damages estimate across the Named and Opt-In Plaintiffs is $138,000. (*Id.*) *See Ansari v. New York University*, 179 F.R.D. 112, 115-16 (S.D.N.Y. 1998) (denying certification; "A potential award of around $90,000 is hardly the type of de minimis recovery that would discourage individual class members from . . . filing suits on their own behalf.").

Therefore, Named Plaintiffs have failed to satisfy either prong of Rule 23(b)(3).

## B. Plaintiffs Have Failed to Satisfy Rule 23(a)

Class certification of the NYLL claims should also be denied for the independent reasons that Plaintiffs cannot satisfy the Rule 23(a) commonality, typicality, or adequacy requirements.

### 1. Plaintiffs Cannot Demonstrate Commonality

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury," which depends on "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis in original). Class certification must be denied where "[d]issimilarities within the proposed class have the potential to impede the generation of common answers." *Id.; see also Dailey v. Groupon, Inc.*, 2014 WL 4379232, at *8 (N.D. Ill. Aug. 27, 2014) (due to "individualized experiences and job duties," "[p]laintiffs will not be able

-30-

to establish in one stroke whether the administrative exemption" applies); *Romero v. H.B. Auto. Grp.*, 2012 WL 1514810, at *20 (S.D.N.Y. May 1, 2012) (no commonality in exemption case; "job duties of the proposed class are *not* consistent") (emphasis in original).  Here, too, in light of the significant variation in class members' work experiences, duties, the way their duties were carried out, and the level of discretion they exercised (*supra* I.A), Plaintiffs have failed to demonstrate that there are common answers to the question of whether all class members satisfy the administrative exemption.

For their part, Plaintiffs identify a series of "common questions" (Motion 14-15) and flatly state that, by identifying these questions, they "have established commonality."  But this approach was rejected by the U.S. Supreme Court in *Dukes*.  564 U.S. at 350 ("[w]hat matters to class certification ... is not the raising of common 'questions'—even in droves"); *Callari v. Blackman Plumbing Supply, Inc.*, 307 F.R.D. 67, 76 (E.D.N.Y. 2015) ("as *Wal-Mart* clarified, the presence of common questions is not sufficient to satisfy commonality").  Instead, the key issue is whether the "common contention . . . is capable of classwide resolution," meaning "that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Dukes*, 564 U.S. at 350.  Plaintiffs do not even attempt to argue that a "central" issue is susceptible to classwide resolution "in one stroke."

Plaintiffs point (Motion 17-21) to some post-*Dukes* decisions in which class certification was granted.  But these decisions are distinguishable and off-point.  For example, *Espinoza v. 953 Associates LLC*, 280 F.R.D. 113 (S.D.N.Y. 2011), involved claims that hourly restaurant employees were not paid for all time worked through time shaving.  *Id.* at 119-20.  This is far afield from the exemption dispute here.  *Pippins v. KPMG LLP*, 2012 WL 19379 (S.D.N.Y. Jan. 3, 2012) did not involve Rule 23, but instead involved the far more lenient first-step FLSA

-31-

conditional certification inquiry, which this Court described as "minimal" and a "low threshold." (Dkt. No. 37 at 3; *see also Pippins*, 2012 WL 19379, at *7 ( "Rule 23 standards are not applied when conditionally certifying section 216(b) overtime classes [which] means that . . . *Dukes* . . . is inapplicable")). *Flores v. Anjost Corp.*, 284 F.R.D. 112, 117 (S.D.N.Y. 2012), is likewise distinguishable because it involves allegations that tips were improperly withheld from restaurant employees, and not exemption claims.

Lastly, Plaintiffs argue (Motion 16) that commonality is satisfied because "Defendant had a policy of paying all . . . Representatives a salary and not paying additional premium pay for overtime hours." But common classification does not satisfy commonality. *Romero,* 2012 WL 1514810, at *20 ("uniform decision to classify all employees as exempt" does not establish commonality) (citing *Myers*, 624 F.3d at 959).

### 2.    Plaintiffs Cannot Demonstrate Typicality or Adequacy

Plaintiffs, likewise, have failed to prove that their claims are typical of the proposed class, or that they are adequate class representatives. *See* Fed. R. Civ. P. 23(a)(3), (4). Claims are not typical where "the class representative is subject to a defense that would pose an unacceptable risk of drawing attention away from the central issues in the litigation," *Trawinski*, 2012 WL 6758059, at *7, and a plaintiff cannot adequately represent a class if "a defense unique to [the plaintiff] threatens to become the focus of the litigation," *Noble v. 93 Univ. Place Corp.*, 224 F.R.D. 330, 344 n. 102 (S.D.N.Y. 2004).

Named Plaintiff Lee's own deposition testimony (Dep. 396:9-13, "You just cross your fingers and hope it is correct later on…a monkey can do the job") belies any argument that his experience was typical of his proposed class. Many others testified to having complex day-to-day duties and using significant amounts of discretion. (Krieger Dep. 144:8-19 ("[Y]ou would have to think pretty hard…They asked very difficult questions"); Leyfman Dep. 168:2-19

(discussing use of creativity); Stephens Dec. ¶ 12 ("Managers encourage all Reps . . . to be innovative and take ownership of projects").)  Given this variation, Lee is not an adequate class representative and his claims are atypical of those of his proposed class.  *See Trawinski*, 2012 WL 6758059, at *7-8 (claims not typical and plaintiff not an adequate representative where defendant "rais[ed] material question concerning the adequacy of [p]laintiff's job performance").

## III.   THE COURT SHOULD DENY PLAINTIFFS' MOTION FOR CLASS CERTIFICATION OF CALIFORNIA LAW CLAIMS

Plaintiffs, likewise, have failed to meet their burden to show that their California-law claims can be certified under Rule 23.[4]  The California administrative exemption involves questions such as whether employees (i) have jobs that involve the "performance of office or non-manual work directly related to management policies or general business operations of his/her employer or his employer's customers," (ii) "customarily and regularly exercises discretion and independent judgment," (iii) "perform[] under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge, and (iv) "execute[ ] under only general supervision special assignments and tasks."  Cal. Wage Order 4-2001(1)(A)(2), codified at 8 Cal. Code Regs. § 11040(1)(A)(2).  In this analysis, "[t]he work actually performed by the employee . . . must, first and foremost, be examined."  *Id.*

### A.   Plaintiffs Have Failed To Satisfy Rule 23(b)(3)

Plaintiffs have failed to satisfy Rule 23(b)(3)'s predominance and superiority requirements because California Representatives' "work experiences . . . differ in ways that go to

---

[4] In addition to an overtime claim, Named Plaintiff Van Vleet asserts a California "waiting time" claim and seeks certification of a separate class for this claim.  (Dkt. 103 at ¶¶ 88-92 (Van Vleet "and other members of the California Class who were terminated or resigned" are owed penalties for failure "to be promptly paid lawful overtime compensation"); Motion 37.)  Because this claim is derivative of his overtime claim, and Van Vleet has failed to carry his certification burden on the overtime claim, the Court should likewise deny Van Vleet's request (Motion 37) for certification of the waiting time claim.  *See, e.g., Kilbourne v. The Coca-Cola Co.*, 2015 WL 5117080, at *14 (S.D. Cal. July 29, 2015) (certification denied; "[p]laintiff's waiting time penalties . . . claim[] is derivative of the [overtime] claim[]").

the heart of the elements of the" administrative exemption.  *Benedict*, 314 F.R.D. at 477; *see also*

*Delodder v. Aerotek, In*., 2010 BL 383299, at *17 (C.D. Cal. Aug. 16, 2010), aff'd 471 Fed.

Appx. 804, 806 (9th Cir. 2012) (denying certification; "degree of discretion exercised by [class

members] varies"); *Williams*, 2011 WL 2200631, at *14-15 (denying certification; "employees

worked under varying degrees of supervision" and exercised "varying levels of judgment").

Named Plaintiff Van Vleet and the proposed California class performed varying tasks and

carried out those tasks in varying ways.  *Benedict*, 314 F.R.D. at 477.  Van Vleet alleges that his

job was to merely "respond to requests for assistance regarding how to use proprietary

Bloomberg software."  (3d Am. Compl. ¶ 45.)  But David Goltra, unlike Van Vleet, met with

clients, taught client seminars, worked on long-term projects for specific clients, and conducted

new-hire training for other Representatives.  (Goltra Dec. ¶¶ 17, 23, 24.)  Jeff Leathers, for his

part, and unlike Van Vleet and Goltra, interviewed internship candidates and made hiring

recommendations; reviewed advice given by Generalists and Specialists and provided them with

feedback; and worked with a client to create a hedge fund.  (Leathers Dec. ¶ 14, 20-21.)

California Representatives also varied on the extent to which they "exercised discretion

and independent judgment."  8 Cal. Code Regs. § 11040(1)(A)(2).  In Opt-In Mary Johnson's

experience, allegedly there was "generally only one answer" to a client request for advice.

(Johnson Dep. 270:2-7.)  By contrast, in David Goltra's experience, it was his "job to provide the

best possible advice to every client, which required making judgment calls when there were

multiple ways to proceed."  (Goltra Dec. ¶ 9.)  And Jeff Leathers "provided recommendations on

business solutions that the client had not even considered."  (Leathers Dec. ¶ 6.)

California Analytics Representatives also diverged as to the extent to which they

"perform[] under only general supervision."  8 Cal. Code Regs. § 11040(1)(A)(2).  Mary

Johnson alleged that she did "not at all" work independently.  (Johnson Dep. 300:21-23.)  But Jeff Leathers testified that, as a Generalist, he "was not closely supervised" and his "Team Leader did not tell [him] how to advise clients."  (Leathers Dec. ¶ 9.)  Goltra likewise "worked directly with clients with minimal real-time supervision."  (Goltra Dec. ¶ 11.)

Representatives also diverged as to the extent to which they performed "work along specialized or technical lines requiring special training, experience, or knowledge" or "special assignments or tasks."  8 Cal. Code Regs. § 11040(1)(A)(2).  The specialties vary in complexity, such that Representatives with more complex specialties regularly encounter more complicated questions.  (Saven 2016 Dec. ¶ 17.)  And, to progress into specialties and subspecialties, Representatives must participate in training tailored to the knowledge and expertise needed for the specific area.  (*Id.*)  Not surprisingly then, for example, Equities Specialist David Goltra was required to have "a deep market knowledge and understanding of the client's business" and, as an Advanced Specialist, he "advise[d] clients regarding only the most complex and difficult matters."  (Goltra Dec. ¶¶ 14, 20-21.)  In contrast, Named Plaintiff Van Vleet was not a point of escalation for clients requiring specialized expertise.  (Van Vleet Dep. 152:12-153:5.)

Therefore, because class member testimony varies on key elements of the California administrative exemption, "the merits . . . cannot be resolved without significant individual inquiry" and "common questions do not predominate."  *Delodder*, 2010 BL 383299, at *19.

### B.    Plaintiffs Have Failed To Satisfy Rule 23(a)

Certification of California-law claims should also be denied because Plaintiffs failed to meet their Rule 23(a) burden.  As to Rule 23(a)(2), in light of the variation in job duties at the heart of the California administrative exemption (*supra* I.A), Plaintiffs have not demonstrated commonality.  *Alakozai v. Chase Investment Servs. Corp.*, 2014 WL 5660697, at *8, 9 (C.D. Cal. Oct. 6, 2014) (no commonality; California "administrative exemption would require an

-35-

individualized inquiry" because of "significant variation in terms of whom the Advisors serviced, the level of supervision . . . , and how the Advisors performed their duties").

Plaintiffs, likewise, have failed to demonstrate typicality or adequacy.  *See* Fed. R. Civ. P. 23(a)(3), 23(a)(4).  *See, e.g.*, *Litty v. Merrill Lynch & Co.*, 2014 WL 5904907, at *5 (C.D. Cal. Aug. 4, 2014) (in exemption case, plaintiff "failed to satisfy the typicality requirement" where "[d]efendants' declarations and [p]laintiff's own evidence contradict the allegation that [p]laintiff performed his work duties similarly to other" class members); *Till v. Saks Inc.*, 2013 WL 5755671, at *6 (N.D. Cal. Sept. 30, 2013) (claims not typical and plaintiffs not adequate representatives where "the experiences of the [named] plaintiffs compared to those of the class appear to diverge significantly").  Likewise, here, Named Plaintiff Van Vleet admits that his experience was far from typical of those in the putative California class.  Van Vleet testified to having a difficult relationship with his manager, such that he was denied opportunities to advance as a Representative.  (Van Vleet Dep. 244:12-247:4, 248:3-249:21.)  This is far different from the experience of David Goltra and Jeff Leathers, who were afforded significant career opportunities, progressed to the Advanced Specialist role, and whose work was increasingly complex over time.  (Goltra Dec. ¶¶ 17-18, 20; Leathers Dec. ¶¶ 11-12, 14.)

For their part, Named Plaintiffs have not attempted to prove that they satisfied the Rule 23 certification requirements for the proposed California class.  *Hamelin v. Faxton-St. Luke's Healthcare*, 274 F.R.D. 385, 392 (N.D.N.Y. 2011) ("Each proposed subclass must independently meet the requirements of Rule 23.").   Therefore, the Court should deny Named Plaintiff Van Vleet's request for class certification of California-law claims.

## IV.   THE COURT SHOULD DENY PLAINTIFFS' REQUEST TO ISSUE CLASS NOTICE AND FOR PRODUCTION OF CLASS MEMBER INFORMATION

Because the Court should deny the Motion, it does not need to reach the issues associated

with issuance of class notice.  However, should the Motion be granted, Plaintiffs' request for

class member email addresses (Motion 35) fails because first-class mail is the preferred method.

*See Aponte v. Comprehensive Health Management, Inc*., 2011 WL 2207586, at *7 (S.D.N.Y.

June 2, 2011); *Beckman v. KeyBank, N.A*., 293 F.R.D. 467, 476-477 (S.D.N.Y. 2013); *Karvaly v.

EBay, Inc*., 245 F.R.D. 71, 91 (E.D.N.Y. 2007).  The Court should likewise deny Plaintiffs'

request to post the notice "where it can be seen by current workers" (Motion 35) because "the

potential class members that such a posting would reach are the same [individuals] for whom

defendant most likely has current home address information," *Koehler v. Freightquote.com, Inc*.,

93 F. Supp. 3d 1257, 1266 (D. Kan. Mar. 18, 2015).  Plaintiffs' proposed class notices (Dkt. 179-

20) are likewise deficient.[5]  Because of these and other deficiencies, if the Motion is granted, the

Court should direct the parties to meet and confer on the content of the notices.  *Pichardo v.

Carmine's Broadway Feast, Inc*., 2016 WL 4379421, at *12 (S.D.N.Y. June 13, 2016).

## CONCLUSION

For the reasons set forth herein, the Court should deny the Motion.

| | |
|---|---|
| Dated: September 27, 2016<br>New York, New York | Respectfully submitted,<br><br>JONES DAY<br><br>By:<br>/s/ Matthew W. Lampe<br>_____<br>Matthew W. Lampe<br>Terri L. Chase<br>250 Vesey Street<br>New York, New York 10281<br>(212) 326-3939<br>mwlampe@jonesday.com<br>tlchase@jonesday.com |

---

[5] For example, the notices do not adequately describe Bloomberg's defenses, failing to even mention the administrative exemption.  The notices also fail to mention that a class member would be barred from bringing individual lawsuits.

-37-