UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

**ERIC MICHAEL ROSEMAN, ALEXANDER LEE, and WILLIAM VAN VLEET, individually and on behalf of others similarly situated,**

**Plaintiffs,**

**v.**

**BLOOMBERG L.P.,**

**Defendant.**

Case No. 14-CV-2657 (DLC) (KNF)

ECF Case

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BLOOMBERG L.P.'S MOTION TO DECERTIFY PLAINTIFFS' (1) STATE-LAW CLAIMS RELATING TO LIABILITY AND DAMAGES ISSUES OR (2) IN THE ALTERNATIVE, STATE-LAW CLAIMS RELATING TO DAMAGES ISSUES ALONE**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................... iii

BACKGROUND ................................................................................................................. 2

ARGUMENT ..................................................................................................................... 6

    A.    The Decertification Standard ............................................................................... 6

    B.    Plaintiffs' Damages Claims Should Be Decertified .............................................. 7

        1.    Out-of-Office Hours is an Individualized Question as to Which There is Wildly Varying Evidence and No Common Proof ..................... 8

        2.    Determination of the Appropriate Overtime Calculation Method Requires "Nuanced Determination of the Understanding Between a Given Employee and Employer" And Thus Is Not Susceptible to Common Proof ............................................................................................ 14

    C.    Liability Cannot Be Determined on a Classwide Basis ..................................... 15

CONCLUSION ................................................................................................................. 20

## TABLE OF AUTHORITIES

Page

CASES

*Anderson v. Mt. Clemens Pottery Co.*,
   328 U.S. 680 (1946).........................................................................................13

*Bernard v. Group Pub., Inc.*,
   970 F. Supp. 2d 1206 (D. Colo. 2013)...............................................................18

*Blanchar v. Standard Ins. Co.*,
   736 F.3d 753 (7th Cir. 2013) ............................................................................18

*Carrera v. Bayer Corp.*,
   727 F.3d 300 (3d Cir. 2013)...................................................................7, 10, 13

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013)...............................................................................................6

*Cruz v. Dollar Tree Stores, Inc.*,
   2011 WL 2682967 (N.D. Cal. July 8, 2011)......................................................10

*Cruz v. Lawson Software, Inc.*,
   764 F. Supp. 2d 1050 (D. Minn. 2011)..............................................................19

*Espenscheid v. DirectSat USA, LLC*,
   705 F.3d 770 (7th Cir. 2013) ......................................................................11, 12

*Grochowski v. Phoenix Const.*,
   318 F.3d 80 (2d Cir. 2003).................................................................................10

*Grupke v. GFK Custom Research N. Am.*,
   2015 WL 363589 (S.D.N.Y. Jan. 28, 2015) ......................................................19

*Harold Levinson Assocs., Inc. v. Chao*,
   37 F. App'x 19 (2d Cir. 2002) .....................................................................10, 11

*Hosking v. New World Mortg., Inc.*,
   570 F. App'x 28 (2d Cir. 2014) .........................................................................12

*Hundt v. DirectSat USA, LLC*,
   294 F.R.D. 101 (N.D. Ill. 2013).........................................................................19

*In re Initial Pub. Offerings Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006), decision clarified on denial of reh'g sub nom. 483
   F.3d 70 (2d Cir. 2007) ....................................................................................................16, 17

*Indergit v. Rite Aid Corp.*,
   293 F.R.D. 632 (S.D.N.Y. 2013) ...............................................................................................7

*Jacob v. Duane Reade, Inc.*,
   293 F.R.D. 578 (S.D.N.Y. 2013) ...................................................................................7, 10, 14

*Jimenez v. Allstate Ins. Co.*,
   2012 WL 1366052 (C.D. Cal. Apr. 18, 2012) .........................................................................12

*Jimenez v. Allstate Ins. Co.*,
   765 F.3d 116 (9th Cir. 2014) ...................................................................................................12

*Klein v. Torrey Point Grp., LLC*,
   979 F. Supp. 2d 417 (S.D.N.Y. 2013) ......................................................................................14

*Lance v. Scotts Co.*,
   2005 WL 1785315 (N.D. Ill. July 21, 2005) ...........................................................................15

*Lopez v. United Parcel Serv., Inc.*,
   2010 WL 3630619 (N.D. Cal. Sept. 10, 2010) ........................................................................19

*Mazzei v. Money Store*,
   308 F.R.D. 92 (S.D.N.Y. 2015) ...............................................................................................20

*Mazzei v. Money Store*,
   829 F.3d 260 (2d Cir. 2016) ..............................................................................................6, 20

*McLaughlin v. Am. Tobacco Co.*,
   522 F.3d 215 (2d Cir. 2008) ......................................................................6, 7, 12, 13, 16

*Ramos v. Telgian Corp.*,
   176 F. Supp. 3d 181 (E.D.N.Y. 2016) .....................................................................................14

*Roach v. T.L. Cannon Corp.*,
   778 F.3d 401 (2d Cir. 2015) .......................................................................................................7

*Siegel v. Bloomberg L.P.*,
   2015 WL 223781 (S.D.N.Y. Jan. 16, 2015) ......................................................................14, 15

iv

*Wal-Mart Stores, Inc. v. Dukes,*
   564 U.S. 338 (2011).................................................................................6, 7, 13, 16

**STATUTES AND REGULATIONS**

28 U.S.C. § 2072(b) ............................................................................................7

29 C.F.R. § 541.700(b) ......................................................................................17

Fed. R. Civ. P. 8 ...............................................................................................15

Fed. R. Civ. P. 23 ...................................................................................... passim

Defendant Bloomberg L.P. ("Bloomberg") respectfully moves this Court pursuant to Fed. R. Civ. P. 23(c)(1)(C) to decertify Plaintiffs' state-law damages claims.  Decertification is necessary for two reasons.  First, Plaintiffs' damages claims based on alleged out-of-office work should be decertified.  The number of hours that class members worked outside of Bloomberg's office is a completely individualized issue as to which there is no electronic time-tracking data.  No common evidence whatsoever bears on the issue.  It should therefore be decertified even if the Court were to consider awarding damages for in-office work based on class members' badge data.

Second, the determination as to whether overtime should be paid using the half-time or "fluctuating workweek" method versus the time-and-a-half method turns on the highly individualized issue of whether there was a "clear mutual understanding" between the employer and the employee that the fixed salary was compensation for all hours worked.  As this Court has held, resolution of this issue requires a nuanced determination of the understanding between a particular employee and his or her employer.  The record here demonstrates that class members understood materially different things in this regard:  Some claimed that they understood their salary covered 40 hours, while others testified that they understood their salary covered all hours worked, no matter how few or many.  In these circumstances, decertification of the damages determination is necessary.

Finally, Bloomberg respectfully moves the Court to revisit its prior certification of liability issues and to decertify the state-law classes in their entirety.  Classwide adjudication as to liability would necessarily cause Bloomberg to forfeit defenses that it could assert in individual proceedings.  Under such circumstances, binding authority compels decertification.

## BACKGROUND

Plaintiffs are current and former Analytics Representatives in Bloomberg's Analytics Department.  Plaintiffs bring this case under the federal Fair Labor Standards Act ("FLSA") and New York and California law, asserting that Bloomberg improperly classified them as exempt from the overtime requirements under these laws and that they are owed damages for hours worked over 40 in any given week.  Dkt. 103, Third Amended Complaint.

In February 2015, the Court granted conditional certification of Plaintiffs' FLSA class, pursuant to which notice issued to over 700 potential FLSA class members allowing them to "opt in" to the FLSA case.  There are currently 31 members of the FLSA class.  Following discovery, in fall 2016, Plaintiffs moved to certify state-law classes under Fed R. Civ. P. 23 and for partial summary judgment as to Bloomberg's exemption defense, and Bloomberg moved to decertify Plaintiffs' FLSA class.  In September 2017, the Court denied Plaintiffs' summary judgment motion and Bloomberg's FLSA decertification motion and granted Plaintiffs' Rule 23 motion, certifying separate classes under New York and California law.  Dkt. 307, 308, and 309.

In granting Plaintiffs' certification motion, the Court found certification appropriate in part because of Plaintiffs' representation that "most, if not all, of the overtime liability" could be determined by reviewing "Bloomberg's electronic data."  Dkt. 307 (the New York "Certification Order"), 22.  The Court later determined that such evidence conclusively determines the number of in-office hours worked by each class member.  Ex. B, February 22, 2018 Conference Tr. 5:16-6:5.  However, Plaintiffs' January 2018 damages disclosures demonstrate that this alleged overtime liability is not "most if not all" of the overtime liability that they seek.  Ex. C, Plaintiffs' Second Supplemental Initial Disclosures ("SSID"), 1-2.  In fact, it accounts for less than half of the overtime damages that Plaintiffs claim.  *Id.*; *see also* Ex. M, February 28, 2018 Expert Report of Dr. John H. Johnson, IV ("2018 Expert Report"), 6-8.  The majority of the

damages Plaintiffs seek stems from their alleged out-of-office work.  *Id.*  As to these alleged

damages, Plaintiffs rely not on electronic data as proof, but on "representative" testimony from

select opt-in Plaintiffs.  SSID 1-2.[1]  But they have not produced any statistical basis or analysis

as to how their witnesses will be "representative" of the class as a whole, nor have they disclosed

any methodology or calculation to support the assumption underlying their damages disclosures

that Plaintiffs work 10 out-of-office hours per week on average.  2018 Expert Report 8.[2]  And

Plaintiffs' "representative" testimony does not constitute common evidence of the out-of-office

hours worked by the class.  It is not even common evidence of the out-of-office hours worked by

the "representative" witnesses themselves, as their deposition testimony reveals that their

experiences, relative to each other, were anything but common.

For example, Andrew Krieger testified that the only activity he did at home was study to

prepare for tests during those discrete periods of time when he was in training.  Ex. D, Krieger

Dep. 198:11-199:16.  He testified that he would study "[p]robably two hours a day within a …

two-day period of when the actual tests were" during the 10-week Generalist training period and

2-week Specialist training period (that is, for twelve of the 42 weeks he spent as an Analytics

---

[1] *See also* Dkt. 412, Plaintiffs' Motion to Exclude Bloomberg's Evidence of Incomplete Remote Access Logs to Work Systems, 4 (recognizing that there is "no record of the off-site work hours").

[2] Plaintiffs have moved to exclude the 2018 Expert Report on the grounds that Bloomberg's expert challenged what Plaintiffs now claim is a "non-existent 10-hour assumption."  Dkt. 408 at 6; *see also id.* at 4-5.  As Bloomberg will demonstrate fully in a separate filing, this argument is specious.  Among other things, Plaintiffs' operative Rule 26 damages disclosure specifically states that "Plaintiffs' damages calculations … herein are based upon an average of 10 unrecorded offsite work hours per week, which may be revised up or down based upon the jury's determination."  SSID 2.  The fact that the jury may reject Plaintiffs' 10-hour assumption does not detract from the fact that Plaintiffs' damages calculations are in fact based – explicitly, on the face of Plaintiffs' damages disclosure – on Plaintiffs' "average of 10 unrecorded offsite work hours per week" assumption.  In any event, the conclusion of Bloomberg's expert that Plaintiffs' testimony does not support Plaintiffs' ten-hour assumption applies with equal force to *any* average that could be gleaned from the testimony Plaintiffs intend to present at trial.  2018 Expert Report 13 ("Plaintiffs' assumption of 10 hours of off-site work per week is not based on any identified 'averaging' of self-reported off-site hours from the deposed plaintiffs….").  In other words, Plaintiffs have utterly failed to produce any statistical basis or analysis or even any averaging methodology to justify any claim of average out-of-office hours.

Representative), *id.* at 191:12-193:7, and that he would split this time "50-50" between home and the office. *Id.* at 200:23-201:5. Mary-Lillian Johnson testified that as both a Generalist and a Specialist, she would only work "one to two hours a week" outside of the office if she was not in a training program. Ex. E, Johnson Dep. 244:12-24. But during the 10 and a half weeks that she was in training programs, she allegedly studied approximately 10 to 15 hours per week outside of the office. *Id.* at 237:17-238:24; 242:4-243:10. Tyler Held testified that he worked roughly three hours per week from home as a Generalist but up to six or seven as a Specialist. Ex. F, Held Dep. 272:20-275:15, 277:4-23. Eric Roseman testified that he spent more time working from home as he became more senior, and that the amount of work fluctuated depending on his responsibilities, working between 2-5 and 3-8 hours from home as a Generalist and 5-15 hours a week as a Specialist. Ex. G, Roseman Dep. 291:14-297:18. William Van Vleet testified that he worked up to 15 hours per week when he was studying, but spent 7-10 hours per week brushing up on his knowledge when he did not have tests. Ex. H, Van Vleet Dep. 197:13-199:23 (noting that, while he did this work from home, many colleagues studied at the office). Aleksander Leyfman testified that he worked 7.5 hours each week, during his commute time. Ex. I, Leyfman Dep. 327:18-23, 333:4-7. Meanwhile, Brian Williamson, who did not opt in, but is a member of the putative New York class, swore that he "did not work at home outside [his] scheduled hours." Dkt. 215, Declaration of Brian Williamson ¶ 9. Nick Krizek, a member of the California class, similarly testified that he "generally did not work at home outside of my normal work hours. I did not check my work email or update tickets outside of my regular shift hours; there was no need for me to do so." Dkt. 214, Declaration of Nick Krizek ¶ 9.

    In addition to determining that badge hours conclusively establish in-office hours worked, the Court recently determined that the jury will be required to make certain factual

determinations with respect to whether the Court will calculate overtime using the half-time or "fluctuating workweek" method as opposed to the time-and-a-half method.  February 22, 2018 Conference Tr. 18:25-19:4.  To do so, the jury must determine whether class members had a "clear mutual understanding" that their salary covered all hours of work.  *Id. at* 19:18-20:6. However, the record evidence demonstrates that class members had varying understandings on this score.  For example, Named Plaintiff William Van Vleet testified that he understood his salary to cover a 40-hour week.  Van Vleet Dep. 233:8-23.  On the other hand, Seth Green testified that he understood that Analytics Representatives "were paid a salary, and the salary covered whatever work [Representatives] were supposed to be doing."  Ex. J, Green Dep. 215:10-22.  Likewise, Brian Williamson swore that, while "[t]he number of hours [he] worked varied from week to week," he "understood that this salary was compensation for all of the hours that [he] worked, regardless of the number."  Williamson Dec. ¶ 10; *see also* Krizek Dec ¶ 10 ("I received a salary as an ADSK Rep. I understood that the salary compensated me for all of the hours I worked each workweek, regardless of how few or many, and that I would not receive overtime for any hours worked over 40 in a workweek.").

Finally, in the Certification Order, the Court found that certification was appropriate as to the underlying liability question because class members shared a common "primary duty": "answer[ing] client questions about the Bloomberg Terminal."  Certification Order 21. However, the Court has not made any determination with respect to class members' primary duty that is binding on the jury.  *See also id.* at 22 n.6 (speculating as to what arguments Bloomberg would advance regarding class members' primary duty at trial).  Indeed, Plaintiffs separately moved for summary judgment, in part requesting the Court to preclude Bloomberg from arguing

that their primary duty is anything other than responding to client inquiries, and the Court denied this motion in its entirety.  Dkt. 229, 9-15; Dkt. 309, 2.

As the Court is well aware, this matter is now scheduled for an 8-day trial beginning April 16, 2018 during which each side will have 20 hours to present its case.

## ARGUMENT

### A.    The Decertification Standard

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (internal quotations marks omitted).  The Federal Rules of Civil Procedure permit a court to alter or amend a class certification decision at any time before final judgment.  Fed. R. Civ.P. 23(c)(1)(C).  Additionally, the Second Circuit has held that the Due Process Clause imposes on courts an "affirmative duty of monitoring its class decisions" to ensure that class treatment continues to be appropriate.  *Mazzei v. Money Store*, 829 F.3d 260, 266 (2d Cir. 2016) (internal quotations marks omitted) cert. denied sub nom. 137 S. Ct. 1332 (2017) and 137 S. Ct. 1332 (2017); *see also* 3 Newberg on Class Actions 7:37 (citing *Boucher v. Syracuse University*, 164 F.3d 113, 118 (2d Cir. 1999) (courts are "required to reassess their class rulings as [a] case develops.")).

A plaintiff opposing decertification "retain[s] the burden to demonstrate" the appropriateness of class treatment.  *Mazzei*, 829 F.3d at 270.  "[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23[] have been satisfied."  *Comcast*, 569 U.S. at 33 (2013) (internal quotations marks omitted).  To that end, the use of class adjudication "to mask the prevalence of individual issues … is an impermissible affront to defendants' due process rights."  *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 232 (2d Cir. 2008).  Moreover, "[b]ecause the Rules Enabling Act forbids interpreting Rule 23 to

'abridge, enlarge or modify any substantive right,' 28 U.S.C. § 2072(b)…a class cannot be certified on the premise that [defendant] will not be entitled to litigate its statutory defenses to individual claims."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011).

### B.    Plaintiffs' Damages Claims Should Be Decertified

"[W]henever damages calculations require significant degrees of individualized proof, defendants are entitled to respond to and address such variances—in fact, due process *requires* it."  *Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 592 (S.D.N.Y. 2013) (emphasis added) (*citing Dukes* and *Comcast*), aff'd, 602 F. App'x 3 (2d Cir. 2015); *see also Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013) ("A defendant in a class action has a due process right to raise individual challenges and defenses to claims, and a class action cannot be certified in a way that eviscerates this right or masks individual issues.") (*citing McLaughlin*, 522 F.3d at 231).

Accordingly, even where a court determines that the underlying liability question is susceptible to proof through common evidence, and that, as such, common issues predominate, damages claims should be decertified if they are not similarly subject to proof through common evidence.  *Jacob*, 293 F.R.D. at 592 (partially decertifying class and requiring plaintiffs, if successful on their class merits claims, to proceed individually as to damages); *Indergit v. Rite Aid Corp.*, 293 F.R.D. 632, 659 (S.D.N.Y. 2013) (certifying as to liability only); *cf. Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (recognizing that "*damages may have to be ascertained on an individual basis*" even if a class is certified as to liability) (emphasis added) (*quoting Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010)); *see also* Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues."); Fed. R. Civ. P. 23 advisory committee's note (1966 Amendment, subdivisions (b)(3) and (c)(4)) (contemplating need in a class action for a "separate determination of the damages suffered by individuals within the class" and noting that "the

7

members of the class may … be required to come in individually and prove the amounts of their respective claims").  Here, particularly in light of the Court's decisions on various damages issues, Plaintiffs' damages claims cannot be appropriately decided without significant individualized proof, and thus decertification is required.

### 1.   Out-of-Office Hours is an Individualized Question as to Which There is Wildly Varying Evidence and No Common Proof

In granting Plaintiffs' certification motion, the Court relied in part on "the plaintiffs['] argu[ment] that Bloomberg's electronic data will reveal most, if not all, of the overtime liability."  Certification Order 22.  Plaintiffs' subsequent damages disclosures, however, show that this is not true.  Plaintiffs claim that, in addition to any overtime liability that can be determined using Bloomberg's data – specifically, the time that Bloomberg's badge records demonstrate that class members were present in Bloomberg's offices[3] – each class member worked on average an additional ten hours per week outside of Bloomberg's offices for which they are owed overtime.  SSID 1-2.  These alleged out-of-office hours account for more than half of the overtime damages that Plaintiffs seek to recover at trial.  2018 Expert Report 6-8.  Plaintiffs will attempt to demonstrate the amount of out-of-office hours not through data, but by extrapolating crude averages from the "representative testimony" of a handful of trial witnesses as an alleged "matter of 'just and reasonable inference.'"  SSID 1-2.  However, Plaintiffs have done nothing to demonstrate how the witnesses whom they will present at trial – whose identity,

---

[3] The Court has already concluded that, should Plaintiffs succeed in establishing liability, it will consider any hours captured by these badge records as hours worked for the purpose of calculating damages.  February 22, 2018 Conference Tr. 5:16-6:5.  Bloomberg maintains that these records are over inclusive to the extent that they capture meal breaks and other non-compensable time under the Portal-to-Portal Act, as demonstrated by the testimony of the ten Plaintiffs deposed in this matter.  *See* Ex. L, June 2016 Expert Report of Dr. John H. Johnson, IV, pp. 12-22.  Indeed, the divergent testimony from these same individuals regarding the extent to which they engaged in non-compensable activities while badged into Bloomberg's office only further supports a conclusion that damages in this case are too individualized to be determined uniformly across the entire class.  *Id.*

for that matter, has not been disclosed with any certainty – are actually "representative" of the experiences of the class as a whole, by statistical analysis or otherwise.  2018 Expert Report 8-9.

Plaintiffs' so-called representative witnesses will not claim that they or the class worked a common number of hours – indeed, they cannot, as these witnesses' own testimony demonstrates that alleged out-of-office hours varied wildly from person to person.  For example, while Mary-Lillian Johnson testified that she worked only "one to two hours a week" outside of the office if she wasn't in a training program (Johnson Dep. 244:12-24), Nicholas Psulkowski testified that he worked on average 10 to 15 hours per week outside of the office.  Ex. K, Psulkowski Dep. 348:16-350:3.  But class member Brian Williamson testified that he did not perform any work outside of the office.  Williamson Dec. ¶ 9.  Likewise, nearly all of the deposed class members who testified to performing work outside of Bloomberg's offices testified that these hours varied significantly depending on a number of factors, including the class position they held at the time and whether or not they were in training.  *See* pp. 3-4 *supra*.  Nonetheless, Plaintiffs will attempt to meld this amalgamation of disparate testimony into a basis for awarding a *flat* amount of alleged out-of-office overtime to each of the over 1,500 class members.  The actual number of hours worked (if any) by each of the over 1,500 class members will not be considered, as it would be impossible to have 1,500 mini trials on damages, let alone within a two-week trial that must also resolve liability issues.  Accordingly, without the jury examining out-of-office hours worked for any of the non-testifying class members, each such class member will be awarded damages (assuming Plaintiffs establish liability) based on the findings of the hours worked by other individuals.  Indeed, not even the testifying witnesses under this approach would be awarded damages for the hours they claim to have worked, as they will also be awarded damages based on averages derived from the testimony of other class

members.  This proposed approach suffers from multiple fundamental fatal flaws that must be fixed through decertification.  *Cruz v. Dollar Tree Stores, Inc.*, 2011 WL 2682967, *4 (N.D. Cal. July 8, 2011) (decertifying class where plaintiffs' plan of proffering classwide proof was "no longer tenable").

First, due process requires that Bloomberg have the opportunity to advance individualized proof as to its defenses.  *Jacob*, 293 F.R.D. at 592 (S.D.N.Y. 2013) ("due process requires" a defendant be able to address "damages calculations require[ing] significant degrees of individualized proof"); *see also Carrera*, 727 F.3d at 307 ("A defendant in a class action has a due process right to raise individual challenges and defenses to claims").  The record in this case demonstrates precisely why it is important that Bloomberg be afforded the opportunity to address Plaintiffs' damages claims on an individualized basis.  Plaintiffs have consistently presented damages estimates based on assumed out-of-office work amounting to ten hours each week.  However, in deposition, Plaintiffs told a far different story, with most claiming to have worked far fewer hours each week.  *See* pp. 4-5 *supra*.  The class device should not be used to deprive Bloomberg of the opportunity to cross-examine these witnesses and advance its individual defenses.  Rather, anyone who wants to seek damages should have to come forward and prove them in separate individualized proceedings in which Bloomberg has the opportunity to cross examine the individuals.

Second, Plaintiffs' proffered approach of extrapolating averages from wildly divergent testimony of a handful of witnesses is nothing more than bald speculation as to the experiences of non-testifying class members.  *Grochowski v. Phoenix Const.*, 318 F.3d 80, 88-89 (2d Cir. 2003) ("speculation" by testifying plaintiffs insufficient to establish hours worked by non-testifying plaintiffs); *Harold Levinson Assocs., Inc. v. Chao*, 37 F. App'x 19, 21-22 (2d Cir.

2002) (rejecting the application of departmental averages to individual class members and directing the district court on remand to make individualized determinations as to hours worked). The Court should not countenance a method of adjudication in which damages awards can be derived only from rank speculation and the fiction that all of 1,500 class members worked the exact same alleged out-of-office hours week in and week out.

Indeed, the Seventh Circuit, in *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 773-75 (7th Cir. 2013), squarely rejected the exact damages model Plaintiffs seek to advance here as a sufficient basis to justify certification. There, the Plaintiffs had proposed a trial plan by which they would present the testimony of 42 class members, from which the jury would make a finding as to the average number of hours worked, which would then be extrapolated to all 2,300-plus class members. *Id.* at 774. The court first challenged the degree to which the selected witnesses were actually "representative":

> Class counsel has not explained ... how these 'representatives' were chosen—
> whether for example they were volunteers, or perhaps selected by class counsel
> after extensive interviews and hand picked to magnify the damages sought by the
> class. There is no suggestion that sampling methods used in statistical analysis
> were employed to create a random sample of class members to be the witnesses,
> or more precisely random samples, each one composed of victims of a particular
> type of alleged violation.

*Id.*

More troubling, however, was Plaintiffs' attempt to charge a jury with deriving averages based on this testimony that would then be extrapolated to the remaining class members. The court concluded that this would result in a non-trivial "windfall" to class members who worked less than the average and undercompensation to those who worked more:

> And even if the 42, though not a random sample, turned out by pure happenstance
> to be representative in the sense that the number of hours they worked per week
> on average … was equal to the average number of hours of the entire class, this
> would not enable the damages of any members of the class other than the 42 to be

11

> calculated. To extrapolate from the experience of the 42 to that of the 2341 would require that all 2341 have done roughly the same amount of work, including the same amount of overtime work …. No one thinks there was such uniformity. And if for example the average number of overtime hours per class member per week was 5, then awarding 5 x 1.5 x hourly wage to a class member who had only 1 hour of overtime would confer a windfall on him, while awarding the same amount of damages to a class member who had 10 hours of overtime would (assuming the same hourly wage) undercompensate him by half. The differences would not be trivial, because the technicians' average hourly rate was about $15.

*Id.* Accordingly, the Seventh Circuit concluded that Plaintiffs' proposed method of determining hours worked was simply not a workable solution for dealing with individualized damages and therefore denied certification. *Id.* at 775 (explaining that plaintiffs would have to find some other "method that enables the trier of fact to draw a 'just and reasonable inference' concerning the amount of time the employee had worked"); *see also McLaughlin*, 522 F.3d at 232 (decrying use of class adjudication "to mask the prevalence of individual issues"); *Hosking v. New World Mortg., Inc.*, 570 F. App'x 28, 31–32 (2d Cir. 2014) (affirming rejection of damages application on default in collective action; "the seven declarants [of 47 opt-ins] attested to the number of hours they worked 'on average'" but did not "state[] how the 'average' was calculated, or address[] whether different employees could have worked different hours"); *Jimenez v. Allstate Ins. Co.*, 2012 WL 1366052, at *15 (C.D. Cal. Apr. 18, 2012) ("Plaintiff has not met his burden of affirmatively demonstrating that statistical sampling is a proper method of calculating individual damages."), aff'd 765 F.3d 116, 1167 (9th Cir. 2014) ("[S]tatistical sampling and representative testimony are acceptable ways to determine liability *so long as the use of these techniques is not expanded into the realm of damages*.") (emphasis added); 4 Newberg on Class Actions § 11:21 (5th ed.) ("[C]ourts have generally rejected [trial by extrapolation] as a binding litigation solution to establishing damages[.]").

Here, it is irrefutable that there is no common evidence of alleged out-of-office hours and testimony on the subject shows significant, person-by-person variation.  Moreover, Plaintiffs do not support their proposed extrapolation with any statistical sampling evidence and, in fact, do not even have an expert witness.  2018 Expert Report 8 (from Bloomberg's expert: "Plaintiffs have not…[p]rovided or disclosed any statistical analysis to compare any deposed Plaintiff to any other class member with respect to any on-site work or off-site work"); Ex. A, December 22, 2017 Conference Tr. 7:9-13 ("We're not relying on experts, your Honor.  We're just applying mathematical calculations to the payroll records…").  Therefore, assuming Plaintiffs prevail on liability, continued certification of their damages claims virtually guarantees that damages awards will not be tied to actual work hours and class members and Bloomberg will be deprived of due process and the individualized justice that individualized circumstances mandate. *McLaughlin*, 522 F.3d at 232 ("[T]o mask the prevalence of individual issues … is an impermissible affront to defendants' due process rights."); *Dukes*, 564 U.S. at 367 ("[A] class cannot be certified on the premise that [defendant] will not be entitled to litigate its statutory defenses to individual claims."); *Carrera*, 727 F.3d at 307 ("A defendant in a class action has a due process right to raise individual challenges and defenses to claims, and a class action cannot be certified in a way that eviscerates this right or masks individual issues.").

The Supreme Court's decision in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946) does not dictate a different outcome.  That case set forth a standard of proof for establishing damages in an FLSA action.  *Id.* at 686-87.  It was not a Rule 23 class action and therefore did not even address whether Rule 23 permits class-wide adjudication of damages based entirely on highly variable, individualized evidence and no common evidence whatsoever.

> 2.   **Determination of the Appropriate Overtime Calculation Method Requires "Nuanced Determination of the Understanding Between a Given Employee and Employer" And Thus Is Not Susceptible to Common Proof**

Decertification of the damages claims is also warranted because damages cannot be calculated without adjudicating the inherently individualized issue of what work hours each class member understood their fixed salary covered.  Specifically, damages for each class member turns on whether he or she had a "clear mutual understanding" that their salary would compensate them for all hours worked, no matter how few or many.  As this Court has found, this inquiry is not susceptible to classwide adjudication, such that decertification of damages is necessary.  *Jacob*, 293 F.R.D. at 590.

Determination of whether such a "clear mutual understanding" exists requires "a nuanced determination of the understanding between a given employee and his employer."  *Klein v. Torrey Point Grp., LLC*, 979 F. Supp. 2d 417, 439 (S.D.N.Y. 2013); *see also Ramos v. Telgian Corp.*, 176 F. Supp. 3d 181, 198 (E.D.N.Y. 2016) (denying summary judgment and explaining that FWW issue would turn on "Plaintiffs' testimony regarding their understanding of how they were being compensated"); *Siegel v. Bloomberg L.P.*, 2015 WL 223781, at *7 (S.D.N.Y. Jan. 16, 2015) (Cote, J.) (in a misclassification case, "if an employee reached a clear understanding that his compensation was payment for all hours worked per week, no matter their number, then the [FWW] method … would govern.").  The process of determining this on a classwide basis would be "time-consuming and supremely incapable of 'classwide proof.'" *Jacob*, 293 F.R.D. at 590.

Indeed, the conflicting record evidence in this case demonstrates precisely why the issue cannot be determined classwide in this action.  While Named Plaintiff William Van Vleet testified that he understood his salary to cover only a set number of hours, *see* Van Vleet Dep. 233:8-23, other class members swore that they understood their salary to be their compensation

for all of the hours that they worked, regardless of the number.  Green Dep 215:10-22;
Williamson Dec. ¶ 10; Krizek Dec ¶ 10; *see also Siegel*, 2015 WL 223781, at *7 (denying
summary judgment where inconsistent testimony from plaintiffs "reveal[ed] a murkier picture"
of their understanding as to what their salary was intended to cover); *Lance v. Scotts Co.*, 2005
WL 1785315, at *9 (N.D. Ill. July 21, 2005) (denying certification of FWW case where
"Defendant has produced declarations from several [putative class members] indicating that they,
unlike Plaintiff, clearly understood" that their salary covered all hours worked).

The jury should not be called upon to make an all-or-nothing determination as to the
entire class based on such conflicting, individualized testimony.  To do so would inherently
result in an incorrect damage calculation as to some portion of the class.

In short, because neither the number of hours each class member worked outside of
Bloomberg's office nor the question of whether each class member had a clear and mutual
understanding as to what hours their salary was intended to cover can be determined by
classwide proof, decertification of damages is warranted.

### C.     Liability Cannot Be Determined on a Classwide Basis

In addition to decertifying Plaintiffs' damages claims, the Court should revisit the
classability of liability issues and now decertify both the New York and California classes in
their entirety.  Complete decertification of the state-law classes is warranted because class
adjudication would impermissibly preclude Bloomberg from presenting individualized defenses
to class member claims.  Specifically, Bloomberg would be deprived of the opportunity to
present alternative exemption defenses centered around duties of individual class members other
than consulting that the jury could determine to be both primary and exempt.

A party has a right to set forth alternative defenses to individual claims.  Fed. R. Civ. P.
8(d)(2-3).  Binding Supreme Court precedent unequivocally holds that class certification is not

15

appropriate if it would force defendants to forfeit individual defenses. *Dukes*, 564 U.S. at 367 (2011) ("Because the Rules Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right,'…a class cannot be certified on the premise that [Defendant] will not be entitled to litigate its statutory defenses to individual claims.") (*quoting* 28 U.S.C. § 2072(b)); *see also McLaughlin*, 522 F.3d at 232 (use of class treatment "to mask … individual issues … is an impermissible affront to defendants' due process rights.").

Central to the Court's class certification orders here was its determination that Analytics Representatives share a primary duty of "answer[ing] client questions about the Bloomberg Terminal" such that a jury could determine whether this duty is exempt using generalized evidence.  Certification Order 21.  To that end, the Court speculated that Bloomberg would argue at trial "that the primary duty of Analytics Representatives is to respond to client inquiries regarding the Bloomberg Terminal, and that the nature of that primary duty meets all the requirements for the administrative exemption to overtime pay obligations."  *Id.* at 22, n.6. Indeed, as Bloomberg recognized in its opposition to Plaintiffs' motion for partial summary judgment, all Analytics Representatives do perform this consulting work to greater or lesser extents such that a fact-finder could reasonably determine that it is the primary duty of each class member.  Dkt. 259 at 23.  Likewise, as Bloomberg argued in opposition to summary judgment, it fully intends to demonstrate at trial that this duty is exempt under the administrative exemption. *Id.* at 23-36.

However, the Court's determination as to the primary duty of class members in its class certification decision is not binding on the finder of fact for the purposes of its liability determination.  *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006), decision clarified on denial of reh'g sub nom. 483 F.3d 70 (2d Cir. 2007) ("[T]he determination [of a

merits issue] as to a Rule 23 requirement is made only for purposes of class certification and is not binding on the trier of facts[.]").  And notwithstanding the Court's non-binding conclusions as to the class as a whole, a reasonable jury could determine at trial that if Plaintiffs' consulting work were not their primary duty and/or not exempt, that individual class members had other duties that were in fact primary and exempt.  For instance, a review of Nicholas Psulkowski's badge data against his ADD data – the latter of which demonstrates the time he spent responding directly to client questions – demonstrates that he routinely worked 15-30 hours per week in which he was not responding to client questions.  2018 Expert Report 38.  Similarly, a review of Matthew Renny's data shows that roughly half-way through his employment, the amount of time he spent working on non-chat duties rose substantially such that he too was routinely spending well over fifteen hours per week performing duties other than responding to client questions.  *Id.* at 41; *see also* 29 C.F.R. § 541.700(b).

Indeed, as demonstrated in Bloomberg's opposition to Plaintiffs' summary judgment motion (Dkt. 259), class members performed myriad other tasks for Bloomberg, including devising and conducting training sessions and seminars for other Analytics Representatives, other Bloomberg employees outside of the Analytics Department, and Bloomberg's customers; performing quality control reviews of other Analytics Representatives' work and providing them feedback; promoting the Bloomberg Terminal by participating in meetings directly with clients and working on other projects for clients; writing internal newsletters and creating other resources for the Analytics Department; and serving as a Deputy Team Leader, among other duties.  Dkt. 259 at 3-8.  These functions, which different Analytics Representatives performed to different extents throughout their employment, were important to Bloomberg and its clients. For example, Bloomberg draws on the incredible knowledge of Analytics Representatives by

17

having them train other Bloomberg employees on the financial markets and Terminal functions, which is an important function for Bloomberg given its business goals of equipping employees both within and outside of the Analytics Department with the tools required to effectively perform their jobs.  Dkt. 265, Cohen Dec. ¶ 41.  Moreover, because the vast majority of the consultation work performed by Representatives is performed without seeking input from other employees, the quality control reviews performed by some Analytics Representatives are a critical tool used by the Analytics Department to provide feedback to Representatives and ensure that Representatives are performing at a high level.  *Id*. at ¶ 15, 38.  Likewise, Analytics Representatives who worked with Bloomberg's Product team played an important role in leveraging their unique perspective on clients' workflows and needs to enhance Bloomberg's product offerings.  *Id*. at ¶ 42.

Bloomberg should be permitted to demonstrate to the jury, as it argued to this Court in response to Plaintiffs' motion for summary judgment (*see* Dkt. 259 at 23-38), that these other responsibilities performed by individual class members are also exempt under the administrative exemption and capable of being deemed the primary duty and would compel judgment for Bloomberg even if the jury determined that Plaintiffs' consulting work is not their primary duty and/or not exempt.  *See, e.g., id.* at 24-25, 37 (plaintiffs who performed training served as global "point person" for specific subjects and "designed" and "revamped" training offerings);[4] *id.* at 7, 37 (Representatives who performed promotional work met directly with clients without

---

[4] *Blanchar v. Standard Ins. Co.*, 736 F.3d 753, 757 (7th Cir. 2013) (employee satisfied administrative exemption; "educated [the employer's] salespeople on the different types of plans"); *Bernard v. Group Pub., Inc*., 970 F. Supp. 2d 1206, 1223-24 (D. Colo. 2013) (employee satisfied administrative exemption; "created training materials for employees" and "trained other employees," "performed quality control checks" and "ma[de] suggestions with the goal of increasing efficiency").

supervision, making recommendations that they considered most beneficial to the client);[5] *id.* at 6, 26, 37 (Deputy Team Leaders helped manage teams up to 20 employees, mentored new hires and determined when to escalate issues with workflow and client concerns);[6] *id.* at 29, (Representatives worked with Product and R&D to enhance both Bloomberg's product offerings and internal operations);[7] *id.* at 5, 25-26 (quality control required subjective assessment of peers' effectiveness and was critical to Department operations).[8]

However, the class trial in this matter, in which Bloomberg has only 20 hours to present its classwide liability and damages evidence, leaves Bloomberg facing an untenable dilemma: Bloomberg can either advance evidence as to all of the different duties at issue, demonstrate to the jury why there is not necessarily a single classwide primary duty, and argue how all of these different duties are exempt and why particular such duties could reasonably be deemed the primary duty of particular class members if their consulting work is determined to be either not primary or not exempt – which Bloomberg could not possibly do within 20 hours in a 1,500-person class case – or focus exclusively on presenting evidence as to the importance and exempt nature of the class members' consulting duties, and thereby surrender its right to present alternative individual defenses and seek jury findings at odds with any resulting jury verdict against Bloomberg.  Simply put, should it be forced to succumb to this dilemma, Bloomberg would necessarily be deprived of the ability to present alternative individual defenses such as

---

[5] *Cruz v. Lawson Software, Inc.*, 764 F. Supp. 2d 1050, 1067 (D. Minn. 2011) ("[p]laintiffs' work is explicitly aimed at improving or working on [employer's] clients' efficiency" and they "train[ed] users on the software").

[6] *Hundt v. DirectSat USA, LLC*, 294 F.R.D. 101, 111-12 (N.D. Ill. 2013) (directing work of other employees is exempt administrative work).

[7] *Lopez v. United Parcel Serv., Inc.*, 2010 WL 3630619, at *4 (N.D. Cal. Sept. 10, 2010) ("recommend[ing] improvements to increase efficiency" is exempt administrative work).

[8] *Grupke v. GFK Custom Research N. Am.*, 2015 WL 363589, at *6 (S.D.N.Y. Jan. 28, 2015) (quality control is exempt administrative work).

those that it set forth in its successful opposition to Plaintiff's summary judgment motion. And even if the trial duration were dramatically increased, the jury could not possibly sort and compartmentalize which alternative primary duty defenses pertain to which of 1,500 class members. The extreme jury confusion that would result from even attempting to ask the jury to perform such a feat would incurably prejudice Bloomberg's ability to satisfy its evidentiary burden. Under these circumstances, continued class treatment presents impermissible constraints on Bloomberg's due process rights, and the state-law classes should therefore be decertified.

## CONCLUSION

For the foregoing reasons, Plaintiffs' state-law classes should be decertified under Fed. R. Civ. P. 23. In the alternative, even if a trial is to proceed as to liability, Plaintiffs' damages claims should be decertified.[9]

---

[9] Some district courts in the Second Circuit have suggested that a moving party bears a "heavy burden" in establishing that decertification is warranted and that it must demonstrate "some significant intervening event or a showing of compelling reasons to reexamine the question." *Mazzei v. Money Store*, 308 F.R.D. 92, 106 (S.D.N.Y. 2015) (stating that compelling reasons "include an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice") aff'd, 829 F.3d 260. However, application of such a standard, which is the standard courts apply on reconsideration, is contrary to the law of the Second Circuit regarding decertification. As the Second Circuit decision in *Mazzei* held in no uncertain terms, a district court has an affirmative duty of monitoring its certification decisions. 829 F.3d at 266. Additionally, a plaintiff maintains the burden in response to a decertification motion of establishing that certification remains appropriate. *Id.* at 270. Moreover, even if Bloomberg does have a duty of demonstrating that some "intervening" event warrants decertification or that "compelling reasons" exist to "reexamine the question," that standard is easily met here. Simply put, this case is much further along now than it was when this Court first considered certification. And while Plaintiffs remain elusive in terms of how they plan on presenting their case at trial, we now know that each side will have 20 hours to present its case, and that Plaintiffs have identified 28 witnesses and over 500 documents that they intend to present at trial, which will make it difficult to even try classwide claims and defenses and damages, much less leave any room for individual defenses. Likewise, it is clear from their classwide damages disclosures that, contrary to what this Court understood when considering certification, the majority of Plaintiffs' damages claims are not based on data but will instead be argued using "representative testimony," which, given the divergent nature of the testimony, simply underscores how highly individualized the out-of-office damages claims are. Additionally, the Court has issued its ruling clarifying the standard that will apply to determining the fluctuating workweek question, which ruling highlights the nuanced nature of the inquiry. All of these intervening events are compelling reasons to reexamine certification at this time.

Dated: March 20, 2018                               Respectfully submitted,

         New York, New York

                                                  JONES DAY

                                                  By: /s Matthew W. Lampe

                                                  Matthew W. Lampe
                                                  Terri L. Chase
                                                  Kristina A. Yost
                                                  250 Vesey Street
                                                  New York, New York 10281
                                                  (212) 326-3939
                                                  mwlampe@jonesday.com
                                                  tlchase@jonesday.com
                                                  kyost@jonesday.com