I3SQROSc

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ERIC MICHAEL ROSEMAN,
     ALEXANDER LEE, AND WILLIAM VAN
4    VLEET, individually and on
     behalf of others similarly
5    situated

6                    Plaintiffs

7            v.                          14 Civ. 2657 (DLC)
                                         Final Pretrial
8                                        Conference

9    BLOOMBERG L.P.

10                   Defendant

11   ------------------------------x
                                         New York, N.Y.
12                                       March 28, 2018
                                         2:30 p.m.
13
     Before:
14
                         HON. DENISE L. COTE
15
                                         District Judge
16
                         APPEARANCES
17
     GETMAN SWEENEY & DUNN PLLC
18        Attorneys for Plaintiffs
     DAN GETMAN
19   LELIE TSE
     ARTEMIO GUERRA
20   MEAGAN RAFFERTY

21

22   JONES DAY
          Attorneys for Defendant
23   TERRI L. CHASE
     MATTHEW W. LAMPE
24   KRISTINA A. YOST

25

I3SQROSc

1          (Case called)

2          DEPUTY CLERK:  Counsel, for the plaintiffs, please

3    state your names for the record.

4          MR. GETMAN:  Dan Getman, Getman, Sweeney, Dunn.

5          Leslie Tse, Meagan Rafferty and Artemio Guerra.

6          DEPUTY CLERK:  Thank you.

7          For the defendant, please state your name for the

8    record.

9          MS. CHASE:  Thank you.

10         Terri Chase, Matthew Lampe, Kristina Yost from Jones

11   Day.

12         THE COURT:  Welcome everyone.  This is our final

13   pretrial conference.  I'm asking Ms. Rojas to provide two

14   documents to counsel.  One is a list of individuals that

15   Ms. Rojas was kind enough to pull off your pretrial order

16   documents, and what I would like counsel to do is to make sure

17   the list is complete and accurate, and then, shall we say, by

18   Monday get Ms. Rojas the additions or corrections to the list.

19         You can see it's a long list starting with one name,

20   Christopher Saven and ending with another name Jacqueline Mora.

21         I tell the jury or the venire during the voir dire

22   process that this is a list of names of people who may testify

23   or whose names may be mentioned.  So this is not a witness

24   list.  This is a broader list than that.  It's, you know, we

25   want to inquire during the voir dire do they know any of the

I3SQROSc

1    people who may not appear but who will be discussed, so

2    inclusive versus exclusive is helpful.

3           The second document I asked her to hand out is our

4    schedule right now after we've chosen the jury for the trial.

5    It provides for a two-week trial including summations and

6    deliberations.  I'm planning to meet with counsel a half an

7    hour before the jury time, and what's listed on this piece of

8    paper is the jury time.  So we would expect our jury, for

9    instance, on April 16 to appear at 9:00 and sit until 5:00.  So

10   I will meet with counsel at 8:30 to deal with any legal issues

11   that have arisen that day.  That's our schedule and we've dated

12   this piece of paper March 27 at the top.  So if I revise it at

13   all going forward, you'll be able to see what the most current

14   list is.

15          I'm going to take one second to read a letter that

16   just came in that I haven't had a chance to read.  Hold on.

17          (Pause)

18          THE COURT:  I have read the March 28 letter from

19   plaintiff's counsel.  I want to rule on the motions in limine

20   today.  We have many procedural issues just to make sure we're

21   clear about.  I have some other issues to raise towards the end

22   of this conference, but I think probably it makes sense to

23   start with the motions in limine.

24          I think the order in which I'm taking them is somewhat

25   arbitrary; it's sort of the order in which they were filed.  So

1    we will just take them one at a time.

2              I have read these.  To the extent I have questions, I

3    plan to ask questions.  I think you don't need to present any

4    oral argument unless I have a question but, of course, I want

5    to give you an opportunity.

6              So the first motion I'm taking up is the one filed on

7    March 8, defendant's memorandum of law in support of the motion

8    to clarify issues to be tried.

9              Do either counsel feel a need to address those issues

10   orally?

11             MR. LAMPE:  Your Honor, if I may.  For the defendant

12   on the motion, the order that your Honor entered yesterday, the

13   short one-page order endorsed the concessions that we agreed to

14   make with respect to the statute of limitations and with

15   respect to damages, and our understanding -- and I think your

16   Honor is confirming that right now but I just wanted to

17   clarify.  Our understanding was that you had not substantively

18   purported to rule on the face of that one-page document on all

19   the arguments in our motion.  We identified a number of

20   different types of evidence that we thought should not be

21   admissible at all because the only issue that they would be

22   relevant to would be the issues of willfulness.

23             THE COURT:  That is right, I did not rule on the

24   arguments you're making in your motion.

25             MR. LAMPE:  Thank you, your Honor.

I3SQROSc

1          THE COURT:  OK.  So this is titled as a motion to

2    clarify issues to be tried.  There are a number of arguments

3    made here.  There are arguments about the extent to which

4    evidence should come in at trial, about some prior lawsuits

5    against Bloomberg, about a Department of Labor investigation,

6    about reclassification of certain positions.

7          There are arguments made about Rule 406 and Rule 407.

8    There are arguments made about specific witnesses, five in all:

9    Two attorneys, Asman and Golden, three witnesses who never

10   served as analytics representatives, and one person who is a

11   class member and did serve as an analytics representative but

12   held other positions at Bloomberg too, whether that

13   testimony -- and I'm referring to a witness named Shah --

14   should be limited.

15         So let me tell you sort of my bottom-line analysis of

16   how this plays out.

17         I think that the plaintiff should be able to call

18   witnesses and offer evidence about whether or not sufficiently

19   similar positions to the position at issue here are treated by

20   Bloomberg as non-exempt positions.  From the papers, there

21   appear to be three different positions that the plaintiff might

22   contend are sufficiently similar to make evidence about

23   Bloomberg's practice with respect to payment of those positions

24   relevant.  They are the GCUS position, the GTEC help desk

25   position, and the service desk representatives.

I3SQROSc

1          Counsel are closer to these issues than I am, and I

2     don't know to what extent these are overlapping titles or

3     represent entirely discrete units in every instance, and I'm

4     not prepared without argument or a proffer to find that any of

5     these three or any other position is sufficiently similar to

6     the position at issue here such that evidence of whether

7     Bloomberg treats them as exempt or non-exempt, and here it's

8     non-exempt, is admissible.

9          I would say that the evidence generally of Bloomberg's

10    alleged company-wide policy against finding any position

11    non-exempt or against paying overtime wouldn't come in; that

12    is, would not come in, unless Bloomberg opened the door in some

13    way at trial, and I would expect plaintiff's counsel to raise

14    that with me first if they felt the door had been opened.

15         I think with respect to whether or not Bloomberg once

16    took the position in this litigation that there was no primary

17    duty and now takes the position at trial that there is a

18    primary duty for the analytics representatives and that that

19    primary duty is responding to inquiries with respect to

20    Bloomberg terminal, that that would be admissible.  So its

21    shift on that issue would be the subject of admissible

22    testimony.

23         I also think preliminarily that if it is true as

24    described in these papers, that Bloomberg did not give the

25    Department of Labor the job description it used in the ordinary

I3SQROSc

1    course of its business for this position, analytics

2    representatives, but instead created one for the sole purpose

3    of giving it to the Department of Labor, that that would be

4    admissible testimony too.

5         Now, this overlaps some of the issues raised through

6    this motion practice and its opposition overlaps with some of

7    the other motions that have been made to me.  So, we will see

8    that play out in the course of this discussion.

9         Now, I have dealt with this sort of substantively,

10   what kind of testimony would be admissible as opposed to saying

11   therefore you can or can't call a particular witness.  At the

12   end of this conference or towards the end, I want to go through

13   the witness list and counsel are going to make choices and

14   identify for the record and with their adversary who they are

15   calling.  It's close enough to trial that you are entitled to

16   that information.

17        I have read the decision rendered by the magistrate

18   judge who was in charge of discovery when my colleague Judge

19   Griesa, had this case.  I think it's a decision of June 17,

20   2016.  I don't find that that is going to bind me with respect

21   to the admissibility of evidence with respect to this motion.

22   The attorneys will or won't be necessary.  Evidence will come

23   in through stipulation or not.  The parties will be able to

24   discuss these issues, but I don't think that an attorney-client

25   privilege is implicated by the ruling I have here or that we

I3SQROSc

1    need two witnesses, and how this evidence would be developed, I

2    am not clear from the parties' papers.

3             So, let me begin by asking you, Mr. Getman, of the

4    three positions identified, and I obviously took this material

5    out of the papers, the GCUS, the GTEC and the service desk

6    representatives, are the plaintiffs taking the position that

7    these positions were sufficiently similar to the kind of work

8    done by analytics representatives that it would be probative

9    for the jury to hear how Bloomberg now treats those positions

10   in terms of whether they're exempt or not?

11            MR. GETMAN:  Exactly, your Honor.

12            THE COURT:  Is it true for all three or only for some

13   of them?

14            MR. GETMAN:  For all three.  Each of those three that

15   is a help desk with some overlapping responsibilities with this

16   help desk.  They are all directly analogous, and they all sit

17   in the same general area together at long desks and answer

18   different kinds of questions for the most part but some

19   overlapping authority, and sometimes there is a question tends

20   from what seems to be one kind of question into another, then

21   they will pass it over.

22            THE COURT:  Are they all entry level positions at

23   Bloomberg?

24            MR. GETMAN:  Yes, pretty much.

25            THE COURT:  Are they all subject to a general training

I3SQROSc

| | |
|---|---|
| 1 | program for that position in which many people are trained at |
| 2 | once for the skills and knowledge required for that position? |
| 3 | MR. GETMAN:  Absolutely. |
| 4 | THE COURT:  And do they all deal, at least in a |
| 5 | significant way, with the Bloomberg terminal in answering |
| 6 | questions about the terminal? |
| 7 | MR. GETMAN:  The GCUS customer support answers a set |
| 8 | of entry kind of questions about passwords and authentications. |
| 9 | They also route calls.  So that's the only non-help desk aspect |
| 10 | of that position that is a little bit different. but they do |
| 11 | answer a specific subset of questions, help desk questions, and |
| 12 | they are called customer support, GCUS is customer support. |
| 13 | THE COURT:  What about the GTEC? |
| 14 | MR. GETMAN:  The GTEC department answers questions |
| 15 | about the hardware of the Bloomberg terminal and connectivity |
| 16 | issues, so Bloomberg routers, there are some complex data |
| 17 | streams, stuff that comes in to get the data to the terminal |
| 18 | and GTEC handles those kinds of questions. |
| 19 | THE COURT:  And the service desk reps? |
| 20 | MR. GETMAN:  The service desk reps, that was the |
| 21 | position that was before you in the Siegel case, your Honor. |
| 22 | That was a help desk for Bloomberg's internal employees with |
| 23 | respect to their hardware issue. |
| 24 | In this instance, Bloomberg is claiming the exemption |
| 25 | both with respect to the analytics reps, that the analytics |

I3SQROSc

1    reps answer questions with respect to functionality, but that

2    they claim that they are administering both Bloomberg's

3    business and customer's business.  So the service desk is

4    analogous in the sense that they are claiming there that they

5    originally answered questions about Bloomberg's business with

6    administrative exemption.

7          THE COURT:  In your view -- and I am not going to

8    require anyone to stipulate, I couldn't -- but in your view the

9    fact that Bloomberg took the position as a business that each

10   of these individual positions was exempt and then changed that

11   position on a particular day and concluded they were non-exempt

12   or began to treat them as non-exempt, is that sufficient for

13   your purpose without showing that that decision was made as a

14   result of litigation or a Department of Labor settlement or

15   anything else?

16         MR. GETMAN:  I would say it goes a long way, and I

17   think it addresses the bona fides of this classification for

18   this group.  So there are a number of things about the

19   defendant's defense Of an administrative exemption.  Here, one

20   is that they say that essentially the whole company is exempt

21   under the administrative or some other exemption, and it does

22   show the history that nobody gets paid overtime until they've

23   sued for it at this company, and it shows in these three

24   departments I think very clearly that the help desk -- that

25   that aspect of helping customers with questions about the

I3SQROSc

highly complex Bloomberg terminal is not truly administrative

exempt because these other positions are recognized not to be.

So I think all of those are aspects that we consider

important and would like to have admissible for -- would like

to admit this evidence for.

THE COURT:  This is how we're going to treat this

evidence:  I will allow evidence with respect to these three

positions so that the jury is able to understand the extent to

which the work in that position is sufficiently similar to the

work in the analytics rep position that Bloomberg's treatment

of one is exempt and the others is non-exempt is meaningful.  I

believe the date on which Bloomberg began to treat the position

as non-exempt is relevant as well.

I want the parties to discuss the issue of whether

evidence of prior lawsuits or a Department of Labor

investigation needs to come in.  I am not intending to admit

evidence generally that Bloomberg has some company-wide policy

about all positions.  So I'm hoping this will give you enough

guidance.

If the Department of Labor investigation becomes

relevant because of either discussions by the parties or

further rulings by me, then it seems to me that the plaintiff

has a right to put in that evidence from which a jury could

conclude that Bloomberg in effect misled the Department of

Labor with respect to this position by not sharing the job

I3SQROSc

1    description it used in the ordinary course of its business for

2    analytics reps with the Department of Labor.  I just @as soon

3    we kept that out.  I think it's only relative to the extent

4    that Bloomberg would be in a position to argue that either the

5    Department of Labor looked at us and decided that this position

6    was different than the others and didn't need to be treated as

7    non-exempt.  If that factual basis is before the jury, then I

8    think that's an unfair conclusion for them to draw.

9           So let me turn to the next motion.  This is the

10   plaintiff's motion regarding the primary duty.  It's a motion

11   made on March 16.  You know, I thought this was interesting to

12   read the defendant's response, particularly page 6 of their

13   memorandum.  I have read the material at page 6 several times.

14   I'm not quite sure I entirely understand the position Bloomberg

15   is taking here.  So I thought it might be helpful for me to

16   speak a little bit to this one.

17          Under the regulation, there can only be one primary

18   duty.  So, to the extent that Bloomberg is going to argue at

19   trial that there was more than one primary duty, I will

20   instruct the jury that that is not so.  It will be the

21   defendant's burden at trial to the extent that it wishes to

22   take advantage of this affirmative defense to show what the

23   primary duty was.  It now takes the position, as I understand

24   it from their papers, that they can identify a primary duty,

25   and that was answering questions regarding the Bloomberg

I3SQROSc

terminal.

If the plaintiff has admissible evidence that the defendant once took the position that the analytics representative had no primary duty or they were unable to identify primary duty, I will permit that evidence to be received subject to further argument about a specific admissibility issue, but it is generally relevant.

Now, the material at page 6 could also be read to say that the primary duty is not responding to questions about the Bloomberg terminal but instead the larger, more all-encompassing primary duty of consulting generally with customers.  And, again, it may take that position at trial if it wishes, but again, it can only identify under the law a single primary duty.  So the plaintiff's motion was to exclude Bloomberg's evidence or argument that the analytics representatives have a primary job duty other than that previously established by the Court.  I made findings with respect to legal rulings that I was required to make; that is, rulings on motions that I had to address, but I have not found as a matter of law or in a way that binds any party what the primary duty was.  So if Bloomberg chooses to accept the primary duty, which it appears to in passages on page 6 as answering questions regarding the Bloomberg terminal, it may do so.  If it chooses to try to argue that there was a different primary duty, and that is consulting with customers, it may do

I3SQROSc

1    so.  But I will be instructing the jury that there is only one

2    primary duty.

3              MR. GETMAN:  Your Honor, may I ask a clarifying

4    question, which is we've waited to hear all through discovery

5    what Bloomberg's position what was on this issue on which it

6    bears the burden of proof.  Magistrate Judge Fox had said,

7    well, I'm not going to give it to you on the initial

8    interrogatory, but you can get it in discovery.  In the

9    deposition of the company, Bloomberg refused to say, and said

10   that they need never decided and didn't know, and also claimed

11   a privilege that the witness who was testifying for Bloomberg

12   had only heard what Bloomberg claimed through Bloomberg's

13   counsel, and they weren't going to tell us what it was.  Now, I

14   thought at that point that we obtained enough information for

15   summary judgment that Bloomberg couldn't prevail on something

16   for which it bore the burden of proof.

17             At this point a couple weeks before trial, it would

18   seem to me as a matter of fairness that we should know what

19   Bloomberg is going to present as a claim for its primary job

20   duty.  I would ask the Court to require Bloomberg to at least

21   disclose that to us so that we can go into the trial knowing

22   what we are defending against, because it is their affirmative

23   defense, and we are putting on evidence before they do, so just

24   so we know how to proceed.

25             THE COURT:  Ms. Chase, have you decided on the primary

I3SQROSc

1    duty?

2              MS. CHASE:  Mr. Lampe will speak to this.

3              MR. LAMPE:  Your Honor, our position is -- we've laid

4    our position out in a number of papers.

5              THE COURT:  Tell me what it is.

6              MR. LAMPE:  The primary duty is consulting, and I will

7    say that it's consulting in all instances that relate to the

8    terminal, but there are the lots of different ways that the

9    analytic representative talk to clients about the terminal.

10   One way is a client calls in with questions --

11             THE COURT:  Just define now for the record what is the

12   primary duty.

13             MS. CHASE:  Consulting with customers about how to use

14   the technology of the terminal to satisfy their business

15   objectives.  That involved on-premises meetings with clients,

16   it involved fielding questions from clients that come into help

17   desk function, it involved webinars with clients about the

18   terminal, an all-inclusive consulting about the technology of

19   the terminal and how the client can integrate the terminal into

20   their business to achieve their business purposes.

21             THE COURT:  Fine.  Thank you.

22             Mr. Getman, you may offer in evidence if you find

23   admissible evidence of Bloomberg's lack of knowledge of what a

24   primary duty was, that is admissible evidence.

25             MR. GETMAN:  Thank you, your Honor.

1          THE COURT:  Turning to the plaintiff's motion with

2     respect to the badge hours, this was filed on March 23.  Does

3     anyone wish to be heard?  Thank you.

4          MS. CHASE:  Your Honor, just one point with respect to

5     this motion and plaintiffs make a relatively similar motion.

6     There is a fair amount of confusion on our part in responding

7     to this what evidence is in the record this motion was intended

8     to address.  We did drop a footnote in our opposition to

9     address this.

10          The issue with respect to badge hours could be read --

11     the motion could be read broadly to say, for example, exhibits

12     that plaintiffs have on their exhibit list that involve

13     plaintiffs saying, "I couldn't get to lunch time on time

14     today," which arguably is evidence relevant to whether or not

15     all badge hours are badge hours worked.  It could include that.

16          It also could include chats in which exchanges between

17     colleagues could address things like when they arrive but also

18     at the same time as that chat they discuss work-related duties,

19     such as assisting each other on functionality on the terminal.

20          So part of our concern -- and I think this is somewhat

21     addressed in argument, I just want to make sure it wasn't

22     lost -- was a confusion on our part about how broadly this

23     motion is intended to be read.

24          THE COURT:  Thank you.  Let's see if I can with my

25     rulings give you the clarity that you need to prepare for

I3SQROSc

1    trial.

2              Based on my prior rulings in this case, the plaintiff

3    class to the extent that they establish -- well, to the extent

4    that it is established at trial that they are entitled to

5    overtime pay, they will be entitled to compensation for all

6    badge hours, and if their badge hours are over 40, and they're

7    a New York employee, then they're entitled to overtime.  If

8    it's over eight hours in a particular day, in California for a

9    California employee, then they're also entitled to overtime for

10   that as well as the weekly overtime number.  So I believe what

11   you need me to say is that badge hours "hours worked."

12             Now, to what extent is it relevant at trial and

13   therefore admissible as evidence what a particular member of

14   the class was doing during their badge hours.  Because there is

15   a claim here for off-site overtime work, it may be entirely

16   relevant for the jury to learn how the class spent their time

17   on the premises, how those badge hours are spent.  It may

18   assist them in assessing whether there in fact were any

19   out-of-office hours worked and assist them in assessing the

20   nature, complexity and length of time spent out of the office

21   on their employer's work.

22             This may require me then to resolve some evidentiary

23   disputes.  I know that the motion was to exclude evidence that

24   plaintiffs were engaging in personal, social or meal activities

25   while in the office, checking personal emails or on social

I3SQROSc

1    media or chatting casually with coworkers.  My understanding is

2    that Bloomberg has tried, as many other companies do these

3    days, to create a work atmosphere that is inviting and one that

4    its employees will find meets their needs so that they can eat

5    and be comfortable at work and not have to go off-site as much.

6    It makes them a more productive, happier employee perhaps.

7    Even some law firms have that approach, happy to serve you

8    meals at your desk, etc., keep you working around the clock.

9         So I don't think this is going to be novel or unusual

10   for a jury to a hear that during badge hours, people actually

11   ate food and chatted with friends.  But the extent of that I

12   think is relevant and Ten plaintiffs are asking the jury to

13   find that there was an enormous number of hours worked

14   off-site.

15        I think it is more likely that off-site work is done

16   if your time on-site is fully occupied with your employer's

17   business as opposed to perhaps records show that the employee

18   had a fairly casual day on-site with lots of extra time to

19   spare, and if that's the case, then it makes it less likely

20   that they worked for any length of time off-site.

21        So I hope that gives you the guidance that you need on

22   that motion, and, of course, you will present any additional

23   dispute with respect to particular communications.

24        That brings us I think to the next one, the social

25   communications.  This is the plaintiff's motion in limine to

I3SQROSc

exclude communications among ADSK representatives that are

primarily social or personal in nature.  That is a motion filed

March 16.

          I think this follows directly from what I've just said

The amount of time spent on social communications may be highly

relevant to this jury.  The content of those is not.  And

becoming a witness at trial should not mean that you're subject

to harassment, embarrassment or penalized for participating in

litigation.

          So I think defense counsel can inquire of these

witnesses about the amount of time they spent on social

communications as opposed to projects for their employer,

because of the relationship that that has here to the claim

here for out-of-office compensation.  But the content of

personal communications is only relevant to the extent it's

relevant to the claims here.  So to the extent that it's a

discussion of work, such as "I don't have much work today" or

"I have so much work today I cannot manage it in the hours

given," that may be highly relevant and admissible.  To the

extent it's about the Super Bowl, it's not.

          MS. CHASE:  Your Honor, one clarifying point on that.

To the extent that there is an extended exchange which contains

contents on both topics; for example, two pages of discussion

about what they ate for lunch that day and then there is a

serious discussion -- which we have on some of these answers.

I3SQROSc

1  Serious discussions about how "that last test was so easy, I

2  didn't study.  I didn't study at all" or "I'm only working

3  eight hours a day.  This job is so easy."

4         Would you want us to redact that information?

5         THE COURT:  Yes.

6         MS. CHASE:  OK.

7         THE COURT:  That takes us to our motion with respect

8  to Dr. Johnson.  That's plaintiff's motion in limine filed on

9  March 16.  It is to exclude testimony of Bloomberg's expert,

10  Dr. John Johnson.  There are Supreme Court cases the parties

11  have cited that are relevant to this.  They include the *Mt.*

12  *Clemens* case, 66 S.Ct. 1187; the *Tyson Foods* case, 136 S.Ct.

13  1036.  There's also a Second Circuit case -- there are many,

14  but I will cite one -- *Kuegel*, 643 F.3d 352.

15         In connection with this, I also have defense counsel's

16  letter of March 27 with respect to the desire by plaintiffs to

17  seek damages for off-site hours.  I think there is just one

18  other sort of background fact I should place on the record.

19         On January 31, 2018, the plaintiffs disclosed as

20  follows:  That its damages calculations that it was presenting

21  on that day were based upon an average of ten unrecorded

22  off-site work hours per week which may be revised up or down

23  based upon the jury's determination.  Then it sites another

24  exhibit for illustrations.

25         So the legal principles that govern this issue, and

I3SQROSc

1   Dr. Johnson offered expert testimony to rebut the claim for

2   off-site hours, an average of ten hours per week.  I will get

3   to the specifics of that in a moment, but to analyze this, I am

4   trying to follow these principles of law.  An employer has a

5   duty to keep records, and when it does not, of hours worked,

6   there is a reduced obligation on the plaintiff.  The plaintiff

7   has the burden of presenting sufficient evidence of overtime

8   worked such that there can be a reasonable inference with

9   respect to the extent of damages.  The plaintiff, therefore,

10  need only offer sufficient evidence to show the amount and

11  extent of the work -- and this is the critical phrase -- "as a

12  matter of just and reasonable inference."Furthermore,

13  representative evidence is acceptable if it meets that

14  standard.  Plaintiff need not provide scientific evidence or an

15  expert report with an expert opinion about the amount of work.

16          Therefore, in this case, as I understand it, the

17  plaintiffs intend to rely on testimony if people held this

18  position or perhaps Bloomberg witnesses as well, but

19  testimonial evidence from lay witnesses and use that to argue

20  that the jury has the basis to assess the off-site number of

21  hours worked on average worked off-site by analytics

22  representatives.  And as the parties have agreed, once the jury

23  makes a finding, if it is able to, with respect to the average

24  time worked off-site or the average time of overtime beyond

25  badge hours, I should say, they're the same here, but I will

I3SQROSc

1   compute the damages figure with the parties' help in post-trial

2   proceedings.

3          In its disclosures, the plaintiff has given the

4   defendant notice of the methodology for calculation, and it

5   also gave notice that it would be relying on representative

6   testimony and not calling an expert to create an average number

7   that could be input into the calculation:

8          I looked at Dr. Johnson's report, but I didn't take it

9   apart line by line.  I'm happy to do that, but I thought I

10  would give you some general rulings, and then let you meet and

11  confer, and if you can't redact it appropriately, then I will

12  hear from you again.  Of course, the report is not coming into

13  evidence.  So when I say redact, I meant make revisions to it,

14  redactions to it, so it would reflect what Dr. Johnson would be

15  permitted to say at trial and what he would not be permitted to

16  say at trial.  Before I complete this ruling, I have a couple

17  questions, though.

18         I have the impression from what I have read here in

19  this set of motion papers that the amount of non-badge time for

20  which there is hard data reflects a small amount of time spent

21  off-site on work.  Am I right impressionistically?  Can

22  somebody give me a sense of the numbers?

23         MR. LAMPE:  Well, your Honor, our understanding is

24  that the amount of off-site over time is greater than the

25  amount of on-site over time.

I3SQROSc

```
1          THE COURT:  I see that in the charts, but, I mean, I'm

2    trying to tease out -- I know there was data presented in

3    discovery of access to logins to the Bloomberg computer system

4    from off-site locations that you could tease out for certain

5    kinds of access when that was done off-site as opposed to

6    during badge hours.  Am I wrong?

7          MS. YOST:  Your Honor, this is Kristina Yost.

8          Yes, your Honor, there was certain data produced that

9    shows remote logins to the computer.  Some of that data which

10   reflects login to a VPN, which is where you actually log in to

11   a computer, your own work computer remotely on the computer,

12   does show a duration.  So that is fairly complete.

13         There is also separately what's called just login

14   data, so data that shows when someone logged in remotely to the

15   extent they use a web-based computer log-in program.  That data

16   is not very complete at all as to how much time someone spends

17   off-site because it's only a login and not a logout.  There is

18   very, very limited data that is going to actually show off-site

19   hours.  Primarily, the claim appears to be not data-related.

20         THE COURT:  I know there was that whole discovery

21   dispute about production of use of a mobile device.  So we

22   don't have any data with respect to use of a mobile device.

23   So, with respect to the one data field where we have login and

24   logout, can you quantify for me at all what that shows with

25   respect to off-site work?
```

I3SQROSc

1          MS. YOST:  It's very, very limited, your Honor.  With

2     respect to the 31 plaintiffs where we've looked at in detail,

3     very few of them have very few VPN usage data at all.

4          THE COURT:  So this testimony, Mr. Getman, what are

5     the witnesses going to describe they were doing?

6          MR. GETMAN:  The witnesses will describe doing

7     training homework and training modules.

8          THE COURT:  How?

9          MR. GETMAN:  They did that without, again, there being

10    a data point in the data provided to us.

11         THE COURT:  You mean on their iPhone?

12         MR. GETMAN:  Correct me if I'm misstating.

13         THE COURT:  Are they using paper?

14         MR. GETMAN:  They can be using paper.  They can be

15    using remote logins either with a computer or they can be doing

16    work with a phone or a mobile device.  They can also be

17    accessing Bloomberg's training provider system for which there

18    were no logins recorded or provided in this case.

19         So there are a number of things that occurred that we

20    contend are work time.  In addition to those activities, there

21    is also keep abreast of the market, doing market research, to

22    understand market terms, special projects in terms of being

23    asked to create a newsletter or to write certain materials

24    where they wouldn't necessarily need to login to Bloomberg's

25    system to perform that work.

I3SQROSc

1          So there is a host of activities.  Our objection to

2     the VPN data points are that it's the miniscule portion of the

3     data points that exist.  So it's not even a -- it's a small

4     subset of a small subset

5          THE COURT:  Well, good.  So -- and I thought this was

6     true.  So to the extent that the jury is going to be able to

7     draw a reasonably reliable inference about the average number

8     of hours worked off-site, it's going to be based almost

9     entirely on this soft testimony as opposed to the VPN login

10    information, for instance.

11         MR. GETMAN:  Absolutely, at this point.

12         THE COURT:  OK.  Good.  And so what number are you

13    going to argue in your opening statement Mr. Getman, is the

14    average number of hours that analytics representatives worked

15    off-site?

16         MR. GETMAN:  Your Honor, if I am going to offer

17    anything specific, at this point my thought was that it would

18    be ten or more.

19         THE COURT:  Well, you're going to be bound by what you

20    say here.

21         MR. GETMAN:  If permitted, I would either prefer not

22    to say that because I can't -- I can't personally accurately

23    represent what the summary of all that testimony will be.

24         THE COURT:  Who on your team can?

25         MR. GETMAN:  Is there any possibility of our giving

I3SQROSc

1    that figure tomorrow or the day after?  Is your Honor requiring

2    us to say it today and be bound by it?

3              THE COURT:  No, you can give it tomorrow.

4              MR. GETMAN:  Then I would prefer to have the

5    opportunity to summarize that and meet with my team to do that.

6              THE COURT:  OK.  You just have to give a number.

7              MR. GETMAN:  Very good.

8              THE COURT:  OK.  So the defendant understood in

9    January that the number you were giving was ten; that you were

10   going to argue to the jury that the average number of hours

11   would be ten that they should find.  And, of course, they could

12   find more or less because they're a jury.  They're in charge of

13   their fact-finding.  That's why we're having this trial.  But

14   the defendant was entitled to have your calculation, the

15   plaintiff's calculation of its damages, and it will have that

16   by tomorrow, that is the number that would be filled in with

17   respect to the calculation should the jury find as you hope it

18   will.

19             MR. GETMAN:  So I think we had provided at least on

20   one or another motion we had provided to the defendant in

21   January the calculation and the methodology and what that comes

22   up with at ten.  We have also given the defendants what that

23   methodology comes up with at different increments ranging from

24   I believe two and a half, five, seven and a half, ten, 15 and

25   20.  So the defendant has had that information or the

I3SQROSc

1    information with which to do their own calculations since at

2    least January 31.

3         THE COURT:  Great.  But of course in preparing for

4    trial, it needs to know and has a right to know exactly what

5    you are going to argue.  So I am assuming for purposes of our

6    conference today it's ten, but you will identify the precise

7    number tomorrow.  And, of course, the jury will decide what it

8    decides.

9         So if it is ten, it makes Dr. Johnson's report

10   particularly relevant, and I find much of it, including much of

11   the charts, absolutely admissible.  It is an exploration that

12   is of assistance to the jury of what that ten really means in

13   connection with the other evidence in the record and how likely

14   it is that ten was the average number.  Even if it was for one

15   individual in one week, how likely was it that it was ten for

16   that individual in every week much less ten on average for

17   every other member of the class.

18        That said, much of the editorializing is not

19   admissible expert testimony.  And so -- I mean, I thought this

20   report was very helpful in helping the jury understand whether

21   the number ten was a matter of a just and reasonable inference,

22   but I would not allow Dr. Johnson to testify that plaintiff's

23   assumption of ten hours of off-site work every week for every

24   class member is not a reasonable inference.  He can present --

25   I'm not saying all his charts, I haven't studied each one, but

I3SQROSc

1    the ones I looked at seemed fine so that the jury understands

2    how the choice of ten plays out against the backdrop of the

3    other evidence and what the ramifications of choosing ten are

4    given what else they know about an individual's work week and

5    how they spent their time and how it proportionately is

6    measured with respect to the badge hours.

7              So what I would like counsel to do is go over

8    Dr. Johnson's report and hopefully meet and confer and resolve

9    the scope of his testimony that's appropriate.  If you need

10   more guidance from me, I'm happy to give it to you.  Of course

11   if there are disputes, I will resolve those

12             MR. LAMPE:  Can I have more guidance?  I understood

13   what you were saying until the point at which you said that

14   Dr. Johnson would not be able to opine that the ten number is

15   not a reasonable inference.  It sounds like everything that's

16   involved in his exploration would be a predicate for him to say

17   ten is not a reasonable number in light of the data and the

18   analysis.  So I apologize, but I don't understand where the

19   Court is drawing the line.

20             THE COURT:  I don't think he is an expert with respect

21   to that issue.  I think he is very helpful -- this is way below

22   his pay grade, but an accountant, a calculator, a human

23   calculator.  Counsel can argue from this data what they wish in

24   summation, but his expertise is not in deciding whether the

25   number of off-site hours worked claimed here is reasonable or

1    not.  His pulling together data can be very helpful.

2            MR. LAMPE:  I understand.  Thank you very much.

3            One other point.  Dr. Johnson relied on that ten

4    number.  All of the analysis was based on that ten number, all

5    the charts, all the math.  If Mr. Getman were to change that

6    number tomorrow, that could create a very significant burden

7    and prejudice for us because then we'd have to redo that

8    report.  And I guess we don't have this issue yet, but you will

9    certainly be hearing from us if there is a change in that

10   number in some way that would require us to redoing the

11   analysis at this very late stage.  We have been frustrated at

12   the lack of disclosure.  We finally got some red meat.  We dug

13   into the ten hours.  If that is going to change on us now, that

14   will create a lot of burden and prejudice for us.

15           THE COURT:  OK.  Good.  I just think about these young

16   college grads working at Bloomberg here in Manhattan, and what

17   they are doing with their evenings.  I'm sure everyone here has

18   thought long and hard about that too.

19           OK.  That brings us to the plaintiff's motion to

20   exclude Bloomberg's evidence of salary, benefits and damages.

21   I'm going to deny that motion.  I think it is highly relevant

22   for the jury in terms of assessing what kinds of work they were

23   performing and whether it was exempt or non-exempt.  And to the

24   extent that the plaintiff feels there's prejudice because

25   people were well compensated, I'm happy for them to submit a

I3SQROSc

1    curative instruction or limiting instruction to address that

2    more directly.  It's also highly relevant to any

3    cross-examination and motive evidence.  It's hard, I think, to

4    think about how to understand any witness' testimony about

5    their job without being able to explore those issues.

6           That brings us to the defendant's notice of motion to

7    exclude various plaintiff's witnesses and exhibits.

8           Wait a minute.  Yes, this is another one.

9           OK.  This is the March 16 one.  Good.  My staff made a

10   request yesterday, and I know that plaintiff's counsel -- or

11   maybe it was the day before -- and I know defense counsel got

12   notice of that because we asked that any responsive material be

13   sent to us with a cc. to defense counsel, and plaintiff's

14   counsel was happy to do that.

15          But there were references in this set of motion papers

16   to materials I did not have.  I did not have the Russo

17   declaration, which was submitted some time ago, actually years

18   ago.  And we searched for those files, and we were not able to

19   retrieve them from my predecessor's files.  It's a

20   September 22, 2016 declaration from Michael Russo.  I

21   understand that it was the intent at that time that it be filed

22   under seal, but our clerk of court does not have this document

23   under seal.

24          So I am planning to file this under seal now -- I have

25   a copy now -- so that it will be part of the record in this

I3SQROSc

1    case without independently deciding whether it should have been

2    sealed at that time or not.  I'm just trying to recreate the

3    record as it was.  Without objection.  Everybody is nodding.

4             MR. GETMAN:  That's fine, your Honor.

5             MS. CHASE:  No objection, your Honor.

6             THE COURT:  Good.  And the other thing we got, and I

7    guess I now understand why I didn't have it, was because it

8    wasn't ready, was -- I wanted a couple pages of the 1006

9    summary, so I could understand precisely what was the subject

10   of this motion practice.

11            And so I understand from the cover letter that this

12   chart is still being prepared.  Yes, I got this March 27, and

13   so I'm treating it as a draft, but it helps me understand what

14   the plaintiffs are hoping to do.  And they are creating an

15   extensive summary of evidence which they want to present to the

16   jury under Federal Rule of Evidence of 1006, that just lists of

17   the question asked by the customer through the chat system at

18   Bloomberg, and these are the questions asked of certain class

19   members.  I understand there will be testifying class members,

20   I expect, but at least identified class members.  So just for a

21   few of the class members.

22            So I have defendant's motion to exclude testimony from

23   three support staff at plaintiff's law firm who were involved

24   in the preparation of 1006.

25            I have a motion to exclude testimony taken from

I3SQROSc

1    Bloomberg 30(b)(6) witnesses in the Jackson and Siegel case,

2    which the plaintiff seeks to offer as relevant to one of the

3    issues or two of the issues the jury will have to decide here,

4    a method of calculating wages which we referred to as FWW and

5    the out-of-office work time.

6          We have a dispute with respect to whether certain

7    depositions can be admitted into evidence because of the

8    hundred mile rule.

9          We have testimony reflected in the Russo declaration,

10   which I understand would not be received through a declaration

11   but, rather, in court testimony.  So let me give you my rulings

12   there.

13         So the plaintiff has explained that the four witnesses

14   are either beyond the one hundred mile limit, and they've given

15   me and the defendant an affidavit with respect to the four that

16   describe a health situation.  So having had those

17   representations made, is the defendant still requiring

18   in-person trial testimony from those four witnesses.

19         MS. CHASE:  No, your Honor.  That was the

20   clarification we attempted to get from them in advance of this

21   ruling and now we have it.

22         Just to be clear, the other piece we were attempting

23   to get was that the remaining six deponents, those depositions

24   would not come into evidence as depositions unless something

25   came out in trial, maybe they became unavailable and couldn't

I3SQROSc

1    come in to court because of some medical or some other

2    emergency.

3              THE COURT:  Good.  So it looks to me like the 1006

4    summary just listing the various questions asked of analytics

5    representatives is admissible.  Of course, the plaintiff is

6    required to identify the admissible evidence that is summarized

7    through the chart; and if is any disagreement about that,

8    counsel should meet and confer.  If there is any inaccuracy in

9    the summary, they should meet and confer.

10             I should tell you that I didn't know we actually

11   needed the client names in the summary, but I leave that to you

12   to talk about because I don't think it's really relevant.

13             MS. CHASE:  Two issues on that, your Honor.  We

14   actually have been meeting and conferring with respect to the

15   names of the individual employees.  The reason that we,

16   Bloomberg, feels the names of the clients are relevant is that

17   plaintiff's counsel has taken the position is that many of the

18   exchanges an analytics rep has are that Bloomberg terminal

19   users are students or professor, whereas in reality the vast

20   majority of the Bloomberg terminal users are finance

21   professionals.  And, therefore, the fact that the Bloomberg

22   user is an employee at Goldman Sachs or at Credit Suisse is in

23   fact relevant to that disputed point.

24             What we don't believe is relevant is the name of the

25   individual employee at that company and we have been meeting

I3SQROSc

1   and conferring about the prospect of redacting the name of the

2   employee of the organization.  Plaintiff's counsel has

3   indicated that they do want to have some reflection of the name

4   of the individual, and while we have not concluded meeting and

5   conferring, what we have been discussing is keeping the first

6   name, but not last name for purposes of privacy of employees.

7   So we are working on that.

8           THE COURT:  Good.  Or initials.  M period, S period,

9   something.

10          MS. CHASE:  Something.

11          With respect to the this issue of the first question,

12  I do want to note, your Honor, with respect to Rule 1006

13  summary, to the extent that it is purported to be a reflection

14  on all chats involving the custodian at issue, the exhibits

15  that plaintiffs identified in -- so, during the joint pretrial

16  preparation process, we raised concerns about the scope of the

17  Rule 1006 summary because it did not identify the source, and

18  potentially the source was over 50,000 pages of chats.

19          In response to our motions in limine in their

20  opposition for the first time we became aware that they were

21  now narrowing the scope.  It is still over 10,000 pages.  It is

22  not a subset of chats, that is from any that we can discern

23  based upon a criteria such as time frame or otherwise for each

24  of the custodians that we have been able to identify in the

25  past 24 hours has this issue of the list in the chats.  What we

1    have been able to identify it is a subset of chats, exchanges

2    between a Bloomberg plaintiff and a client where there are no

3    parameters that resulted in what gets included and what gets

4    excluded.  In addition, some of those chats are not in English.

5    Some of those chats appear to be between Bloomberg employees

6    and not customers.

7            The first question in the chat is often not the

8    question that gets answered.  I brought many chats to show you

9    if you are interested in guiding this topic.  Oftentimes the

10   question that the analytic rep answers doesn't come up until

11   two or three or four lines down in the exchange.  So we are

12   concerned with respect to this Rule 1006 summary, which we saw

13   for the first time, and it was our understanding it was a draft

14   when it was submitted yesterday that this is being offered for

15   some purpose or suggestion due to the type of questions being

16   asked, it is not a fairly representative document of what the

17   questions are.  If you just look at the first question.  So we

18   continue to have concerns about the representative the accuracy

19   of the summaries, your Honor.

20           THE COURT:  So who is for the plaintiff's group in

21   charge of this one.

22           MR. GUERRA:  I am, your Honor.  I will pick it up

23   here.  Two quick comments.  First, on the first question, our

24   approach to this summary has been formed by multiple, I believe

25   dozens of similar exercises that Bloomberg has gone through to

I3SQROSc

1     understand the types of inquiries that come into the help desk.

2                So we will introduce evidence as well to support the

3     summary.  We will introduce documents where Bloomberg has done

4     the same exercise of pulling what Bloomberg calls the first

5     inquiry.  In many instances, the first inquiry is just a

6     question mark of an impatient person wanting to get someone at

7     the help desk quickly.  And in those instances we're going

8     through this work in progress, we're going down the line in the

9     process to pull that person.  So what we're doing here is what

10    Bloomberg itself does on an ongoing basis to understand the

11    type of inquiries coming into the help desk and to provide

12    better customer experience to the terminal users.

13               Second, on the redactions issue that, Ms. Chase just

14    discussed, our understanding is we had an agreement to use the

15    first name of the terminal user.  We will be prejudice if the

16    name altogether was redacted or just --

17               THE COURT:  First name is fine with me.

18               MR. GUERRA:  Thank you, your Honor.

19               THE COURT:  What about the parameters?  Which chats

20    did you choose?

21               MR. GUERRA:  We chose chats to HelpOne@Bloomberg.com,

22    which is the identifying email address that comes up when a

23    customer hits the help key twice on their terminal to access

24    the help desk, which is the primary way customers access the

25    help desk.  And this is the entire universe of Help One chats

I3SQROSc

1    provided for the cases.  There is nothing else.  There are

2    about 10,000 transcripts.

3              THE COURT:  So, you included every such inquiry?

4              MR. GUERRA:  In our source data for the summary, we

5    included every inquiry that defendants provided to us.  They

6    provided to us millions of rows of data that excluded from that

7    data production the customer inquiries.  They only provided

8    those customer inquiries for a subset of the class pursuant to

9    a keyword search.

10             MS. CHASE:  With respect to that, during the

11   prediscovery process, there were months of negotiations over

12   ESI protocol, and there was an agreement reached as to how the

13   chat would be produced.  They were produced on a custodian

14   basis and they were produced pursuant to search terms.  At no

15   point in time was there ever any misunderstanding that all

16   chats that had -- an opt-in member was included in this group

17   ever touched as part of production.  There was an extensive

18   search term list.  It was heavily negotiated.  The vast

19   majority of terms on that list were identified by plaintiff's

20   counsel and that resulted in the production, and they were

21   produced in the manner in which they were maintained.  So there

22   was no efforts to hide the chats among production as has been

23   suggested by plaintiff's counsel.

24             In response to the comment, we've only had 24 hours

25   with this Rule 1006 summary, but in our less than 24 hours with

I3SQROSc

1      the document, we have identified that within that list there

2      are exchanges with in employees that don't involve customer

3      exchanges.  We have identified exchanges that are not in

4      English.  We have also identified that there appears to be

5      about a thousand chats exchanged between Bloomberg analytics

6      rep employee and a customer that for one reason or another were

7      excluded from this sample deck.

8                 THE COURT:  Well, there's an issue, a threshold issue

9      of whether 1006 is reliable and therefore admissible.  But

10     there is also, even if it is admissible an ability to

11     cross-examine to whoever is responsible for putting it together

12     and presenting it to the jury.

13                So, good.  Thank you.  Did I understand correctly that

14     the data contained in the Russo declaration is going to be the

15     subject of in-person testimony at the trial testimony?

16                MR. GUERRA:  Yes, your Honor.

17                THE COURT:  Yes.  OK.  The request to strike the

18     deposition itself is moot.

19                MS. CHASE:  Your, Honor just to be clear, your Honor,

20     we made that request because it was in fact on Plaintiff's

21     Exhibit list.

22                THE COURT:  Good.  Thank you.

23                The next motion is the plaintiff's motion --

24                MS. CHASE:  Your Honor, with respect to the other

25     topics in that motion, did you want to address them?  I know

I3SQROSc

that you mentioned earlier in the day that one of the topics

you wanted to cover at the end was the issue with respect to

trial witnesses, so I expect that that has been addressed or

can be addressed later.  There was also the issue of deposition

testimony from other cases.

THE COURT:  Thank you.  The three support staff may

testify -- I don't know if we need all three of them -- with

respect to their preparation and the parameters of what is

reflected in 1006.  It needs an exhibit -- it needs a witness

to introduce the exhibit and explain to the jury what the

exhibit is intended to reflect.  So I know there are three

witnesses that were listed there as potentially witnesses to

support 1006.  We certainly need testimony to support 1006.

With respect to the 30(b)(6) testimony, it is relevant

on the showing of these papers, and what we need from the

parties is a specific page and line designation so if there is

a dispute with respect to particular lines and passages,

obviously that is something that I will address if necessary.

But testimony from Bloomberg would come in as admissible

testimony when offered by the plaintiff on issues relevant to

this trial.

MS. CHASE:  Your Honor, if I may, our motion with

respect to this topic was not seeking to exclude 30(b)(6)

testimony, but seeking to exclude the written objections that

Bloomberg filed in connection with that deposition which is an

I3SQROSc

1    exhibit that is on Plaintiff's Exhibit list which we believe is

2    in argued and not proper evidence.  Plaintiff has argued in

3    response to our motion they believe this should be seen by the

4    jury that this is literally the written objections to the scope

5    of the testimony and the subject matter of the testimony that

6    we filed when they noticed the 30(b)(6) witness.

7              THE COURT:  Thank you.  I did not understand that.

8              Counsel.

9              MR. GETMAN:  On that, your Honor, that is merely

10   background.  I would certainly hope we don't have to go into

11   whether the 30(b)(6) witness was speaking on behalf of

12   Bloomberg.  As long as that's not disputed, then the scope of

13   the designation and the designation by Bloomberg won't need to

14   come in.  Then we'll be introducing Bloomberg's testimony

15   before the jury, no problem.  But that's there as background if

16   needed.

17             THE COURT:  Normally a jury would not see the

18   objections or commentary by counsel.  They would only see the

19   testimony of the company representative.  So I will let counsel

20   discuss this with each other.

21             MS. CHASE:  Thank you.

22             THE COURT:  And I think that covers --

23             MS. CHASE:  The only other topic, there were the

24   depositions from other lawsuits, your Honor.  There were

25   depositions referenced in that motion of various individuals in

I3SQROSc

1    prior litigation that are -- it seems to be offered for the

2    sake of establishing willfulness and establishing that there

3    was prior litigation.  For example, Kate Wheatley is a senior

4    student resource executive.  She is scheduled to testify live

5    in this matter.  She was also deposed as a 30(b)(6) live in

6    this matter, but her deposition testimony from a prior

7    litigation has been designated by plaintiff's counsel as

8    deposition testimony that they intend to read into the record

9    in this case.

10              It seems to me the entire purpose of this is to

11   demonstrate to the jury that there was another prior litigation

12   where Ms. Wheatley testified.  Obviously, she testified

13   inconsistently with prior testimony.  We are not suggesting

14   that that couldn't be used for rebuttal purposes.  But to have

15   it read to the jury as part of plaintiff's case in chief as

16   they are also seeing to do with other witnesses from other

17   litigations seems to me solely related to the issue of trying

18   to establish willfulness to the jury, your Honor.

19              THE COURT:  Let me step back and talk more generally.

20   This was on my list to cover things more generally on this

21   conference with counsel.

22              I expect each witness who will testify will only be on

23   the stand once.  Does everyone agree with that?

24              MS. CHASE:  Yes, your Honor.

25              THE COURT:  Good.  No objection.  And some of our

I3SQROSc

1    witnesses will have been deposed already.  So I think it is

2    helpful if we can reach the following agreement:  With respect

3    to a witness at trial who has previously been deposed, you will

4    not separately offer their deposition testimony.  You may use

5    it to impeach them, but you are not going to offer separately

6    their deposition testimony.  So the jury, when it deliberates,

7    will, for instance, know what Mr. Russo said at trial, won't

8    have a separate document or separate testimony to consider

9    where his prior deposition was read when he wasn't on the

10   stand.  If it's read as part of the impeachment of Mr. Russo

11   while he's on the stand, great.

12           Is that agreeable with counsel?

13           MS. CHASE:  Absolutely, your Honor.

14           MR. GETMAN:  Absolutely.

15           THE COURT:  Good.  Then that brings us to witnesses

16   who will not be testifying at trial, and whether their

17   depositions can be received.  And for those witnesses,

18   obviously, you need to identify page and line designations and

19   counter designations and figure out whether you are objecting

20   earth on the ground of completeness or something else,

21   competency, whatever, hearsay and meet and confer with respect

22   to any such objections, and I will resolve any disputes that

23   remain after that meet and confer process.

24           So with those grounds rules, Ms. Chase, are you

25   concerned about a particular deponents then who is a defense

I3SQROSc

1    witness?

2            MS. CHASE:  Your Honor, it's not the defense

3    witnesses -- you addressed one them, who is Kate Wheatley, and

4    she will testify live, so you've addressed that issue.

5            The issue is that there are plaintiffs from other

6    litigations, litigations you referred to earlier regarding GCUS

7    and GTEC, that have given testimony in those cases, and the

8    fact of their testimony in a prior case if it comes in will

9    reflect nothing more than the fact that there was a prior

10   litigation involving wage and hour claims.

11           So, particularly because plaintiff's counsel has --

12   it's unclear to us if these people are all going to testify

13   live.  Perhaps this will be addressed as we move forward in

14   time -- as we get closer to trial, but there is sort of this

15   concern about plaintiffs from prior lawsuits and their

16   testimony of prior lawsuits being unduly prejudicial because

17   the reasonable conclusion a juror will draw is that if there

18   was a prior deposition, this person must have been involved in

19   prior lawsuit involving wage and hour claims, your Honor.

20           THE COURT:  Mr. Getman, are you calling any witnesses

21   current or former Bloomberg employees who worked in positions

22   other than positions of analytics representatives where they

23   won't be testifying live?

24           MR. GETMAN:  I wasn't aware of that.  I'm not sure

25   what Ms. Chase is referring to.  Neither does anyone else on my

I3SQROSc

1    team.

2             MS. CHASE:  I think it's the fact that many of their

3    witnesses on their witness list are identified as live or

4    deposition so it's not clear to us whether or not those

5    individuals from the prior litigation are going to be live

6    testimony or if they were offering deposition.

7             THE COURT:  Well, inquire of each other, thank you.

8    Obviously, if they're within a hundred miles, they would have

9    to be here and testify live.  Good.

10            I have a motion of March 16, plaintiff's motion

11   regarding resumés and social media profiles.  The issue of what

12   was the primary duty of an analytics representative is an issue

13   for the jury to decide.  My prior class certification ruling

14   did not take this issue from the jury.  The plaintiff's own

15   descriptions on their resumés or on their social media,

16   conversations or websites, however they describe themselves

17   over the internet are admissible as admissions of a party

18   opponent.  But there is law here that I plan to instruct the

19   jury about, and I don't think that law is in dispute, and both

20   sides relied on it in their papers to me.  What an employee

21   describes as their job is quite different than what the jury

22   will have to decide a primary duty was, but that evidence is

23   admissible.

24            And that may take us to the last motion in limine, a

25   motion filed March 16.  It's the plaintiff's motion to exclude

I3SQROSc

1   Bloomberg's evidence of incomplete remote access logs to work

2   systems.  I believe in their responsive papers, the defendant

3   agrees that it will only use evidence or questions with respect

4   to -- and I think this principally concerns use of a mobile

5   device -- to impeach a witness if their direct testimony

6   contradicts what the evidence is.

7           You know, this is a little hard for me to understand,

8   I went back and read the November 13 conference transcript.

9   There are a variety of ways in which, as I understand it, an

10  employee could have remote access while off-site to the

11  Bloomberg computer system, and I dealt with a discovery dispute

12  in November of last year, and I looked at the November 13

13  transcript, about one type of remote access, and that was

14  access through a mobile device.  It had not been produced; that

15  is, to the extent which there was -- Bloomberg had access to

16  records, that had not been produced.  I made my rulings based

17  on the record before me and for the reasons stated on that

18  record.

19          But one of the interesting things that I learned at

20  that time is that while there might be in Bloomberg's archives

21  evidence of when you login, there would be no evidence of when

22  you logged out if you were logging in with a mobile device.

23          So I don't know if I have sufficiently resolved this

24  issue or actually if the defendant's response to the motion

25  sufficiently resolved this issue.

I3SQROSc

1          Mr. Getman, do you have the guidance you need on that

2     motion?

3          MR. GETMAN:  Well, I'm sorry, I'm not sure if I'm

4     understanding your Honor's ruling.  I'm not sure if that's me

5     or who.  I mean, I understood the ruling in the November

6     conference that we were not going to be able to receive and the

7     defendant would not be able use the data from the mobile access

8     and the tablet access.  Our concern on the incomplete remote

9     logs is with respect to computer logins that the defendant has

10    charted those and there is hard data that they plan to use of

11    that very limited subset.

12         THE COURT:  So this is a computer login, you are

13    distinguishing that from the mobile login.

14         MR. GETMAN:  They didn't make that distention.  It

15    records it in a different database or a different column of the

16    same database or whatever form.

17         THE COURT:  So I'm just going to share my

18    understanding.  All of these are computers.  My little iPhone

19    is a very powerful computer.  So terminology is important that

20    we're talking about the same language here.

21         There are desktops.  There are iPads.  There are

22    iPhones, to just use just Apple terms.  Through those various

23    kinds of equipment, each of which is a computer, you can

24    theoretically get access into a network.  And Bloomberg's

25    network has been described to me as a VPN, a virtual private

I3SQROSc

1    network, or you can get access into the Bloomberg access

2    terminal.  So telling me that the computer login information

3    exists, I don't know exactly what is meant by that.

4            MS. YOST:  Your Honor, may I clarify?

5            THE COURT:  Yes.

6            MS. YOST:  Thank you, your Honor.

7            So there are three different types of data sets at

8    issue here.  There is VPN login data can only be done on a

9    computer.

10           THE COURT:  What type of computer?

11           MS. YOST:  A desktop or laptop, let's say.

12           THE COURT:  Not a mobile device.

13           MS. YOST:  Not a mobile device, not an iPhone, not an

14   iPad.  It can only be done on the computer.

15           THE COURT:  Please don't say computer.

16           MS. YOST:  I apologize, your Honor.

17           THE COURT:  It can only be done by--

18           MS. YOST:  Let's say a laptop or a desktop.

19           A complete record of VPN data for all class members

20   was produced in this case.

21           THE COURT:  Login/logout.

22           MS. YOST:  Login/logout.  It has a duration.

23           Separately data was produced called terminal login

24   data, which states either that something was a login remotely

25   or on the actual Bloomberg terminal.  There is a field in the

I3SQROSc

1    data that identifies whether it was a remote login or a login

2    at your actual Bloomberg terminal at your desk.

3              To the extent that someone logs in using a V-unit,

4    which is a little device like a fob that allows you to then

5    login to the terminal remotely, that time that you login, is

6    going to be recorded in the terminal login data that was

7    produced.

8              The two ways someone could login on a laptop or a

9    desktop are either using that V-unit to login on the internet,

10   which would be reflected in our terminal login data that we

11   produced or by using VPN, which again, is reflected in the VPN

12   data that we produced.

13             The terminal login data, to the extent someone uses

14   their V-unit to login to a mobile device would theoretically

15   include that as well.  We certainly acknowledge that there are

16   other ways that someone could login to a mobile device with an

17   iPhone or an iPad.  That data has not been produced.  We are

18   not planning to use any of that data to suggest that what we've

19   produced is a complete record of that type of mobile login

20   usage.

21             But to clarify a little bit further what we plan to

22   use this data for.

23             THE COURT:  What is it for?

24             MS. YOST:  The login data that shows what you can --

25   the remote login data that shows what you can login to on the

I3SQROSc

desktop or the laptop, which is the terminal login data and VPN

data.  There are certain things that only can be done on a

desktop or a laptop and cannot be done on a Bloomberg mobile

app.  For example, after you login to the system where the

class member is take chat, that can only be done on a laptop or

desktop.  It cannot be done on a Bloomberg mobile app.

Updating tickets, which are the back end data behind the actual

chats with customers can only be done on a laptop or desktop.

It cannot be done on a mobile device.

          So to the extent that a plaintiff in this case

testifies about work that they did remotely, they talk about

actually logging on to the system to take chats at night

outside the office.  To the extent they talk about updating

tickets at night at home outside the office, those are things

that can only be done on a laptop and desktop, and we certainly

should be entitled to use that data, which is complete data,

showing when someone logged into a laptop or desktop remotely

to impeach that testimony about what work they did on the

desktop or laptop remotely.

          THE COURT:  Thank you.

          MR. GUERRA:  Your Honor, might I just clarify

something?  I think -- if I could direct the Court's attention

to page 3 of our motion, document number 412, where we cite

deposition testimony from deposition of Mr. Leyfman, I think

this gets to the core of the issue.  Mr. Leyfman had been

I3SQROSc

1  testifying up to this point about off-the-cuff work, working

2  remotely.

3          Then he was asked would it surprise you if you only

4  logged on to the Bloomberg system through VPN nine times during

5  your entire tenure at Bloomberg?"

6          And he testified, "This would surprise me because I

7  checked everything on my phone.  Everyday I check it.  It would

8  not surprise me if you mean through my home computer, nine

9  times, once a month that makes sense."

10         What we have here is once you log on through the

11 Bloomberg edit-ware application on your tabled, on your iPad or

12 your mobile device, or your computer accessing the Bloomberg

13 edit-ware application through the mobile application, those

14 data points were not provided to us.  And we have somebody who

15 is being impeached or cross-examined on nine logins as opposed

16 to hundreds of daily logins that will only have existed through

17 the mobile application data.  That data is not provided.  That

18 is why we think it is highly misleading to rely only on a

19 subset of incomplete data points when young recent college

20 graduates don't have any idea what a home computer is any

21 more..  Everybody uses a laptop.  Everybody uses an phone for

22 work.

23         MS. CHASE:  Your Honor --

24         THE COURT:  Well, I am not going to exclude questions

25 about the amount of time off-site that employees spent

I3SQROSc

1       accessing the VPN.  The jury needs that data.  It needs it to

2       understand realistically how much time was spent on off-site

3       work.  The fact that we don't have reliable data about off-site

4       work is something I know counsel are going to somehow explain

5       to the jury.  And so long as the questioning is clear, so that

6       a question about using, for instance, the laptop to access the

7       VPN, you only did that X number of times over the course of a

8       year, whatever.  I don't think there is any problem for

9       confusion.

10                 MR. GETMAN:  May I ask, your Honor?

11                 THE COURT:  Yes.

12                 MR. GETMAN:  May I ask your Honor if your Honor

13      would -- I mean, as you may recall at that November conference,

14      when we addressed the issue, it hadn't been on the Court's

15      binder -- you had said to us at that point that you thought you

16      had ruled on all the motions we had made up to that point, and

17      I agree we've given you a lot of motions between the two, and

18      the full reading of the papers hadn't happened at the time of

19      the rulings.  Can we go back -- I mean, we always expected to

20      prove this case as much through those logins we expected to get

21      them.  We never got them.  They may not show duration but they

22      show frequency.

23                 THE COURT:  We are not revisiting this, Mr. Getman.

24                 MR. GETMAN:  That was the question.

25                 THE COURT:  OK.  As I remember, there was a retrieval

 1   issue and the cost and burden of the issue, the fact that it

 2   wouldn't show length of access, duration, I should say, was an

 3   issue, and also the whole history of the discovery rulings in

 4   the case.  So we're moving forward.  Moving forward.

 5           Good.  Counsel, with your help, I am going to try and

 6   make sure the jury has a fair and accurate understanding of

 7   each of these things.  So place your questions with care so

 8   that they're not misleading, but if the jury is getting

 9   confused, you can ask for a curative instruction because if you

10   think the other side has done something that is misleading or

11   unfair that you can't cure through additional questions of the

12   witness, and I expect usually you will be able to, you could

13   make an application to me.

14           Let's talk, the hour is getting late, about some

15   general things.  I think I ruled about all the motions in

16   limine.  Now is the time to identify our witnesses.  So I have

17   the joint pretrial order on the bottom of page 8.  We are just

18   going to quickly go through these, and I want the plaintiff to

19   identify whether they're calling the witness or not.

20           Saven.

21           MR. GETMAN:  Yes, your Honor.

22           THE COURT:  Yeulett.

23           MR. GETMAN:  Yes, your Honor.

24           THE COURT:  Hannawacker.

25           MR. GETMAN:  Yes.  We were just advised that

I3SQROSc

1    Ms. Hannawacker may not be available.  We do have her

2    deposition testimony.  I haven't had a chance to -- it sounded

3    like she may not be available an we may have to have some other

4    means, whether it's taking testimony remotely.  I guess that's

5    a question that I would like to ask your Honor.

6              THE COURT:  We are not going to take testimony

7    remotely.

8              MR. GETMAN:  In which case, if there is some showing

9    that she is unavailable, then we would do that by deposition.

10             THE COURT:  Coleman.

11             MR. GETMAN:  Yes, your Honor.

12             THE COURT:  Wheatley.

13             MR. GETMAN:  Yes, your Honor.

14             THE COURT:  Asman.

15             MR. GETMAN:  Yes.

16             THE COURT:  Golden.

17             MR. GETMAN:  Yes.

18             THE COURT:  Rios.

19             MR. GETMAN:  Briefly.

20             THE COURT:  That's a yes?

21             MR. GETMAN:  Yes.

22             THE COURT:  Agopian.

23             MR. GETMAN:  We would, your Honor.

24             THE COURT:  Tahmoush.

25             MR. GETMAN:  Also briefly.

I3SQROSc

1          MS. CHASE:  I'm sorry.  I didn't hear.  Were the last

2    two yes?

3          THE COURT:  Yes.  The word yes will help.

4          Roseman.

5          MR. GETMAN:  Yes.

6          THE COURT:  Van Vleet.

7          MR. GETMAN:  Yes.

8          THE COURT:  Lee.

9          MR. GETMAN:  Yes, those are the three named

10   plaintiffs.

11         THE COURT:  Betesh.

12         MR. GETMAN:  Yes, your Honor.

13         THE COURT:  Cavallaro.

14         MR. GETMAN:  Yes.

15         THE COURT:  Shah.

16         MR. GETMAN:  No.

17         THE COURT:  Held.

18         MR. GETMAN:  Yes.

19         THE COURT:  Johnson.

20         MR. GETMAN:  No.

21         THE COURT:  Litchford.

22         MR. GETMAN:  Yes.

23         THE COURT:  Leyfman.

24         MR. GETMAN:  We believe so, your Honor.

25         THE COURT:  That also's a yes.

I3SQROSc

1          Lownes.

2          MR. GETMAN:  Yes, by deposition.

3          THE COURT:  Well, you're going to read the deposition

4   to the jury.

5          MR. GETMAN:  Your Honor, we do have some video for the

6   plaintiffs.  The defendant arranged to take their depositions

7   by video, and we would anticipate using that means as well.

8          THE COURT:  Great.  Great.  Just make sure your

9   designations and everything is all lined up.  Great.

10          Krieger

11          MR. GETMAN:  Again, by deposition video.

12          THE COURT:  Psulkowski.

13          MR. GETMAN:  That's a yes.

14          THE COURT:  Renny.

15          MR. GETMAN:  By video deposition.

16          THE COURT:  White.

17          MR. GETMAN:  That's a no.

18          THE COURT:  Coldwell.

19          MR. GETMAN:  Your Honor, a slight uncertainty.  Can we

20   answer that question by tomorrow?

21          THE COURT:  Yes.

22          Alvira

23          MR. GETMAN:  The same, by tomorrow.

24          THE COURT:  Question mark.

25          Kandel.

I3SQROSc

| | |
|---|---|
| 1 | MR. GETMAN:  That is support staff in my office, |
| 2 | lead-in person. |
| 3 | THE COURT:  That's a yes. |
| 4 | MR. GETMAN:  That's a yes.  That's the three that your |
| 5 | Honor identified previously, Jason Kandel, Julia Friday and |
| 6 | Michael Russo. |
| 7 | THE COURT:  They are all yes. |
| 8 | MR. GETMAN:  They are all yes, and we expect to -- |
| 9 | THE COURT:  Do you plan to call them? |
| 10 | MR. GETMAN:  We plan to call them. |
| 11 | THE COURT:  All three? |
| 12 | MR. GETMAN:  Yes. |
| 13 | THE COURT:  Then we go to the defendant's list. |
| 14 | And Saven is no. |
| 15 | MS. CHASE:  It is yes. |
| 16 | THE COURT:  Saven is on the plaintiff's case. |
| 17 | MS. CHASE:  We also -- I mean, he will -- he's one of |
| 18 | our witnesses as well.  If they didn't call him, we would still |
| 19 | call him. |
| 20 | THE COURT:  OK. |
| 21 | Montgomery. |
| 22 | MS. CHASE:  Yes. |
| 23 | THE COURT:  Yeulett. |
| 24 | MS. CHASE:  Yes. |
| 25 | THE COURT:  Hannawacker. |

I3SQROSc

1          MS. CHASE:  Yes, with the caveat that she is currently

2     on medical leave, and if not able to return, we will not be

3     able to have testimony.

4          THE COURT:  Harris.

5          MS. CHASE:  Yes.

6          THE COURT:  Cohen.

7          MS. CHASE:  Yes.

8          THE COURT:  Coleman.

9          MS. CHASE:  Yes.

10          THE COURT:  Gordon.

11          MS. CHASE:  Yes.

12          THE COURT:  DeMartino.

13          MS. CHASE:  Yes.

14          THE COURT:  Kate.

15          MS. CHASE:  Kate Wheatley, yes.

16          THE COURT:  Braun.

17          MS. CHASE:  Shireen Braun, which is B-R-A-U-N.  No.

18          THE COURT:  Johnson.

19          MS. CHASE:  Yes.

20          THE COURT:  Held.

21          MS. CHASE:  With respect to Held, we have designated

22     deposition testimony and so you are reaching a stretch where

23     it's by deposition.  Of course we would cross-examine at the

24     end of being live.  We didn't know at which point these were

25     preparing so if he's live, we'll cross-examine him.  If he's

I3SQROSc

1    not live, we have deposition testimony designated.

2              THE COURT:  Johnson.

3              MS. CHASE:  The same for Johnson.  If he's live, we'll

4    cross-examine him.  If not, we have deposition testimony.

5              THE COURT:  Krieger.

6              MS. CHASE:  Same for Krieger.  If live, we will

7    cross-examine.  If not, we will do deposition testimony.

8              THE COURT:  Lee.

9              MS. CHASE:  Same for Lee.  If he's live, we will

10   cross-examine him.  If not, we have deposition testimony.

11             THE COURT:  Leyfman.

12             MS. CHASE:  Same for Mr. Leyfman.  If he is live, we

13   will cross-examine him.  If not, we've designated deposition

14   testimony.

15             THE COURT:  Is it the same for the following.  Lownes,

16   Psulkowski, Renny, Roseman, Van Vleet.

17             MS. CHASE:  Not for Ms. Lownes and Renny.  We've been

18   informed already by Mr. Getman that in response to our motion

19   in limine that those two individuals will not be live.  We know

20   those two will be by deposition designation.

21             THE COURT:  Salzman.

22             MS. CHASE:  For Mr. Salzman is yes.

23             THE COURT:  McGonigle.

24             MS. CHASE:  Yes.

25             THE COURT:  Ayer.

I3SQROSc

1          MS. CHASE:  Yes.

2          THE COURT:  Green.

3          MS. CHASE:  No.

4          THE COURT:  Cardinal.

5          MS. CHASE:  Yes.

6          THE COURT:  Mora.

7          MS. CHASE:  Yes.

8          THE COURT:  Krizek.

9          MS. CHASE:  No.

10         THE COURT:  Williamson.

11         MS. CHASE:  No.

12         THE COURT:  Schorr.

13         MS. CHASE:  Yes.  Though I will note with respect to

14    Mr. Schorr, and I had raised this issue with the plaintiff's

15    counsel.  Mr. Schorr as well as the next witness, Mr. Shalen,

16    will be available as needed to lay the foundation for various

17    data sets.  We have proposed to plaintiff's counsel if they

18    would withdraw their exhibits to the admissibility of these

19    data sets such as payroll and badge data and other data sources

20    which all happen to be on their Exhibit lists, we don't need to

21    use our court time calling the witness in for laying foundation

22    for that evidence.

23         As we stand, coming into court today, they had not

24    agreed to do so and therefore they still remain on our witness

25    list.  We are hopeful we can reach agreement on that topic so

I3SQROSc

1   we don't have to duplicate data sets.

2            THE COURT:  I saw you reached a set of stipulations

3   I'm sure you'll talk further about stipulations.  And probably

4   it will be easier having some hopefully having some relief

5   today.  When are you making your final deposition designations

6   or have you done that.

7            MR. GETMAN:  I believe both sides are complete with

8   that.

9            THE COURT:  Have you done your counter-designations?

10           MR. GETMAN:  We have.

11           MS. CHASE:  Yes, your Honor.  They were submitted as

12   part of the joint pretrial order.

13           THE COURT:  But are they final?

14           MS. CHASE:  They are final.  What I will say is that

15   clarification we received in the past few days about who would

16   be available by deposition and who will be live will result in

17   some of those individuals no longer coming into evidence as

18   deposition designation.  Therefore, I would expect the entire

19   individual's deposition will no longer be read into evidence.

20           So to the extent that whether your Honor is asking us

21   is should we prepare another submission of deposition

22   designations that only include those individuals that are not

23   expected to be available live we can certainly do that.

24           THE COURT:  Have you finished the meet and confer

25   process with respect to objections?

I3SQROSc

1          MS. CHASE:  I believe we have.

2          MR. GETMAN:  Yes, we have.

3          THE COURT:  Do I have hard copy of all the depositions

4   that you are planning to read?

5          MR. GETMAN:  I don't believe we've given them to your

6   Honor.

7          THE COURT:  This is what I would like.  For me to rule

8   on depositions, I would like for those parties whose

9   depositions you would like to read to the jury or present

10  through video one copy of the deposition marked to show who is

11  offering what, whether it's the plaintiffs offering a portion

12  of the deposition testimony or the defendant.  Usually, it's

13  best by color coding.  And then in the margin the objection on

14  which you wish me to rule.  So I can look at one document, read

15  everything in context and give you rulings.

16          If there are lots of objections and this is a

17  voluminous task, I'm going to ask you to highlight two or three

18  objections that I can look at with care and then apply the

19  rulings for the rest of the deposition.  If you only have two

20  or three objections, happy to look at those.  If you have 200,

21  then highlight the critical objections you need me to rule on,

22  a handful, I will do that, and then you will apply that across

23  the board.

24          MS. CHASE:  Thank you, your Honor.  It's somewhere 200

25  and 2, but we will try to limit it and present the set to you.

1          THE COURT:  Great.  And because you have to, you know,

2     cut the video, I think you should meet and confer and get me

3     these submissions no later than next Friday, does that make

4     sense, the 6th, April 6th?

5          MS. CHASE:  Yes, your Honor.

6          THE COURT:  OK.  Good.

7          The plaintiff must have their witnesses available and

8     ready to fill a trial day.  If you don't, you're deemed to have

9     rested.  The same thing goes for the defendant.  I'm going to

10    give you time limits for summations.

11         There are really only three questions that the jury

12    has to decide here.  One is what was the primary task of an

13    analytics representative.  One has to do with the number,

14    average number of off-site work hours.  And another has do the

15    calculation of the overtime, whether or not the FWW method can

16    be applied.

17         So I'm going to limit you also on summation.  You have

18    20, however, a side with respect to your presentation of

19    evidence.  The clock is running against you whenever you're on

20    your feet in front of the jury other than summation time.  So

21    it's running against you during opening, during direct, during

22    cross-examination.

23         I am happy to keep the clock if you want me to keep

24    the clock.  Both my law clerk and I keep the clock and we are

25    sort of a check on each other, but I am happy to have counsel

1    choose some other person, paralegal, two paralegals, whatever

2    but how I do it if I do it, and counsel often ask me to do it,

3    is I give you the running time at the end of each day so you

4    know where you are.  We should roughly get at least six hours

5    of testimony in a day when we sit a full day.

6        I am going to change the break and lunch times.  We

7    are only going to take an hour for lunch.  We will have a small

8    jury, so we will take about ten minutes for a morning break and

9    an afternoon break.  I have some structural issues here with

10   respect to the schedule, so I need to bring this in on time to

11   move to my next tasks, but I think we can.

12        We are having jury selection the morning of April 12,

13   so we will have a jury in place.  I am thinking of having eight

14   jurors.  As you know, there are no alternates in a federal

15   civil jury trial.  So everyone who is sitting at the time of

16   deliberations will be able to -- everyone who is here at the

17   beginning of deliberations will be able to deliberate.  I think

18   eight is enough in what is roughly a two-week trial, but I

19   would like your agreement.  If for some reason we lose more

20   than two jurors, we can take a verdict a unanimous verdict from

21   whoever is left, so we just do this trial once.

22        MR. GETMAN:  That's acceptable to plaintiffs, your

23   Honor.

24        THE COURT:  Acceptable to the defendants?

25        MS. CHASE:  Yes, it's acceptable, your Honor.

1          THE COURT:  Thank you.  Much appreciated.

2          In terms of summations we will do three summations:

3     Plaintiff, defendant, plaintiff.  So if you get an hour apiece,

4     the plaintiff can decide how much to reserve for rebuttal.  But

5     it shouldn't be more than ten or 15 minutes.  This is not ten

6     minutes and then 50 minutes.  The defendant needs to know, and

7     obviously there are no surprises here, what you are going to

8     argue.  So rebuttal should be a fair rebuttal.

9          MS. CHASE:  Is your Honor setting one hour now or is

10    that an open issue still?

11         THE COURT:  I think I'm setting it.

12         MS. CHASE:  And for opening as well?

13         THE COURT:  No, that comes out of your 20 hours.

14         MS. CHASE:  Out of the 20.

15         THE COURT:  Now, you know I'm horrified by the number

16    of witnesses you're calling.  Horrified.  I think this case can

17    be tried with many, many, many fewer witnesses, but I am very

18    fortunate in this case to have sophisticated, experienced,

19    excellent counsel, so I leave this for your judgment entirely,

20    and the time limits will help you make good choices.

21         Mr. Getman, are there issues that would be helpful for

22    me to address today that we haven't touched upon?

23         MR. SKWRAO:  Yes, your Honor.  I had some questions

24    about how your Honor conducts voir dire and to what extent we

25    might participate or not in that process.

1          THE COURT:  You may absolutely participate in the way

2     that you have by presenting your requested voir dire questions.

3          MR. GETMAN:  And should we take it those are the

4     questions or will your Honor advise us at some point

5     beforehand.

6          THE COURT:  I do a written voir dire.  I've read both

7     sides requested voir dire questions because I wondered if there

8     was anything I was uncertain about, I wanted to be sure I could

9     ask you about it at this conference, but nothing struck me.

10          So there is no stock ownership issue here, Ms. Chase,

11     right?

12          MS. CHASE:  I'm sorry, your Honor?  I didn't follow

13     that.

14          THE COURT:  Bloomberg is a limited partnership.

15          MS. CHASE:  Correct.  Correct.

16          THE COURT:  Great.  So what I do is I have a written

17     voir dire.  Everybody is given a copy of it as they walk into

18     the jury room.  I give my initial instructions.  We will call

19     14 potential jurors to fill the jury box.  I will go through

20     each of the questions with Juror No. 1.

21          Excuse me one second.

22          (Pause)

23          THE COURT:  I believe you've already received a

24     written description of my voir dire process.  I think it went

25     out with the March 20 scheduling order.

I3SQROSc

1          After I go through each individual question with the

2     first juror, for subsequent potential jurors, I just ask do you

3     have a yes answer to any of those questions, and then there's a

4     page of individual questions.

5          You each have three peremptory strikes.  Before you

6     exercise those, I will make sure that there are no additional

7     objections for cause or no additional questions to ask the

8     venire.  But you will make simultaneous strikes, and we will be

9     left with your jury.

10          So we should have a jury at morning, I hope, so we

11     would start with opening statements.  Or actually not.  I

12     haven't thought about this.  I will give my preliminary

13     instructions on that Thursday when we choose the jury or wait

14     until Monday morning.  I will give that some more thought.

15          Ms. Chase, did you have any questions?

16          MS. CHASE:  I do, your Honor.  Just one.  You had

17     eleven items on our list and you covered the other ten of

18     things we wanted to get clarified.  As it stands presently with

19     respect to the filing of the joint pretrial order, every item

20     on Defendant's Exhibit list has an objection from plaintiff's

21     counsel.  We had raised and hoped to narrow some of that in

22     advance, but wanted some clarification from your Honor about

23     how you want objections to exhibits being raised, and it seems

24     like there is a significant number of them that plaintiff's

25     counsel have.

1          THE COURT:  Certainly.  If there is an authenticity

2     objection, I want counsel to flag that immediately.  I should

3     have ruled on authenticity problems today.  If you still have

4     any, we need to rule on those sooner rather than later.

5          With respect to other objections, obviously now that

6     you have my rulings on the motions in limine, hopefully you

7     will be able to figure out which objections you're going to

8     withdraw, so can I ask Mr. Getman for a revised list being

9     provided to -- well, I will put this on both sides.  How about

10    revised exhibit lists with revisions to objections you really

11    care about and they should be only the objections you really

12    plan to meet and confer about and if necessary raise with me,

13    can we say on Monday?  Does that make sense?

14          MS. CHASE:  By this Monday, your Honor?

15          THE COURT:  Yes.

16          MS. CHASE:  I think that's fine.  The only concern I

17    have somewhat is the holiday issue.  I don't know if that

18    creates issues for people.

19          THE COURT:  Oh, very good point.  Why don't the two of

20    you Mr. Getman and Ms. Chase just confer about a schedule right

21    now with each other just quietly, and we will put one on that

22    meets everybody's needs.  Good point.

23          (Pause)

24          THE COURT:  Mr. Getman, do you have an agreement?

25          MR. GETMAN:  We do, we will take your Honor's rulings

I3SQROSc

1   of today, apply them to the exhibit lists that we've previously

2   given each other, we will then have hopefully a significantly

3   narrowed list of exhibits which we will exchange to each other

4   on Tuesday.

5                MS. CHASE:  April 3.

6                MR. GETMAN:   April 3.  Then we will provide objections

7   to each other by the Thursday thereafter, which I guess would

8   be the 5th.

9                MS. CHASE:  Thank you, your Honor.  That is agreed.

10               THE COURT:  Perfect.  Perfect.  Anything else to raise

11  while we are on the record?

12               MS. CHASE:  Just one clarification.  We did cover it

13  earlier.  We discussed the fact that there were various

14  redactions that may be made to exhibits.  Do you need to see

15  any of that in advance?  The parties agree and redact, we can

16  mark it and come forward.

17               THE COURT:  Perfect.  You know, I should mention --

18  and I know every judge is different about this.  In my

19  courtroom, we don't rise for the jury.  They come in and go

20  out; we just stay seated.

21               Also, you don't need to request permission to leave

22  the podium to show an exhibit to a witness.  Just make clear

23  for the record what you're doing.  "Let me show you Exhibit 23.

24  Is that your signature at the bottom of the document?"  Boom.

25  You don't need to ask my permission to approach.

I3SQROSc

1          MS. CHASE:  Is it not your Honor's practice to have

2     exhibit binders with the witnesses?  I've seen many judges do

3     have premarked binders and you direct witnesses to a certain

4     tab.  We've done it at many trials I've had, but every judge

5     has different preferences on that.

6          THE COURT:  It's fine with me if you use binders.

7     It's more often than not these days people are using screens,

8     but I'm happy for you to use a binder.  Anyway you want to do

9     it.

10         MS. CHASE:  OK.  One other topic your Honor when do

11    you anticipate a charging conference or when will we at least

12    get your preliminary instructions?

13         THE COURT:  It will be before summations.

14         MS. CHASE:  The charge conference.

15         THE COURT:  Yes.

16         MS. CHASE:  Will we see your preliminary instructions

17    in advance of opening at all?

18         THE COURT:  No.

19         MR. GETMAN:  Your Honor, we have a number of

20    plaintiffs.  We want to know if there are any sequestration

21    rule with respect to plaintiffs or parties here or do they have

22    a right to be present?

23         THE COURT:  So the normal rules with respect to

24    sequestration is that parties and experts are not sequestered.

25    Everyone else is.  Counsel can agree to some other system or

I3SQROSc

1   make an application to me for some other rule to apply, but

2   that's the ordinary rule.  And when I say a party, it would

3   mean also a corporate representative of the defendant's

4   choosing could sit at counsel table for the whole trial whether

5   they are a witness or not.

6           MS. CHASE:  Does your Honor consider all of the

7   plaintiffs parties for that purpose.

8           THE COURT:  Good point.  I think it is named

9   plaintiffs.  Hmm.

10          MR. GETMAN:  I would point out --

11          THE COURT:  I don't think it's class members.  I think

12  we're going to sequester class members if they're not named

13  plaintiffs.

14          MS. CHASE:  What about opt in's for the FLSA case.

15          THE COURT:  Opt in's would not be sequestered they are

16  bringing their own lawsuit.

17          MS. CHASE:  Thank you.

18          MR. GETMAN:  A couple of very practical issues.  Can

19  we leave equipment and/or materials in the courtroom overnight

20  or how does that work?

21          THE COURT:  That is why I have a fabulous deputy,

22  Ms. Rojas, with whom you are free to consult.

23          MR. GETMAN:  Terrific.  And I think I understood you

24  to suggest we would be behind a podium except to show an

25  exhibit or something like that or are we free to roam a bit

I3SQROSc

 1    otherwise?  Or does your Honor wish us to remain behind the

 2    podium.

 3            THE COURT:  When you're making your opening and

 4    summation arguments, you can stand anywhere you would like.

 5    When you're questioning a witness, I want you behind the

 6    podium.  You can wander behind the podium, but I don't want you

 7    wandering up to the witness.  So stay behind the podium.

 8    Anywhere back there is just fine with me.  But you can't get in

 9    front of the podium except to walk up and hand a document to

10    the witness if that's necessary.

11            MR. GETMAN:  With respect to objections as they come

12    up, would you like us just to say the word "objection" or any

13    explanation at all?

14            THE COURT:  Thank you very much.  No speaking

15    objections.  The word "objection" is enough.  If I have any

16    confusion about what might be the basis for an objection, I

17    will look at you and feel free to say "hearsay" or "lack of

18    foundation" or "competence" or something, but no speeches.

19            MR. GETMAN:  Very good.

20            MS. YOST:  A question about exhibits, your Honor.  We

21    anticipate that there might be some exhibits that are not

22    conducive to being printed out on paper.  I'm not sure if your

23    Honor wants those on a CD or a flash drive or if your Honor has

24    any preferences about those?

25            THE COURT:  You mean for me.

I3SQROSc

1        MS. YOST:  For you and I suppose for the jury as well.

2        THE COURT:  Well, the jury is not going to have

3   access -- oh, well, I suppose theoretically the jury could have

4   access to something on a flash drive during deliberations.  But

5   counsel coordinate with each other so you both have a chance to

6   inspect the laptop.  Make sure it's clean, and there is nothing

7   extraneous on the laptop.  And inspect the disk so it's clean

8   and there is nothing extraneous except, you know, the only

9   thing on the disk is the exhibit or maybe you've already loaded

10  the laptop.

11       But, generally speaking, I want all the exhibits to go

12  into the jury during their deliberations so they don't have to

13  ask for them.  If you have an exhibit list and both sides have

14  reviewed it, I will send it in as an aid so they can sift

15  through the exhibit sufficiently, but again, you both have to

16  approve it.  So I wouldn't want it to be an argumentative

17  document.  I don't need to see anything unless I need to rule

18  on it.  I like to look at the exhibit during the trial as the

19  jury is looking at them so I need copies, I would like to have

20  copies if the jury is being given copies.  If the jury is just

21  going to look at them on a screen, I can look at them on a

22  screen.

23       MS. YOST:  Thank you, your Honor.

24       MS. CHASE:  On that topic, your Honor, I need some

25  clarification of -- do you want -- there's nothing on your

1    individual practices that require us to give you a set of

2    exhibits in advance of trial.  If that's your preference, and

3    if so, how many sets.

4              THE COURT:  Well, the exhibits here are voluminous, so

5    I don't need a set of paper documents.  If you do create an

6    electronic digital set of documents, that would be great, but I

7    don't want you to do more work than you would otherwise do.  If

8    you're creating it for yourselves, I'd love a copy.

9              (Pause)

10             MR. GETMAN:  Is my understanding correct, your Honor,

11   that we would supply your Honor with a list of the technology

12   that we plan to bring that we will need internally for our own

13   use to be so ordered for the clerk to allow us to bring it in.

14   Is that how that works?

15             THE COURT:  You can consult with Ms. Rojas.  Yes,

16   there are forms and procedures that the Court uses, that the

17   Southern District uses.

18             MS. CHASE:  I just some more clarification, your

19   Honor, on the topic of exhibits.  You want everything

20   premarked.  Do you have a preference, letters, numbers?

21   There's nothing in the rules that states a preference.

22             THE COURT:  Everything should be premarked.  Whatever

23   system counsel think is best for the jury works for me.

24             MS. CHASE:  OK.  Thank you.

25             THE COURT:  Closing the record.   (Adjourned)